ACCEPTED
15-25-00082-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/4/2025 4:15 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00082-CV

## *In the Court of Appeals For the Fifteenth Judicial District Austin, Texas*

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/4/2025 4:15:52 PM
CHRISTOPHER A. PRINE
Clerk

_____

STATE OF TEXAS

APPELLANT,

V.

ARITY 875, LLC,

APPELLEE.

_____

*On Appeal from the 457th Judicial District Court, Montgomery County Trial Court Case No. 25-01-00561*

# BRIEF OF APPELLEE, ARITY 875, LLC

W. Reid Wittliff
Texas Bar No. 00791951
reid@wittliffcutter.com
**Wittliff | Cutter PLLC**
510 Baylor St.
Austin, Texas 78703
Telephone: (512) 960-4866
Facsimile: (512) 960-4869

Jake Sommer (*pro hac vice*)
jake@zwillgen.com
Kelsey Harclerode (*pro hac vice*)
kelsey@zwillgen.com
**ZwillGen PLLC**
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 296-3585

Sudhir V. Rao (*pro hac vice*)
sudhir.rao@zwillgen.com
**ZwillGen PLLC**
183 Madison Ave., Suite 1504
New York, NY 10016
Telephone: (646) 362-5590

ATTORNEYS FOR APPELLEE

# TABLE OF CONTENTS

ISSUE PRESENTED ..............................................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

INTRODUCTION .................................................................................................2

STATEMENT OF FACTS .....................................................................................4

    I.      Arity 875 Is A Data Analytics Company That Does Not Share
           Mobile Data with Insurers for Pricing or Underwriting
           Purposes. ..................................................................................................4

    II.     The FAP's Few Jurisdictional Allegations Are Irrelevant. ........................7

    III.    The State's Claims Challenge Alleged Omissions That
           Occurred Outside Texas. ..........................................................................9

    IV.    The Trial Court Granted Arity 875's Special Appearance After
           Striking the State's Untimely Affidavits. ................................................12

STANDARD OF REVIEW .................................................................................14

LEGAL STANDARD .........................................................................................15

SUMMARY OF ARGUMENT ...........................................................................17

ARGUMENT ......................................................................................................18

    I.      Arity 875 Has Not Purposefully Availed Itself of the Texas
           Forum. ....................................................................................................18

        A. That Two Mobile App Developers Allegedly Headquartered in
           Texas Incorporated the Arity SDK Into Their Apps Does Not
           Mean Arity 875 Has Contacts with Texas. .............................................20

        B. That Arity 875 Could Be Unilaterally Contacted at a Dallas PO
           Box Does Not Establish Specific Jurisdiction. ........................................24

C. That Texans Happened to Download and Use Apps That Incorporated the Arity SDK Does Not Mean Arity 875 Has Contacts with Texas. ..................................................25

D. That Third Parties Allegedly Targeted Advertisements to Texas Does Not Mean Arity 875 Has Contacts with Texas. ...........................32

E. *Volkswagen* and the Stream-of-Commerce-Plus Framework Are Inapposite..........................................................................................35

II. The State's Claims Are Not Substantially Connected to Arity 875's Purported Forum Contacts Because the Claims Challenge Out-of-State Conduct.......................................................................40

A. The TDPSA Claim Challenges Out-of-State Omissions. ........................42

B. The Date Broker Claim Challenges Out-of-State Omissions. .................51

C. The Insurance Code Claim Challenges Out-of-State Omissions. ............52

D. The State's Remaining Contrary Arguments Are Meritless. ...................54

III. Exercising Personal Jurisdiction Here Would Offend Traditional Notions of Fair Play and Substantial Justice. ........................56

PRAYER.........................................................................................................60

CERTIFICATE OF COMPLIANCE.................................................................62

CERTIFICATE OF SERVICE ........................................................................63

APPELLEE'S APPENDIX

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*AIKG, LLC v. CSP Consultants Grp., LLC*,
2022 WL 947197 (Tex. App.-San Antonio Mar. 30, 2022, no pet.) .................50

*Ajamie LLP v. Podesta Grp., Inc.*,
2020 WL 716734 (Tex. App.-Houston [1st Dist.] Feb. 13, 2020, no
pet.) ........................................................................................................................41

*Aldossari ex rel. Aldossari v. Ripp*,
49 F.4th 236 (3d Cir. 2022) ..................................................................................21

*Alves v. Goodyear Tire & Rubber Co.*,
683 F. Supp. 3d 111 (D. Mass. 2023)...................................................................29

*Anderson v. Bechtle*,
2001 WL 930205 (Tex. App.-Houston [1st Dist.] Aug. 16, 2001,
no pet.) ...................................................................................................................42

*Bristol-Myers Squibb Co. v. Superior Ct.*,
582 U.S. 255 (2017)......................................................................................56, 57

*Brocail v. Anderson*,
132 S.W.3d 552 (Tex. App.-Houston [14th Dist.] 2004, pet.
denied)....................................................................................................................42

*BRP-Rotax GmbH & Co. KG v. Shaik*,
2025 WL 1727903 (Tex. June 20, 2025)......................................27, 29, 34, 35

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).............................................................................................23

*Caerus Oil & Gas, LLC v. Terra Energy Partners*,
LLC, 2023 WL 2169495 (Tex. App.-Houston [1st Dist.] Feb. 23,
2023, no pet.) .........................................................................................................21

*Castelaz v. Estée Lauder Cos.*,
2024 WL 136872 (N.D. Ill. Jan. 10, 2024).........................................................25

*Chen v. Razberi Techs., Inc.*,
2022 WL 16757346 (Tex. App.-Dallas Nov. 8, 2022, pet. denied) .............41, 42

iii

*Choice Auto Brokers, Inc. v. Dawson*,
   274 S.W.3d 172 (Tex. App.-Houston [1st Dist.] 2008, no pet.)........................45

*Concord Energy, LLC v. VR4-Grizzly, LP*,
   2022 WL 17101034 (Tex. App.-Dallas Nov. 22, 2022, no pet.)......................41

*Conexiones Tornado S. de RL. de CV v. Ramirez de Munoz*,
   2024 WL 4262405 (Tex. App.-Dallas Sept. 23, 2024, no pet.).........................40

*Dalal v. Clearview AI, Inc.*,
   2025 WL 1726259 (D.N.J. May 1, 2025)...........................................................28

*Dalglish v. Royal Indem. Co.*,
   2006 WL 3334543 (Tex. App.-Beaumont Nov. 16, 2006, no pet.)...................57

*Dallas Cent. Appraisal Dist. v. Tech Data Corp.*,
   930 S.W.2d 119 (Tex. App.-Dallas 1996, writ denied).....................................35

*Facebook, Inc. v. Doe*,
   650 S.W.3d 748 (Tex. App.-Houston [14th Dist.] 2022, pet.
   denied)................................................................................................................34

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021)...........................................................................................40

*Fresh Coat, Inc. v. K-2, Inc.*,
   318 S.W.3d 893 (Tex. 2010) ..............................................................................35

*Gerdes v. Kennamer*,
   155 S.W.3d 523 (Tex. App.-Corpus Christi-Edinburg 2004, pet.
   denied)...................................................................................................7, 13, 60

*Google LLC v. State*,
   2025 WL 52611 (Tex. App.-Corpus Christi-Edinburg Jan. 9, 2025,
   pet. abated) .................................................................................15, 16, 46, 47, 48

*Gulf Coast Int'l, L.L.C. v. The Rsch. Corp. of the Univ. of Haw.*,
   490 S.W.3d 577 (Tex. App.-Houston [1st Dist.] 2016, pet. denied)............56, 59

*Hasson v. FullStory, Inc.*,
   114 F.4th 181 (3d Cir. 2024) .............................................................................31

*Hinduja Glob. Sol., Inc. v. Ganjaei*,
  2023 WL 179808 (Tex. App.-Dallas Jan. 13, 2023, pet. denied)........................42

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)...........................................................................................16

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ........................................................................29, 58

*Kelly v. Gen. Interior Constr., Inc.*,
  301 S.W.3d 653 (Tex. 2010) ....................................................................*passim*

*Key Management Group, LLC v. Meridian Hospital Systems Corp.*,
  2021 WL 1538237 (Tex. App.-Houston [14th Dist.] Apr. 20, 2021,
  no pet.) ................................................................................................................32

*Kinsale Ins. Co. v. Clearview Horizon, Inc.*,
  2022 WL 742718 (D. Idaho Mar. 11, 2022)........................................................25

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,
  647 F.3d 1218 (9th Cir. 2011) ............................................................................34

*McDonald v. Kiloo ApS*,
  385 F. Supp. 3d 1022 (N.D. Cal. 2019)..........................................................28, 49

*MDSave, Inc. v. Sesame Inc.*,
  2023 WL 353998 (W.D. Tex. Jan. 11, 2023) ......................................................30

*Mehta v. State ex rel. Ahmed*,
  2025 WL 1560037 (Tex. App. [15th Dist.] June 3, 2025, no pet.) ........14, 42, 44

*Michiana Easy Livin' Country, Inc. v. Holten*,
  168 S.W.3d 777 (Tex. 2005) .....................................................................15, 18, 22

*Micromedia v. Automated Broadcast Controls*,
  799 F.2d 230 (5th Cir. 1986) ........................................................................23, 24

*Moki Mac River Expeditions v. Drugg*,
  221 S.W.3d 569 (Tex. 2007) .........................................................15, 16, 34, 41

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
  414 S.W.3d 142 (Tex. 2013) ...............................................................................41

*NexPoint Advisors, L.P. v. United Dev. Funding IV*,
674 S.W.3d 437 (Tex. App.-Fort Worth 2023, two pets. denied)..........13, 51, 60

*Old Republic Nat'l Title Ins. Co. v. Bell*,
549 S.W.3d 550 (Tex. 2018) .................................................14, 22, 27, 33

*Rana Shipping Transp., Indus., & Trade, Ltd. v. Davey & Brogan,*
*P.C.*,
2023 WL 2582357 (Tex. App.-Dallas Mar. 21, 2023, no pet.)
(mem. op.).................................................................................60

*Searcy v. Parex Res., Inc.*,
496 S.W.3d 58 (Tex. 2016).................................................28, 32, 44, 55

*Spir Star AG v. Kimich*,
310 S.W.3d 868 (Tex. 2010) ...............................................................57

*State v. Volkswagen Aktiengesellschaft*,
669 S.W.3d 399 (Tex. 2023) .....................................................*passim*

*Steward Health Care Sys. LLC v. Saidara*,
633 S.W.3d 120 (Tex. App.-Dallas 2021, no pet.)..........................16, 21, 44, 54

*TravelJungle v. American Airlines, Inc.*,
212 S.W.3d 841 (Tex. App.-Forth Worth 2006, no pet.) ...........................30, 32

*TV Azteca v. Ruiz*,
490 S.W.3d 29 (Tex. 2016)..................................................................14

*UMG Recordings, Inc. v. Kurbanov*,
963 F.3d 348 (4th Cir. 2020) ..............................................................34

*Verizon California Inc. v. Douglas*,
2006 WL 490888 (Tex. App.-Houston [1st Dist.] Mar. 2, 2006, no
pet.) .....................................................................................24

*Walden v. Fiore*,
571 U.S. 277 (2014)........................................................................27

**Statutes**

Tex. Bus. & Com. Code Ann. § 509.005......................................................51, 52

vi

Tex. Bus. & Com. Code § 509.001 ..................................................................10

Tex. Bus. & Com. Code § 541.051(b)(5) .......................................................10

Tex. Bus. & Com. Code § 541.101(b)(4) ..................................................9, 43

Tex. Bus. & Com. Code § 541.102(a) .....................................................9, 10, 43

Tex. Bus. & Com. Code § 541.102(b) ...................................................10, 43

Tex. Bus. & Com. Code § 541.103 ......................................................10, 43

Tex. Civ. Prac. & Rem. Code Ann. § 17.042 ....................................................15

Tex. Ins. Code § 2251.103 ...............................................................................6

Tex. Ins. Code § 541.001 ...............................................................10, 52, 54

## Other Authorities

*Google LLC v. State*, Am. Br. of Appellee, 2023 WL 5672666 (Tex. App.-Corpus Christi Aug. 23, 2023) ............................................14, 47

*In re: Allstate & Arity Consumer Privacy Litigation*, No. 1:25-cv-00407, Corrected Consolidated Class Action Compl., Dkt. No. 46 (N.D. Ill. May 27, 2025) ...................................................................59

Tex. R. App. P. 38.1 .........................................................................................5

Tex. R. Civ. P. 120a .........................................................................12, 13, 15

U.S. Const. amend. XIV, § 1 .......................................................................16

## ISSUE PRESENTED

Whether Arity 875, LLC ("Arity 875"), a nonresident defendant, is subject to specific jurisdiction in Texas when it has no relevant contacts with Texas and the State's claims arise from and relate to alleged omissions that occurred, if at all, outside Texas.

## STATEMENT REGARDING ORAL ARGUMENT

Arity 875 respectfully submits that oral argument is unnecessary because settled principles foreclose the exercise of personal jurisdiction over Arity 875 here.

## INTRODUCTION

The State's theory of this case is built on assumptions and innuendo, not facts. On appeal, the State asserts, without citing any record evidence, that Arity 875, LLC ("Arity 875") sought to collect driving data specifically from Texans because Texas drivers are risky insureds and Texas allegedly represents "Allstate's" biggest market. So, the theory goes, Arity 875 shared Texans' driving data with unspecified "Allstate" insurance entities, unbeknownst to drivers, so that those insurers could use the data to manipulate Texans' insurance rates and coverage. *See* Br. 17-20.

Nonsense. The uncontroverted jurisdictional evidence, which the State blithely ignores, establishes that Arity 875 does not share individuals' driving data with *any* insurers for pricing or underwriting purposes—full stop. A wholly distinct Defendant, Arity Services, LLC, which has not contested personal jurisdiction, may share data with insurers but only after insurance customers consent and direct an insurer to request that data. As a result, Arity 875 does not decide *when* the data it possesses is *ever* used for insurance pricing or underwriting purposes: consumers do. The State's fanciful theory about why Arity 875 purportedly targets Texas drivers— to "secretly" share Texans' data with insurers so they can pad their bottom line— crumbles under the weight of the record.

That record, to be clear, is limited to the State's allegations in its First Amended Petition ("FAP") and the jurisdictional evidence Arity 875 submitted in

2

support of its Special Appearance. The trial court properly struck the State's untimely affidavits opposing Arity 875's Special Appearance. The State does not even mention, much less challenge, that ruling on appeal, so the State's affidavits (*see* Am. C.R. 316-32, 337-38; Supp. C.R. 127-43) are not properly before this Court. Instead, the State attempts to overcome its pleading deficiencies and missed deadlines by arguing based on "facts" completely absent from the FAP or record.

Setting aside the State's blatant attempt to amend the FAP on appeal, its doctrinal arguments are tortured, at best. Personal jurisdiction does not lie over Arity 875 for three simple reasons. *First*, Arity 875, a Delaware LLC with its principal place of business in Illinois, lacks any meaningful contacts with Texas. The forum contacts the State attempts to attribute to Arity 875 arise from nonparties' unilateral conduct or are otherwise legally insufficient. *Second*, the record evidence and the State's allegations establish that Arity 875's alleged failures to disclose and other purported omissions occurred outside Texas, if they have any geographic nexus at all. So, the State's claims do not arise from or relate to any Arity 875 contacts with the forum, as they must. *Third*, exercising jurisdiction over Arity 875 would offend principles of fair play and substantial justice, given that Arity 875 lacks any relevant Texas presence, the relevant documents and witnesses reside outside Texas, and Illinois is a superior and more efficient forum.

To resist these conclusions, the State made the same meritless arguments below as it does on appeal, and the trial court roundly rejected them.

This Court should do the same and affirm.

**STATEMENT OF FACTS**

Because the trial court did not issue specific findings of fact, this Court must construe the record favorably to the trial court's determination that it lacks jurisdiction over Arity 875. *See infra* p. 14.

In reciting the relevant facts, Arity 875 first describes its business. Next, it discusses the FAP's allegations that unsuccessfully attempt to link Arity 875 to Texas. Then, it describes the State's claims, which challenge out-of-state omissions. Finally, it describes the case's procedural history, including important aspects of which the State fails to mention.

**I.     Arity 875 Is A Data Analytics Company That Does Not Share Mobile Data with Insurers for Pricing or Underwriting Purposes.**

Arity 875 is not an insurance company: it does not promote, offer, sell, or administer insurance in Texas. *See* Am. C.R. 81, ¶ 4.[1] Arity 875 has no dealings with the Texas Department of Insurance ("TDI") or insurance ratemaking in Texas and does not collect any insurance premiums for policies provided to citizens of any state, including Texas. Am. C.R. 82, ¶¶ 6-7. Despite those facts, the State asserts,

---

[1] Arity 875's Sworn Special Appearance and Original Answer (Am. C.R. 56-83) is reproduced at Appellee's Appendix A-077-A-104. The FAP (Am. C.R. 205-235) is reproduced at A-041-A-071.

4

without citation, that Arity 875 "has committed" tortious "insurance practices" within Texas.  Br. 44.

Arity 875 is a mobility data and analytics company that develops and licenses a software development kit ("Arity SDK") to mobile application ("app") developers. *See* Am. C.R. 82, ¶ 8.  After the app developer integrates the SDK into their app, they can use it to collect data about app users' phone handling, driving, speeding, and braking (the "Mobile Data").  *Id.* ¶ 9.  Arity 875 requires its mobile app developer partners to warrant that they are lawfully disclosing Mobile Data to Arity 875 (*i.e.*, with app users' consent).  *Id.* ¶ 10.  Although the State baldly and repeatedly asserts that Arity 875 "install[s]" or "plac[es]" the Arity SDK on Texans' devices,[2] it does no such thing.  Mobile app developers incorporate the Arity SDK into their apps and use the Arity SDK to collect Mobile Data only if their end users voluntarily download the apps and then affirmatively choose to share location data with the app.  *See* Am. C.R. 82, ¶¶ 8-9; Am C.R. 215, ¶ 36 (State alleging that the Arity SDK is "installed in a mobile app"), Am. C.R. 216, ¶ 39 (State alleging that apps "integrated the Arity SDK" and that "an app user [must] allow[] the app to access their location information" to enable data collection through the SDK).

_____

[2] *See, e.g.*, Br. 13 (asserting, without citation, that Arity 875 "installed its software on Texans' hardware"); Br. 44 (asserting, without citation, that Arity 875 "plac[es] the Arity SDK on Texans' mobile phones").  *Cf. Contra* Tex. R. App. P. 38.1(g) ("The statement [of facts] must be supported by record references.").

Mobile app developers, not Arity 875, choose how to integrate the SDK into their apps, and some developers use the Mobile Data to support features within their apps, including crash detection. *See* Am. C.R. 90, ¶¶ 8-9.

Arity 875 does not disclose the Mobile Data to insurers to price or underwrite consumer insurance policies. *See* Am. C.R. 82, ¶ 11. *Contra* Br. 27 (falsely asserting, without record citation, that Arity 875 "sell[s]" information collected through the Arity SDK "to Texas insurers").[3] Rather, insights generated from the Mobile Data ("Mobile Data Insights") are only ever disclosed to insurers for such purposes **(i)** by a separate entity, Arity Services, LLC ("Arity Services") (which receives Mobile Data Insights from Arity 875 for limited purposes) and **(ii)** after a consumer voluntarily directs an insurer to use the Mobile Data Insights. *See* Am. C.R. 82, ¶ 11. As to insurers, the TDI not only knows about, but approves, the use of driving data in insurance rating decisions because the Commissioner of Insurance "shall disapprove" a rate filing "if the commissioner determines that the rate does not comply with the requirements of this chapter." Tex. Ins. Code § 2251.103(a).

---

[3] The State does not allege, because it cannot, that the two Allstate defendants (Allstate Insurance Company and Allstate Vehicle and Property Insurance Company) sell or issue any type of private passenger automobile insurance policy to Texas residents that makes use of telematics data. Nor has the State pointed to any record evidence to support that proposition.

## II.    The FAP's Few Jurisdictional Allegations Are Irrelevant.

The State's Original Petition lacked any jurisdictional allegations. It alleged in conclusory fashion that "[j]urisdiction is proper for the reasons described throughout this Petition, including because Defendants engaged in unlawful conduct targeting the data of Texans, profited from Texans' data, and harmed millions of Texas consumers through their actions." Am. C.R. 10, ¶ 13. The only other arguable jurisdictional allegation was that Arity 875 maintained a registered agent in Texas. Am. C.R. 12, ¶ 21.[4]

After Arity 875 entered its Special Appearance, the State amended its Original Petition. The State repeated its earlier allegations and added others in a failed attempt to allege a prima facie case of jurisdiction.

***First***, the State alleged that "GasBuddy and Fuel Rewards," two of the app developers that allegedly used the Arity SDK in their apps, "are headquartered in Dallas, Texas." Am. C.R. 216, ¶ 38. But the State did not allege that Arity 875 negotiated or entered contracts with either entity in Texas; that either app had Texas users; that, if so, that Arity 875 knew that; that Arity 875 contracted with either entity

---

[4] On appeal, the State does not argue that jurisdiction exists based on Arity 875's registered agent. *See generally* Br. Nor did it meaningfully argue that point in the trial court. *See generally* Am. C.R. 240-256. Accordingly, the State has waived any such argument. *See, e.g., Gerdes v. Kennamer*, 155 S.W.3d 523, 533-34 (Tex. App.-Corpus Christi-Edinburg 2004, pet. denied).

to target Texas drivers specifically; or that the contracts were to be performed in Texas. Nor does the State specifically challenge the contracts' terms.

***Second***, the FAP alleged that Arity 875's privacy statement invited consumers, "regardless of [their] state of residence," to contact Arity 875 with questions or concerns about its privacy practices at a PO Box in Dallas, Texas. Am. C.R. 211, ¶ 22. But the FAP otherwise makes no reference to this PO Box. The State does not allege that Arity 875 maintained the PO Box; that any correspondence, including from Texas residents, was sent to the PO Box; or that Arity 875 answered any correspondence sent in Texas. Nor does the State assert any claims related to Arity 875's handling of any inquiries sent to the PO Box.

***Third***, the FAP marginally expanded on allegations about the "Arity Defendants'" marketing services, alleging, in substance, that the "Arity Defendants" enabled *others* to target ads based on users' driving behavior. The FAP alleged that the "Arity Defendants" "let companies, including [i]nsurers" target drivers based on "risk, mileage, [and] commuting habits." Am. C.R. 218, ¶ 43(c). Similarly, it alleged that "[t]he Arity Defendants or their customers could reach 'millions of validated drivers, segmented by driving behavior' to display ads and promotions." *Id.* Finally, it alleged on information and belief that "the Arity Defendants could and did display ads to the Texas users of apps that agreed to integrate the Arity SDK." *Id.* But the FAP did not allege that Arity 875 itself advertised to Texas app

8

users. *Contra* Br. 44 (State asserting, without citation, that "Arity 875 advertises to Texans"). And even for ads *other entities* may have published, the FAP did not allege those ads targeted Texas users specifically (instead of, for example, reaching Texans incidentally through national campaigns).

### III. The State's Claims Challenge Alleged Omissions That Occurred Outside Texas.

The State spills much ink purporting to describe the collection of Mobile Data through third-party mobile apps that Arity 875 does not operate and that app users voluntarily install. *See, e.g.*, Br. 16-17, 36. But specific jurisdiction exists over a defendant only if liability arises from or relates to the defendant's forum contacts. *See infra* pp. 40-41. Here, the State's claims arise from or relate to alleged omissions that occurred, if at all, outside Texas.

The State alleges three claims against Arity 875, but none imposes liability merely for collecting data. The first claim, under the Texas Data Privacy and Security Act ("TDPSA"), alleges five violations. Each challenges a failure to disclose information or obtain consent:

1. **Violation 1 - Section 541.102(a)(1)**: alleged failure to provide a "reasonably accessible and clear privacy notice" indicating the sensitive data Arity 875 allegedly processed as a controller of that data. Am. C.R. 224-25, ¶¶ 63-66.

2. **Violation 2 - Section 541.101(b)(4)**: alleged failure to obtain consumers' consent before processing their allegedly "sensitive data." Am. C.R. 225-26, ¶¶ 67-70.

9

3. **Violation 3 - Section 541.102(b)**: alleged failure to include a statutorily required notice if a "controller" engages in the sale of "sensitive data." Am. C.R. 226-27, ¶¶ 71-75.

4. **Violation 4 - Section 541.103**: alleged failure to "provide any disclosure" regarding Arity 875's alleged sales of personal data, targeted advertising practices, or a method to opt out of either. Am. C.R. 227-28, ¶¶ 76-78.

5. **Violation 5 - Sections 541.102(a)(3) and 541.051(b)(5)**: alleged failure to provide a "reasonably accessible and clear privacy notice" describing how consumers may exercise their consumer rights under the TDPSA. Am. C.R. 228-29, ¶¶ 79-85.

In its second claim, under the Texas Data Broker Law, Tex. Bus. & Com. Code §§ 509.001 *et seq.* (the "Data Broker claim"), the State alleges that the "Arity Defendants," including apparently Arity 875, were required to, but did not, register with the Texas Secretary of State's office as data brokers. *See* Am. C.R. 230-31, ¶¶ 86-91.

Finally, the State asserts a claim for Unfair Methods of Competition and Unfair or Deceptive Acts or Practices in the Business of Insurance, Tex. Ins. Code §§ 541.001 *et seq.* (the "Insurance Code claim"). Lumping all defendants together, the State alleges that they failed to verify consumers' consent before purchasing driving-related data from vehicle manufacturers; turned a "blind eye" to the "strong possibility" that consumers did not consent to the collection and sale of their sensitive and/or non-anonymized data to insurers; used allegedly unlawfully obtained data for defendants' own car insurance underwriting processes; and

10

marketed and advertised the data to insurers as "driving behavior" data. *See* Am. C.R. 231-32, ¶¶ 92-96.[5]

In short, all three claims purport to impose liability for alleged omissions— the failure to disclose information to consumers, obtain consumer consent before allegedly processing certain data, and register as a data broker in Texas. But the State does not allege that any of those purported omissions "occurred" in Texas or relate to any purported contacts Arity 875 has with Texas.

If the alleged omissions have any geographic nexus, it is outside Texas. The unrefuted evidence—which the State fails to acknowledge—establishes that decision-making concerning Arity 875's policies with respect to Mobile Data and Mobile Data Insights occurs outside of Texas. *See* Am. C.R. 83, ¶ 14. Moreover, Arity 875, a Delaware LLC with its principal place of business in Illinois, has no employees or offices in Texas. Am. C.R. 81, 83, ¶¶ 3, 17-18. It also does not have a telephone listing in Texas or maintain or possess any bank accounts in the state. *Id.* at 83, ¶¶ 15-16. Not least, Arity 875's development and licensing of the SDK is not specifically directed towards Texas, and none of the Arity 875 teams involved in those activities is based in Texas. *Id.* ¶ 13.

---

[5] In its brief, the State cites only the first two of these allegations as to Arity 875. Br. 22. The State thus appears to concede that Arity 875, which is not an insurance company, could not have used any data for its "own car underwriting processes" and that the allegation that certain "defendants" marketed data to insurers is irrelevant to the State's theory of jurisdiction as to Arity 875. Am. C.R. 232, ¶ 95.

**IV.** **The Trial Court Granted Arity 875's Special Appearance After Striking the State's Untimely Affidavits.**

On January 13, 2025, the State filed its Original Petition. *See* Am. C.R. 6-51. On February 19, 2025, Arity 875 timely filed a sworn Special Appearance contesting personal jurisdiction. *See* Tex. R. Civ. P. 120a; Am. C.R. 56-83. Subject to that Special Appearance, Arity 875 answered the State's Original Petition.[6]

On February 26, 2025, Arity 875 filed a notice setting its Special Appearance "for a submission hearing on April 4, 2025, at 9:00 a.m." Am. C.R. 109. The notice advised "[a]ll parties" to "timely file any responses or objections in accordance with the Texas Rules of Civil Procedure and the local rules of this Court." *See id.* 109-110. Under Rule 120a(3), the State needed to file any affidavits opposing the Special Appearance "at least seven days before the hearing," so by March 28, 2025.

March 28 came and went, and the State filed no affidavits. Then, on April 2, in apparent response to Arity 875's Special Appearance, the State amended its Original Petition. *See* Am. C.R. 205-35. The next morning, less than 24 hours before the hearing date, the State filed affidavits and a brief opposing Arity 875's

---

[6] The State falsely asserts that Arity 875 argued below it "was ***only*** subject to personal jurisdiction in Illinois." Br. 22 (emphasis added). Arity 875 said no such thing. It merely pointed out it was subject to jurisdiction in Illinois and that Illinois is a superior forum to Texas because Arity 875 is already defending lawsuits alleging materially similar theories of liability there. *See* Am. C.R. 71-72.

Special Appearance.[7]  *See* Am. C.R. 240-342.  The State did not explain its delay but requested a continuance so that it could take jurisdictional discovery.  *See* Am. C.R. 256.  Later that day, Arity 875 moved to strike the affidavits as untimely, also noting that Rule 120a barred the State's request for a continuance.  *See* Am. C.R. 343-46.

In response, the State conceded that "Arity 875 [is] correct that the State's affidavits were untimely."  Am. C.R. 379.  Although the State argued the affidavits should be considered anyway, it ultimately claimed the affidavits were immaterial, arguing that "[e]ven if this Court chooses to strike the State's Affidavits . . . it should still deny the Special Appearance[]."  Am. C.R. 380.

On April 10, 2025, the trial court granted Arity 875's Special Appearance and dismissed Arity 875.  *See* Am. C.R. 415.  The court also struck the State's affidavits as untimely and declined to consider them.[8]  But the Court considered Arity 875's motion, the State's "response[]," which relied heavily on the allegations in the FAP,

---

[7] The State falsely implies it opposed Arity 875's Special Appearance and then "***further responded*** by amending its petition."  Br. 23 (emphasis added).  In fact, the State first amended its Original Petition, then filed its opposition—precisely so that it could oppose the Special Appearance based on the FAP's new allegations.

[8] In keeping with its pattern of obfuscation, the State's brief does not even reference the trial court's decision to strike the State's affidavits.  Nor does the State challenge that ruling on appeal, thus waiving it.  *See, e.g.*, *Gerdes*, 155 S.W.3d at 534; *NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 446-47 (Tex. App.-Fort Worth 2023, two pets. denied).  Accordingly, the State's affidavits in opposition to Arity 875's Special Appearance (*see* Am. C.R. 316-32, 337-38; Supp. C.R. 127-43) are not properly before this Court.

and the "arguments of the parties." *Id.* The Court did not issue written factual findings or conclusions of law.

## STANDARD OF REVIEW

Whether a court has personal jurisdiction over a defendant is a question of law this Court reviews de novo, "although the court may have to resolve questions of fact." *Mehta v. State ex rel. Ahmed*, 2025 WL 1560037, at *3 (Tex. App. [15th Dist.] June 3, 2025, no pet.). When the trial court does not issue fact findings and conclusions of law, as here, the Court is "obligated to view the record favorably to the trial court's jurisdictional rulings"—a point the State fails to mention. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 427-28 (Tex. 2023).[9] If the parties challenge the trial court's implied findings for factual sufficiency, *i.e.*, if the parties "present conflicting evidence that raises a fact issue," this Court "will resolve the dispute by upholding the trial court's determination." *Mehta*, 2025 WL 1560037, at *3 (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016)). Where relevant facts are undisputed, the question is simply whether they establish jurisdiction. *See id.* (citing *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018)).

---

[9] In a personal jurisdiction appeal in which the State initially prevailed in trial court, the State emphasized in its appellate brief, citing *Volkswagen*, that "[b]ecause no findings of fact were issued, the Court is obligated to view the record favorably to the trial court's jurisdictional rulings." Am. Br. of Appellee, *Google LLC v. State*, 2023 WL 5672666, at *18 (Tex. App.-Corpus Christi Aug. 23, 2023) (cleaned up). Here, having lost in the trial court, the State apparently preferred to omit that uncontroversial proposition from its opening brief.

14

## LEGAL STANDARD

The Court shall determine a special appearance based on "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3).

Texas courts may assert personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Google LLC v. State*, 2025 WL 52611, at *1 (Tex. App.-Corpus Christi-Edinburg Jan. 9, 2025, pet. abated) (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). Because the Texas long-arm statute extends jurisdiction as far as the federal constitution permits, the statute's requirements are met if the exercise of jurisdiction "comports with federal due process limitations." *Id.* (citation omitted); Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The opposite is not true: a plaintiff's allegations might "satisfy the Texas Long–Arm Statute, but not necessarily the U.S. Constitution." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788 (Tex. 2005).

Under the federal Due Process Clause, personal jurisdiction is proper when a "nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and

15

substantial justice.'" *Moki Mac*, 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); U.S. Const. amend. XIV, § 1.

Minimum contacts can give rise to either general or specific jurisdiction. *See Google*, 2025 WL 52611, at *2. Here, the State does not argue Arity 875 is subject to general jurisdiction, only specific jurisdiction. Specific jurisdiction lies when the defendant has purposefully availed itself of the forum and the claims arise from or relate to the defendant's forum contacts. *See id.* Purposeful availment and relatedness are "co-equal components" of the analysis, and the Court may begin with either. *Id.* at *5-6.

The parties bear shifting burdens of proof in a personal jurisdiction challenge. First, the plaintiff must plead sufficient allegations to satisfy Texas's long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). If the plaintiff fails to do so, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Id.* at 659. If the plaintiff carries its initial burden, the defendant then must "negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* at 658. But that burden "is tied to the allegations in the plaintiff's pleading," *id.*, meaning that a defendant need not "negate jurisdictional allegations appearing only in the response to the special appearance," *Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 129 (Tex. App.-Dallas 2021, no pet.).

16

A defendant may negate jurisdiction factually or legally. That is, the defendant may show it lacks the alleged contacts with Texas or that jurisdiction does not lie even if the plaintiff's allegations are true. *See Kelly*, 301 S.W.3d at 659.

## SUMMARY OF ARGUMENT

This Court lacks jurisdiction over Arity 875 for three independent reasons.

*First*, Arity 875 did not purposefully avail itself of the Texas forum. Its principal place of business is outside Texas. It has no employees, offices, or bank accounts in the State, and neither its services nor its development or licensing of its SDK are specifically targeted to Texas. *See* Am. C.R. 82-83.

The purported Texas contacts the State tries to attribute to Arity 875 do not move the needle. The State alleges Arity 875 contracted with two mobile app developers headquartered in Texas. But it is well settled that merely contracting with a forum resident is insufficient to establish personal jurisdiction. The State also claims Arity 875 collects data about Texans through an SDK that mobile app developers choose to integrate into apps that Texans choose to download. But personal jurisdiction cannot lie based on nonparties' unilateral conduct. For the same reason, that Arity 875 allegedly enables unspecified nonparties to advertise to Texans does not establish that Arity 875 *itself* has contacts with Texas.

*Second*, the State's claims do not relate to any contacts Arity 875 may have with Texas. The claims instead concern alleged omissions and corporate policy

17

decisions—to not provide certain disclosures, obtain certain consents, or register with a unit of Texas government. To the extent those alleged omissions can be linked with any forum, it is not Texas, as the trial court necessarily concluded.

*Third*, traditional notions of fair play and substantial justice cut sharply against jurisdiction. Arity 875 lacks relevant contacts with Texas and would need to litigate this case away from the key witnesses and evidence. And interstate federalism interests point to Illinois as a superior and more efficient forum.

## ARGUMENT

### I.    Arity 875 Has Not Purposefully Availed Itself of the Texas Forum.

Because the State has disclaimed any reliance on a directed-a-tort theory of specific jurisdiction (Br. 43-44), specific jurisdiction exists only if Arity 875 (not any other entity) has contacts with Texas (not Texas residents) that, in turn, give rise or relate to the State's claims. Arity 875 lacks any such contacts.

Three principles guide the purposeful availment analysis: **(i)** the defendant's forum contacts matter—not the plaintiff's or any other party's; **(ii)** the defendant's contacts must be "purposeful," not "random, isolated or fortuitous"; and **(iii)** the defendant must seek some "benefit, advantage, or profit" by "availing itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785.

Here, Arity 875 has no relevant contacts with Texas. Arity 875 has no meaningful physical presence in Texas. It does not own, lease, or otherwise maintain

18

real property in Texas, including office space, does not have a telephone listing in Texas, and does not maintain or possess any bank account in Texas. *See* Am. C.R. 83, ¶¶ 15-16, 18. Other potentially relevant conduct also occurs outside Texas. The development and licensing of the Arity SDK are not specifically directed towards Texas, and the teams involved in those activities are also not based in Texas. *See id.* ¶ 13. Likewise, decision-making concerning Arity 875's policies with respect to Mobile Data and Mobile Data Insights occurs outside of Texas, which is hardly surprising, given that Arity 875 has no employees in Texas. *See id.* ¶¶ 14, 17. And, as discussed below (p. 42), none of the challenged omissions or failures to disclose here "occurred" in Texas.

Against this backdrop, the State attempts to assert jurisdiction over Arity 875 primarily based on other entities' Texas contacts, contrary to longstanding U.S. Supreme Court and Texas Supreme Court precedent. The State also errs in relying heavily on *Volkswagen*, a decision that is distinguishable several times over.

A. That Two Mobile App Developers Allegedly Headquartered in Texas Incorporated the Arity SDK Into Their Apps Does Not Mean Arity 875 Has Contacts with Texas.

The State argues Arity 875's alleged contracts with two mobile app developers allegedly headquartered in Texas constitute Arity 875's purposeful availment of Texas.[10] That is wrong for at least two reasons.

*First*, the State places load-bearing weight on assertions not in the FAP. The State asserts, without citation, that Arity 875 had "*many* contacts with Texas over the course of several years" based on Arity 875's contracts with GasBuddy and Fuel Rewards. Br. 30. Also without citation, the State asserts that Arity 875 "entered into years-long agreements to install the Arity SDK, expand the apps' user base, perform services on the apps, advertise to app users, and continually collect Texans' user data from Texas devices." *Id.*; *see also id.* at 16 (asserting that "[g]iven that both operated in Texas, Arity 875 knew either actually or constructively that Fuel Rewards and GasBuddy had Texas users"). The State adds, again without citation,

---

[10] The State also seems to suggest that Arity 875's contracts with ***non*** Texas-based developers somehow also constitute purposeful availment of the Texas forum. *See, e.g.*, Br. 30 ("Arity 875 entered into agreements with Texas-based companies Excentus Corporation and GasBuddy LLC *(as well as others)* that required Arity 875 to have *many* contacts with Texas over the course of several years.") (first emphasis added). But the State fails to allege that those other contracts have any Texas nexus whatsoever. To the extent the State argues that the other apps collected data *about* Texas residents because Texas residents happened to download and use the apps, that theory fails because specific jurisdiction must arise from contacts the defendant itself creates with the forum. *See infra* Argument § I.C.

that Arity 875 made "monthly payments to both companies," namely, GasBuddy and Fuel Rewards. *Id.* at 31.

But those assertions are not in the FAP or the record below, and the State's audacious effort to amend its pleading on appeal reflects a disregard for the rules. *See Kelly*, 301 S.W.3d at 658; *Steward*, 633 S.W.3d at 129. The FAP does not allege when Arity 875 entered into contracts with GasBuddy and Fuel Rewards; that those contracts were negotiated or entered into within Texas; that Arity 875 contracted with GasBuddy and Fuel Rewards to target Texas drivers specifically; that Arity 875 even knew that GasBuddy or Fuel Rewards had Texas users; that Arity 875 contracted with either entity to increase the apps' user base and, more relevant, their Texas user base; or that Arity 875 made "monthly payments" to either company. (The words "month" and "monthly" do not appear in the FAP.)

*Second*, even if it had been sufficiently pleaded, the allegation that Arity 875 contracted with entities headquartered in Texas cannot, as a matter of law, establish that Arity 875 purposefully availed itself of Texas. It is well settled that "merely contracting with a Texas resident does not satisfy the minimum contacts requirement, and jurisdiction is not justified by the single fact that a contract is payable in Texas." *Caerus Oil & Gas, LLC v. Terra Energy Partners*, LLC, 2023 WL 2169495, at *15 (Tex. App.-Houston [1st Dist.] Feb. 23, 2023, no pet.) (collecting cases) (cleaned up). *See also, e.g., Aldossari ex rel. Aldossari v. Ripp*,

21

49 F.4th 236, 259 (3d Cir. 2022) ("Merely entering into a contract with a resident of a state, absent any indication that the contract was executed or performed there, is insufficient to justify the exercise of personal jurisdiction in that state."). Even "numerous telephone communications with people in Texas do not," standing alone, "establish minimum contacts." *Old Republic*, 549 S.W.3d at 560.

The State cites several cases for the unremarkable proposition that a single contract with a forum resident can *sometimes* establish purposeful availment. Br. 29-30. But those cases are distinguishable. *Michiana*, if anything, aids Arity 875. There, the Texas Supreme Court explained that "the United States Supreme Court has emphatically answered the question whether a single contract with a Texas resident can automatically establish jurisdiction—the answer clearly is that it cannot." 168 S.W.3d at 786 (cleaned up). The Court acknowledged that a single franchise agreement or life insurance contract may support purposeful availment because those agreements involve "many contacts" with the forum "over a long period of time." *Id.* at 787. But *Michiana* did not involve a franchise agreement or life insurance contract and neither does this case. *See id.* The State also has failed to allege that Arity 875 even entered the contracts with GasBuddy and Fuel Rewards within Texas, much less that Arity 875 had other sustained contacts with Texas in connection with either contract. Not least, whereas *Michiana* involved a dispute between the contracting parties (*see id.* at 781), this case does not.

22

In *Burger King Corp. v. Rudzewicz*, another case the State cites (Br. 29), the Court confirmed that an "individual's contract with an out-of-state party" cannot alone "automatically establish sufficient minimum contacts" and explained that court must also consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." 471 U.S. 462, 478-79 (1985). The Court upheld the exercise of jurisdiction because the defendant, one of plaintiff's franchisees, had "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in Florida; the contracts provided that the "franchise relationship [wa]s established in Miami and governed by Florida law" and called for payment of fees "to the [plaintiff's] Miami headquarters"; and the defendant voluntarily accepted "long-term and exacting regulation of his business" from the plaintiff's Florida headquarters. *Id.* at 465-66, 480. Here, the State does not allege remotely comparable facts. If anything, it alleges that Arity 875's contracts with app developers resulted in the collection of data about individuals *across the country*. *See* Am. C.R. 214, ¶ 31.

*Micromedia v. Automated Broadcast Controls*, a nearly forty-year-old breach-of-contract case, is equally unhelpful to the State. 799 F.2d 230, 234 (5th Cir. 1986). There, the defendant had telephone conversations with the plaintiff "in Texas," pursuant to which the defendant shipped equipment to the plaintiff "in Texas," and

the contract between the parties was to be performed in part "in Texas." *Id.* at 234. Again, the State does not allege comparable facts with respect to Arity 875's alleged contracts with GasBuddy and Fuel Rewards.

B. That Arity 875 Could Be Unilaterally Contacted at a Dallas PO Box Does Not Establish Specific Jurisdiction.

The State also argues that, because individuals may contact Arity 875 at a Dallas PO Box with questions or concerns about Arity 875's privacy practices, "Arity 875 knew its conduct would affect the privacy rights of Texas individuals." Br. 32. That is a non sequitur. Arity 875 invited users across *the entire United States* and any users not located in Switzerland, the UK, the European Union, and the European Economic Area to send inquiries to the Dallas PO Box. *See id.* at 33 (citing screenshot that does not appear in the FAP). That broad invitation negates any inference that Arity 875 targeted Texans specifically.

Regardless, the PO Box allegation does not give rise to jurisdiction, whether as a matter of purposeful availment or relatedness. As to purposeful availment, there are no allegations that Arity 875 even maintains the PO Box. (Again, it has no employees in Texas to do so, and Defendants Arity, LLC and Arity Services have not contested jurisdiction in this case.) And being reachable at an address in Texas alone does not establish an affirmative forum contact. *See Verizon California Inc. v. Douglas*, 2006 WL 490888, at *6 (Tex. App.-Houston [1st Dist.] Mar. 2, 2006, no pet.) (that California company indicated to California state authority that it could be

24

reached at a Texas PO Box was insufficient to demonstrate purposeful availment of Texas); *Kinsale Ins. Co. v. Clearview Horizon, Inc.*, 2022 WL 742718, at \*9 (D. Idaho Mar. 11, 2022) (rejecting jurisdiction and explaining that "[r]elying on an Idaho mailing address for convenience does not strike the Court as 'affirmative conduct' which promotes the transaction of business in Idaho").  Courts have also held that even statements reflecting a defendant's awareness of and compliance with forum-specific laws do not show that the defendant targeted the forum.  *See, e.g.*, *Castelaz v. Estée Lauder Cos.*, 2024 WL 136872, at \*5 (N.D. Ill. Jan. 10, 2024) (following "[c]ourts in other jurisdictions [that] have found that invoking a forum state's privacy laws on a website or in terms of use, standing alone, is insufficient to show that a defendant targeted consumers in the forum state" and collecting cases).

As to relatedness, none of the State's claims have anything to do with the PO Box.  The State does not allege, for example, that any correspondence was sent to the PO Box, much less from Texas residents.  Nor does the State assert any claims related to Arity 875's handling of any questions or concerns sent to the PO Box.  In short, the PO Box has no connection, much less a "substantial connection," with the "operative facts" of any of the State's claims.

C. <u>That Texans Happened to Download and Use Apps That Incorporated the Arity SDK Does Not Mean Arity 875 Has Contacts with Texas.</u>

The State next suggests that because Texas users happened to download and use apps that incorporated the Arity SDK, those unilateral decisions subject

25

Arity 875 to jurisdiction in Texas. Br. 33-36. That argument flouts settled precedent and distorts the record. It must be rejected.

The State argues Arity 875 has contacts directly with Texans based on the unpleaded and unsupported premise that Arity 875 "install[ed] the Arity SDK on millions of Texas mobile devices." Br. 33. *See also id.* at 35 (asserting that Arity 875 "install[ed] software on devices nationwide, including Texas"); *id.* at 36 (asserting that Arity 875 "maintains a constant physical presence in Texas" through the Arity SDK).

The State is deeply wrong. Arity 875 does not "place" or "install" *anything* on any user's device. Rather, the State's allegations—and the undisputed evidence—show that mobile app *developers* license the Arity SDK from Arity 875 and incorporate the Arity SDK into *their apps*. *See* Am. C.R. 214, ¶ 31 (alleging that the Arity SDK is "install[ed] . . . into various mobile apps"); Am. C.R. 215, ¶ 36 (alleging that the Arity SDK is "installed in a mobile app"); Am. C.R. 216-17, ¶ 40 (alleging that "Defendants granted an app developer a limited license to integrate the Arity SDK into the developer's mobile app").[11] The mobile app developer, not Arity 875, then markets its app and acquires users. Users download the app, install it on their device, and enable location services. *See* Am. C.R. 216, ¶ 39. Then, only

_____

[11] Even if the State's efforts to expand the record on appeal were proper, this Court must resolve all factual disputes most favorably towards the trial court's conclusion that specific jurisdiction does not lie over Arity 875. *See supra* p. 14.

after at least two third parties—developers and users—have made several unilateral choices does the Arity SDK collect data. The result is that Arity 875 has no assurance, by licensing its SDK to any developer, that Arity 875 will receive data from Texas drivers. Whether it receives such data depends entirely on whether mobile app developers incorporate the SDK, make their app available to Texans (or simply anyone passing through Texas), Texas drivers download apps that incorporate the Arity SDK, use those apps, and elect to share their location information with the apps—dependencies that are beyond Arity 875's control and may change at any given time.

Those are exactly the types of random and fortuitous forum contacts—by persons other than Arity 875—that cannot support specific jurisdiction. As the Texas and United States Supreme Court have explained time and again, specific jurisdiction must rest exclusively on the *defendant's* contacts—not the plaintiff's or any other parties'—with the forum itself, not forum residents. *See Walden v. Fiore*, 571 U.S. 277, 289 (2014) (lower court erred "by shifting the analytical focus from [defendant's] contacts with the ***forum*** to his contacts with [the plaintiffs]") (emphasis added); *Old Republic*, 549 S.W.3d at 561 ("[A] proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there."); *BRP-Rotax GmbH & Co. KG v. Shaik*, 2025 WL 1727903, at *4 (Tex. June 20, 2025) ("[J]urisdictionally relevant

27

activities must have been the defendant's own choice.") (cleaned up). Moreover, mere knowledge that "the effects of [the defendant's] actions will be felt by a resident plaintiff" is "insufficient to confer personal jurisdiction over the nonresident." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 69 (Tex. 2016).

Courts have applied those principles to reject jurisdiction in similar circumstances. In *McDonald v. Kiloo ApS*, for example, to support specific jurisdiction over an SDK developer in California, the plaintiffs argued the developer "was aware that the Disney gaming apps" on which the SDK was allegedly installed "would be engaged on children's mobile devices in California." 385 F. Supp. 3d 1022, 1041 (N.D. Cal. 2019). *Cf.* Br. 16, 34 (asserting that Arity 875 knew "actually or constructively that Fuel Rewards and GasBuddy had Texas users" and that "Arity 875 and its co-defendants" planned "to install the Arity SDK on mobile devices across the country"). The Court batted away that argument, emphasizing that "personal jurisdiction must arise out of contacts that the defendant *himself* creates with the forum State" and cannot rest on the mere "foreseeability of harm" in the forum. 385 F. Supp. 3d at 1041 (cleaned up). *See also Dalal v. Clearview AI, Inc.*, 2025 WL 1726259, at *8 (D.N.J. May 1, 2025), *report and recommendation adopted*, 2025 WL 1725010 (D.N.J. June 20, 2025) (alleged deployment of "software to collect online pictures of individuals and mine their biometric data" did

not establish personal jurisdiction "merely because that activity encompasses data belonging or related to individuals hailing from the forum state").

In this respect, apps that embed SDKs are like universally accessible websites, and the fact that Texans happen to use those websites does not subject the websites to jurisdiction in Texas. *Cf. Shaik*, 2025 WL 1727903, at *7 ("[T]he Shaiks are surely correct that Texans may have interacted with Rotax's website, but they have not identified anything about the website that targets Texas or Texans."). *Alves v. Goodyear Tire & Rubber Co.*, 683 F. Supp. 3d 111, 117 (D. Mass. 2023), *appeal dismissed*, 2023 WL 9782813 (1st Cir. Dec. 18, 2023) ("The only reason why www.goodyear.com interacted with a browser located in Massachusetts is that [the plaintiff] accessed the website in the State. The personal jurisdiction analysis, however, concentrates on the contacts the defendant himself created with the forum -- not those created by the plaintiff.") (footnote omitted) (cleaned up); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021) ("Making a website that's visible in Texas, of course, does not suffice" to establish specific jurisdiction because, "[i]f it could, our jurisdiction would have no limit; a plaintiff could sue everywhere.") (cleaned up). If a universally accessible *app* is not subject to jurisdiction in a forum simply because forum residents happen to use the app, the same must be true, *a fortiori*, for the developer of a *component* of that app—like Arity 875.

The State's cited authorities do not support its argument. In *MDSave, Inc. v. Sesame Inc.*, the Court held that the defendant availed itself of Texas because its website was sufficiently interactive. 2023 WL 353998, at *5 (W.D. Tex. Jan. 11, 2023). There, the website allowed the defendant's patients to conduct business with the defendant over the internet and "browse for, select, and complete purchases of medical services directly through the website." *Id.* Here, the State does not allege that Arity 875 publishes a website (or app) in Texas, much less one that permits Texans to purchase goods or services from Arity 875. Rather, Arity 875 offers its services exclusively to other businesses, not consumers, in arrangements that lack any nexus to Texas. *See* Am. C.R. 82, ¶ 8.

*TravelJungle v. American Airlines, Inc.* does not aid the State either. 212 S.W.3d 841 (Tex. App.-Forth Worth 2006, no pet.). There, the defendant sent software to American Airlines' website and, in turn, its servers in Texas, to scrape information from the website without American Airlines' consent. *See id.* at 850. Here, Arity 875 does not send any software to any devices in Texas. Rather, developers license the SDK from Arity 875 and choose to incorporate the Arity SDK into their own apps. Nothing about Arity 875's agreements with mobile app developers establishes a contact between Arity 875 and any Texas device or guarantees that the SDK will operate on any phones in Texas. Nor has the State

alleged that Arity 875 knew that its contracts with GasBuddy, Fuel Rewards, or any other developer would result in the apps collecting data from Texans.

The State asserts "Arity 875 was entirely aware that its software would be installed on devices located within Texas, as demonstrated both by its own declaration and the fact that Arity 875 collected mobile phones' Texas *location* information." Br. 38-39; *see also* Br. 35 (similar). Yet again, the State mangles the record. The cited portion of the declaration states something completely different: "Arity 875 does not target its services specifically to Texas; rather, its services are equally available in Texas as they are in all other States." Am. C.R. 82, ¶ 12. That statement *contradicts* the State's position. It means, as the trial court necessarily agreed, that Arity 875 does not specifically seek out Texas app developers to license its SDK and that the licensing offer is available equally to developers in Texas as in any other state. The declaration says nothing about what Arity 875 knows, or could know, about where particular app partners' users are located. Even if Arity 875 *later* receives information from the Arity SDK indicating that a particular phone was in Texas, that does not mean Arity 875 was knowingly targeting that device *earlier*. *See also Hasson v. FullStory, Inc.*, 114 F.4th 181, 196 (3d Cir. 2024) ("[A] defendant's post hoc discovery" that purportedly tortious conduct "was received in the forum, without more, does not establish that the company 'targeted' (or 'expressly aimed' its conduct at the forum.")) (cleaned up). As a result, the

31

allegations and evidence here show that Arity 875 did not "deliberately direct[] its activity toward" any Texas devices or individuals. *TravelJungle*, 212 S.W.3d at 851.

Finally, even if *TravelJungle*, a nearly 20-year-old case, were not factually distinguishable, its analysis is also suspect. Primarily, it fails to grapple with the Texas Supreme Court's "express[] reject[ion]" of the "directed-a-tort" theory of specific jurisdiction, *Searcy*, 496 S.W.3d at 69, and the fortuity of the fact that American Airlines' servers were in Texas. More recently, in *Key Management Group, LLC v. Meridian Hospital Systems Corp.*, the court sustained a special appearance when the defendant accessed plaintiff's servers in Texas but did not know the servers were located there. 2021 WL 1538237, at *4 (Tex. App.-Houston [14th Dist.] Apr. 20, 2021, no pet.). The servers' location in Texas "was merely fortuitous," and the plaintiff "unilaterally chose the location for its servers." *See id.*

D. <u>That Third Parties Allegedly Targeted Advertisements to Texas Does Not Mean Arity 875 Has Contacts with Texas.</u>

The State's last gasp is to argue that Arity 875 somehow has contacts with Texas because *nonparties* may, using Arity 875's platform, target advertisements to Texas residents. Br. 39-41.

At several points, the State misleadingly suggests that Arity 875 itself "advertises to Texans." Br. 44.[12] But the FAP alleges no such thing. It alleges that

---

[12] *See also* Br. 13 (asserting, without citation, that "Arity 875 . . . targeted Texas consumers for advertising"); *id.* at 40 (purporting to describe "Arity 875's advertising and marketing").

32

unspecified "Arity Defendants" "*let companies*, including [i]nsurers" target drivers based on "risk, mileage, [and] commuting habits." Am. C.R. 218, ¶ 43(c) (emphasis added). Similarly, it alleges that unspecified "Arity Defendants *or their customers could reach* 'millions of validated drivers, segmented by driving behavior' to display ads and promotions." *Id.* (emphasis added). Finally, the FAP alleges, on information and belief, "the Arity Defendants could and did display ads to the Texas users of apps that agreed to integrate the Arity SDK." *Id.* But the FAP does not allege that those were Arity 875's ads or that the ads specifically targeted Texas users, rather than reach them incidentally through national campaigns.

And for multiple reasons, the State cannot assert jurisdiction over Arity 875 based on *third parties'* advertising. <u>First</u>, as discussed, Arity 875's forum contacts are decisive, not those of other parties. *See supra* p. 18. Here, the State has disavowed any attempt to assert jurisdiction over Arity 875 based on other defendants' contacts, much less those of unrelated third parties. *See* Am. C.R. 250. Moreover, the allegation that Arity 875 enables *other parties* to target advertisements to Texans does not even facially allege a contact between Arity 875 and "the forum state itself." *Old Republic*, 549 S.W.3d at 561. <u>Second</u>, whether any advertisements reach Texas drivers depends on factors entirely out of Arity 875's control, primarily, whether an advertiser chooses to target its advertisement to Texas. If no advertiser were to do so, the State's advertising-based argument for specific

33

jurisdiction would vanish. Specific jurisdiction cannot arise from such contingent and fortuitous "contacts" with a forum. *See, e.g.*, *Shaik*, 2025 WL 1727903, at *4.

The State's cited authorities do not suggest otherwise. *Moki Mac* is inapposite because the Court was analyzing the jurisdictional significance of the defendant's *own* advertising in the forum. *See* 221 S.W.3d at 577. Here, the State does not allege that Arity 875 advertised its services in Texas. And *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 348 (4th Cir. 2020) and *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218 (9th Cir. 2011) are distinguishable because, in both, the *defendant* was displaying ads to the *defendant's* own user base on a website the *defendant* owned and operated—factors that demonstrated the *defendant's* purposeful availment of the forum. *UMG Recordings*, 963 F.3d at 348; *Mavrix*, 647 F.3d at 1230. Here, the State does not allege, nor could it, that Arity 875 owns or operates a website or app on which it displays location-targeted advertisements to its own "user base." Finally, *Facebook, Inc. v. Doe* is distinguishable because Facebook allegedly had far more extensive contacts with Texas than Arity 875: Facebook had millions of users of its site and services in Texas, itself "advertise[d] its services to Texas customers," "derive[d] substantial revenue from Texas," and "hire[d] employees in Texas." 650 S.W.3d 748, 754 (Tex. App.-Houston [14th Dist.] 2022, pet. denied). Beyond that, Facebook allegedly "purposefully direct[ed] tailored advertisements to **each Texas user**, of which there are millions." *Id.* at 757

34

(emphasis added). Here, the State does not allege that Arity 875 even has its own "users" or that Arity 875 directed advertisements to "each" end-user of a partner app in Texas.

In short, the State cannot assert jurisdiction over Arity 875 based on unidentified third parties' advertising efforts.

E. *Volkswagen* and the Stream-of-Commerce-Plus Framework Are Inapposite.

The State's personal jurisdiction argument is built on a faulty analogy to the Texas Supreme Court's decision in *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399 (Tex. 2023). *Volkswagen* does not apply here for at least five reasons.

*First*, the stream-of-commerce-plus theory referenced in *Volkswagen* (*id.* at 416), which the State tries to invoke here (Br. 28), applies only in products-liability cases. As the Texas Supreme Court clarified just this year "***in certain product-liability cases***, plaintiffs may leverage the stream-of-commerce-plus test to conceptualize the manufacturer's minimum contacts with Texas." *Shaik*, 2025 WL 1727903, at *4 (emphasis added) (cleaned up). *Volkswagen* "was not even a 'stream of commerce' case." *Id.* at *8.

Neither is this one. Arity 875 is not a "manufacturer," and the Arity SDK is not a tangible "product." *Cf. Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 897 (Tex. 2010) (citing approvingly definitions of a "product" as "tangible personal property"); *Dallas Cent. Appraisal Dist. v. Tech Data Corp.*, 930 S.W.2d 119, 123

35

(Tex. App.-Dallas 1996, writ denied) (computer application software was not "tangible personal property" for purposes of property tax provisions). Even if the Arity SDK were a "product," the State does not allege the SDK is defective. Instead, the State has sued Arity 875 for alleged web and app-based omissions concerning Arity 875's privacy and data practices. Accordingly, the stream-of-commerce-plus test used in products liability cases does not apply.

*Second*, while the *Volkswagen* court *analogized* to the stream-of-commerce-plus theory in upholding specific jurisdiction, the facts that supported the analogy there are completely absent here. Under the stream-of-commerce-plus test, "[w]hen a nonresident manufacturer has no knowledge, care, or control over where a product ends up," Texas courts "require some 'plus factor' to establish purposeful availment." *Volkswagen*, 669 S.W.3d at 417. Those "plus factors" include "marketing the product through a distributor who has agreed to serve as the sales agent in the forum state" or "creating, controlling, or employing the distribution system that brought the product into the forum state." *Id.* (cleaned up).

In *Volkswagen*, the Court relied on those factors to assert specific jurisdiction over German car manufacturer defendants ("VW Germany"). VW Germany structured its contractual relationships with a North American affiliate, VW America, and a network of car dealerships, including in Texas, to grant VW Germany complete control over recall and service campaigns. *Id.* at 418. Neither

36

VW America nor the dealerships "had discretion to initiate or refuse to implement a recall or service campaign. When the German manufacturers initiated those campaigns, VW America was required to fall in line at their say-so and to compel the dealerships to do the same." *Id.* VW Germany leveraged that control to institute recall and service campaigns with respect to "targeted vehicles," including in Texas, to install software on those vehicles designed to circumvent environmental protection laws. *See id.* at 409.

Because of that unique and pervasive control, the Court reasoned VW Germany had sufficient contacts with Texas. *See id.* at 418. For the same reason, the Court concluded it "need not disregard corporate separateness or fuse the intermediaries with the German manufacturers" to assign jurisdictional significance to "the contractual relationship the parties designed with regard to the specific mechanism by which the wrongful conduct occurred in Texas." *Id.* at 419. *See also* Br. 31.

Here, the State tries to jam a square peg into a round hole by comparing Arity 875 to VW Germany. The State claims "Arity 875 controls the distribution of its product by contracting with companies to provide services to Texans and collect data in Texas." Br. Argument § I.A.1. Setting aside that no "product" is at issue here, the State does not allege that Arity 875 has control over app developers that remotely resembles the control VW Germany had over its affiliates. The State

37

contends Arity 875 "used its contractual authority with the app developers to install the [Arity SDK]." Br. 32 (citing Am. C.R. 206-08). But nothing in the cited portion of the record supports the proposition, and the FAP contradicts it. The FAP alleges that developers elected to incorporate the Arity SDK in arm's-length contracts in exchange for substantial remuneration. *See* Am. C.R. 207, ¶ 5 (alleging that "Defendants paid app developers millions of dollars to integrate Defendants' software into their apps"). App developers had the right and opportunity to decline to incorporate the Arity SDK into their apps if, say, the price were not right or for any other reason. As a result, Arity 875, unlike VW Germany in *Volkswagen*, did not leverage an "established and preexisting" system to forcibly "install" the Arity SDK into any mobile apps, and the apps were not mere "conduits" (Br. 32) for any such installation. 669 S.W.3d at 416.[13]

*Third*, the State does not allege that Arity 875 knew when licensing the Arity SDK to a developer that an app's end-users would reside in Texas, much less that Arity 875 attempted to have the Arity SDK operate on preidentified, "targeted devices." Whether an app collects data about a Texas resident depends on whether a Texan downloads the app and enables location sharing—factors out of Arity 875's

---

[13] The State also asserts, without an accurate supporting citation, that Arity 875 "supplied and approved the consent terms at issue in this case." Br. 32 (citing Am. C.R. 206-08). In fact, the FAP alleges only that unspecified "Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented and obtained from consumers." Am. C.R. 208, ¶ 8.

control that could change at a moment's notice. *See supra* pp. 26-27; Am. C.R. 216, ¶ 39. By contrast, the tampering at issue in *Volkswagen* was directed at "targeted vehicles" that the German manufacturers had already identified. 669 S.W.3d at 409. VW Germany "reached in [to Texas] to modify those [targeted] vehicles." *Id.* at 417. Arity 875 did no such thing; it licensed its SDK to developers, which then incorporated it into their apps. In this way, the Arity SDK is akin to "ordinary software updates . . . released for download without regard to where the consumer is located," which raise no *Volkswagen* issues. *Id.* at 425.

*Fourth*, the software VW Germany required its affiliates to install on targeted vehicles was itself "tainted" and part of an "unlawful" and "illegal" scheme to "circumvent environmental protection laws." 669 S.W.3d at 405, 407-08, 427. VW Germany's conduct in installing the update would have been unlawful even if consumers knew the update's purpose and consented to it. That is not true here. Even under the State's theory, had Arity 875 provided the disclosures and obtained the consents the State claims it should have, there would be no liability whatsoever. The State does not allege the Arity SDK itself is unlawful.

*Finally*, the State relies on *Volkswagen*'s conclusion that a defendant "need not single Texas out in some unique way" relative to other states, "to satisfy constitutional dictates." 669 S.W.3d at 420; *see also id.* at 420-21; Br. 35, 37. But here, Arity 875 has no relevant contacts with Texas, for all the reasons explained

39

previously. Evidence that Arity 875's services are equally available in all states (*see* Am. C.R. 82, ¶ 12) does not establish that Arity 875 has relevant contacts in a particular forum, including Texas.

## II. The State's Claims Are Not Substantially Connected to Arity 875's Purported Forum Contacts Because the Claims Challenge Out-of-State Conduct.

A nonresident defendant's forum contacts must have a "substantial connection" to the "operative facts of the underlying claim" to support specific jurisdiction. *Conexiones Tornado S. de RL. de CV v. Ramirez de Munoz*, 2024 WL 4262405, at *4 (Tex. App.-Dallas Sept. 23, 2024, no pet.) (cleaned up). That analysis considers whether the operative facts are related to the defendant's forum contacts and whether the forum contacts "will be the focus of the trial" and "consume most if not all of the litigation's attention." *Id*. There must be a "strong" relationship among the defendant, the forum, and the litigation. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021). Although a plaintiff need not show that the defendant's forum contacts caused its injuries, that "does not mean anything goes." *Id.* at 362. The relatedness inquiry "incorporates real limits" "to adequately protect defendants foreign to a forum." *Id.*[14] "If the defendant's alleged actionable conduct," meaning the conduct that gives rise to liability, "occurred entirely outside

---

[14] *Ford Motor* is otherwise of limited relevance. The Court's reasoning applies most naturally in traditional products liability cases, which this case is not. The Court expressly warned that it was not "consider[ing] internet transactions, which may raise doctrinal questions of their own." 592 U.S. at 366 n.4.

40

the forum state, the defendant's in-state contacts will generally be insufficiently related to the operative facts of the plaintiff's claim to satisfy" the substantial connection analysis. *Ajamie LLP v. Podesta Grp., Inc.*, 2020 WL 716734, at *4 (Tex. App.-Houston [1st Dist.] Feb. 13, 2020, no pet.) (collecting cases).

Unless all claims arise from the same operative facts, the nexus analysis is also claim-specific. *See Concord Energy, LLC v. VR4-Grizzly, LP*, 2022 WL 17101034, at *6 (Tex. App.-Dallas Nov. 22, 2022, no pet.). That means the "alleged liability" for each claim must arise out of or relate to the defendant's forum contacts. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 156-57 (Tex. 2013) (no jurisdiction over tortious interference claim "principally concerned" with defendant's meeting with a third party in California and a distinct entity's business in Texas); *Moki Mac*, 221 S.W.3d at 585 (no jurisdiction over misrepresentation and wrongful death claims when "operative facts" of lawsuit concerned hiking trip in Arizona); *Chen v. Razberi Techs., Inc.*, 2022 WL 16757346, at *8 (Tex. App.-Dallas Nov. 8, 2022, pet. denied) ("operative facts" underlying fraudulent nondisclosure claim in securities action lacked Texas nexus when no evidence showed the appellants "ever met with the investors in Texas").

Here, the State does not dispute that the relatedness analysis is claim-specific. Rather, the State purports to explain how each of its claims relates to Arity 875's purported Texas contacts. *See* Br. 42-43. But the State's perfunctory analysis and

41

platitudes ("Arity 875's Texas contacts create the heart of the State's case" and "are the State's claims" (Br. 41, 42)) ring hollow because the State mischaracterizes its own claims and the "operative facts" under each one.  Each claim rests on an alleged failure to disclose or an omission of certain facts about Arity 875's conduct.

But as a threshold matter, "[a] failure to disclose demonstrates that a party did **not** have contacts with the forum state." *Hinduja Glob. Sol., Inc. v. Ganjaei*, 2023 WL 179808, at *6 (Tex. App.-Dallas Jan. 13, 2023, pet. denied) (emphasis added).  *See also Mehta*, 2025 WL 1560037, at *4 ("Mehta's decisions about drug manufacturing outside of Texas are not contacts with Texas."); *Brocail v. Anderson*, 132 S.W.3d 552, 564 (Tex. App.-Houston [14th Dist.] 2004, pet. denied) (similar); *Anderson v. Bechtle*, 2001 WL 930205, at *2 (Tex. App.-Houston [1st Dist.] Aug. 16, 2001, no pet.) (similar); *Chen*, 2022 WL 16757346, at *8 ("[W]e cannot conclude that appellants' conduct of sitting mute in Taiwan constitutes directing a tort at Texas or arises from or relates to their contacts with Texas.").  But to the extent the challenged omissions here can be linked to any forum, it is not Texas.

A. The TDPSA Claim Challenges Out-of-State Omissions.

In attempting to connect its TDPSA allegations to Texas, the State dwells on how the Arity SDK allegedly collects data through mobile apps.  But that discussion is a red herring because the TDPSA does not prohibit data collection.  *Contra* Am. C.R. 254 (State arguing below that "[b]ecause the Arity SDK harvests data from

42

Texas, Arity 875 violates Texas law"). Instead, the TDPSA requires covered entities to disclose certain information to consumers and obtain their consent to undertake certain activities.[15] What makes conduct "actionable" under the TDPSA is the failure to provide the required information or obtain the required consents—not the data collection itself. After all, data collected along with the requisite disclosures and consents raises no TDPSA issue. Consistent with that statutory framework, the State's five alleged TDPSA violations challenge alleged failures to disclose information or obtain consent. *See supra* pp. 9-10.

Because the State's TDPSA claim challenges Arity 875's disclosure and consent policies, the focus of any trial on the TDPSA claim will be outside Texas. It will center on Arity 875's disclosures to end consumers, including the privacy statement on its globally accessible website; what those disclosures said; how and why they were formulated as they were; how Arity 875 determined what consent, if any, was required from app users; and how mobile app providers implemented that consent. Yet the State fails to allege that the relevant disclosures, alleged failures to disclose, or associated corporate policies occurred or were formulated in Texas—or

---

[15] *See* Tex. Bus. & Com. Code § 541.102(a) (requiring a controller to "provide consumers with a reasonably accessible and clear privacy notice" that includes certain information); *id.* § 541.101(b)(4) (prohibiting a controller from processing a consumer's sensitive data "without obtaining the consumer's consent"); *id.* § 541.102(b) (requiring a controller engaging in the sale of personal data "[to] include the following [statutorily specified] notice"); *id.* § 541.103 (requiring a "controller sell[ing] personal data to third parties or process[ing] personal data for targeted advertising, [to] clearly and conspicuously disclose that process and the manner in which a consumer may exercise the right to opt out of that process").

43

that individuals responsible for them were based in Texas.[16]  On the contrary, in alleging that Arity 875 is organized under Delaware law and headquartered in Illinois (Am. C.R. 211, ¶ 23), the State all but concedes that the relevant decisions occurred elsewhere.  The State's pleading failure is a sufficient basis to reject specific jurisdiction over the TDPSA claim, since a plaintiff must initially plead "*in its petition*, sufficient allegations to invoke jurisdiction."  *Steward*, 633 S.W.3d at 129 (citing *Kelly*, 301 S.W.3d at 659).

Regardless, the undisputed evidence also negates the required "strong" relationship among Texas, Arity 875, and the "operative facts" of the TDPSA claim. Arity 875 has no employees in Texas, and "[d]ecision-making concerning Arity 875's policies with respect to the Mobile Data and Mobile Data Insights occurs outside of Texas."  Am. C.R. 83, ¶¶ 14, 17.  Moreover, "none of the Arity 875 teams involved in developing or licensing the SDK is based in Texas."  *Id.* ¶ 13.  On this record, which the Court must construe most favorably to the trial court's ruling, Arity 875's challenged disclosure and consent policies are not substantially

---

[16] Even if Arity 875 knew that its notice and consent policies would have effects in Texas, "that knowledge alone is insufficient to confer personal jurisdiction over the nonresident." *Searcy*, 496 S.W.3d at 69.  This Court's recent decision in *Mehta v. State ex rel. Ahmed*, 2025 WL 1560037, at *4 (Tex. App. [15th Dist.] June 3, 2025, no pet.), is instructive.  There, this Court held it lacked specific jurisdiction over the defendant based on allegations that the defendant contracted with Pfizer to market and promote the use of the defendant's drug within Texas.  "[M]erely 'understanding' that a drug would reach Texas through a third party is not conduct by [the defendant] himself—which is the only conduct that matters here for purposes of the personal jurisdiction analysis." *Id.* at *5.

connected to Texas. *See Choice Auto Brokers, Inc. v. Dawson*, 274 S.W.3d 172, 178 (Tex. App.-Houston [1st Dist.] 2008, no pet.) (rejecting specific jurisdiction in private action under Texas Deceptive Trade Practices Act when "[t]here is no evidence that [the defendant] made misrepresentations to [the plaintiff] in Texas").

The State's efforts to avoid this obvious conclusion miss the mark. Principally, the State insists its TDPSA claim relates to Arity 875's alleged "harvesting" of data within Texas. Br. 44. But even if Arity 875, not the mobile apps it partners with, could be said to collect data from mobile phones in Texas (*contra* Am. C.R. 82, ¶ 9 (explaining that the Arity SDK "collects data through the apps")), the TDPSA does not prohibit data collection, as discussed. It imposes notice and consent requirements. And while the State would need to prove at any trial that Arity 875 is subject to the TDPSA and engaged in covered activities, for example, "processing" "sensitive data," those proofs merely establish essential predicates to the TDPSA claim. They do not change the fact that the actionable conduct underlying the claim is an alleged failure to provide required disclosures or obtain required consents. As a result, the State is doubly wrong when it asserts that "Arity 875 commits a necessary portion of the tort within Texas by placing the Arity SDK on the Texans' mobile phones and instructing the Arity SDK to send that data to Arity 875." Br. 44. Arity 875 does not "plac[e]" anything on Texans' mobile phones; the undisputed facts show that mobile app developers incorporate the Arity

45

SDK into their apps, which Texans download. *See supra* p. 26. And the "tort" under the TDPSA is not the collection of data but the alleged failure to provide notice and obtain consent.

*Google LLC v. State*—where the Corpus Christi-Edinburgh Court of Appeals rejected jurisdiction over defendant Google—is on all fours with this case because the State's allegations and jurisdictional theories there are virtually identical to those here. In *Google*, the State sued Google for violating the Texas Deceptive Trade Practices Act ("DTPA"), alleging that Google "deceived" and "withheld material facts" from Texas users about "how and why their behavior is tracked and how to stop [Google] from monetizing their personal data." 2025 WL 52611, at *6. Similarly, here, the State alleges that the "Arity Defendants" did not "inform[] consumers that the Arity Defendants were collecting their sensitive data." Am. C.R. 225, ¶ 69. The State also accused Google of "collecting Texas users['] browsing history, even when the users believe that they are not being tracked by appellant." 2025 WL 52611, at *6. And here, the State has alleged that "[c]onsumers were wholly unaware . . . that by downloading and using a mobile app with the Arity SDK integrated, the Arity Defendants would own, collect, analyze, and sell their sensitive data." Am. C.R. 225, ¶ 69. Finally, in *Google*, the State alleged that Google leveraged the information it collected to "sell 'targeted' advertising designed to exert the maximum influence over those users," and generate substantial revenue in the

46

process. 2025 WL 52611, at \*6. And here, it has alleged that "[t]he Arity Defendants . . . did not provide consumers any notice of . . . their processing of personal data for targeted advertising." Am. C.R. 227-28, ¶ 77.

The State's arguments on the relatedness prong of the specific jurisdiction analysis also track its arguments here. In *Google*, as here, the State argued that Google's out-of-state representations and omissions were sufficiently "related" to its alleged in-state data collection to justify specific jurisdiction. The State pointed to Google's extensive contacts with the Texas—contacts Arity 875 lacks—including that many of Google's 1,100 Austin-based employees developed software related to the litigation and that "Google advertises [relevant technology] and devices that employ it in Texas." Am. Br. of Appellee, *Google*, 2023 WL 5672666, at \*36. Relying also on *Volkswagen*, the State argued that only "*an* activity" related to the claim needs to take place in the forum, "even if other activities that were part of the underlying tort occurred elsewhere." *Id.* at \*36 (cleaned up) (citing *Volkswagen*, 669 S.W.3d at 431). The State argued it met that "relatively low bar" in part because Google had "deliberately place[d] in Texas" products that were the subject of the State's DTPA claims and, through those products, "collected. . . data from devices in Texas." *Id.* at \*36, 38, 40 (cleaned up).

Here too, the State argues it satisfies the nexus prong because at least some "portion" of Arity's conduct occurred within Texas, *i.e.*, purportedly "placing the

47

Arity SDK on the Texans' mobile phones and instructing the Arity SDK to send that data to Arity 875" (though the State has no evidence Arity 875 took any such steps). Br. 44. And here too, the State argues under *Volkswagen* that, "[b]ecause Arity 875 harvests Texans' data without consent from Texas devices," jurisdiction is appropriate, even though the alleged omissions occurred, if at all, outside the forum. Br. 42.

In *Google*, the court rejected the State's effort to mischaracterize its own claims. The Court determined that the "operative facts" of the State's DTPA claim concerned Google's allegedly misleading statements—not the products that those statements concerned. 2025 WL 52611, at *7. Neither the allegations nor evidence established that any of those misleading statements were made by Google employees in Texas. *See id.* Because the State's "principal complaint" was that Google's terms of service and disclosures were misleading, "overwhelming evidence [would] be directed at events outside of Texas." *Id.* As a result, there was no "substantial connection" between the State's claims and Google's Texas contacts.

That reasoning controls here. Because the State's claims against Arity 875 principally concern Arity 875's privacy disclosures and consent policies, none of which have any connection to Texas, much less a "substantial connection," the State cannot establish personal jurisdiction.

Meanwhile, the Texas contacts the State purports to attribute to Arity 875 do not relate to the State's TDPSA claim (or any others). The State argues the TDPSA claim relates to Arity 875's contracts with two mobile app developers allegedly headquartered in Texas. Br. 42. But those contracts do not constitute Arity 875's contacts with Texas, so are irrelevant. *See supra* Argument § I.A. And for purposes of the nexus analysis, the State does not assert any claims—including the TDPSA claim—based on those contracts. *McDonald v. Kiloo ApS* is instructive and consistent with the decision in *Google.* 385 F. Supp. 3d 1022 (N.D. Cal. 2019). In *McDonald,* plaintiffs sued developers of gaming apps and SDKs that the apps incorporated. Plaintiffs alleged that the defendants collected data from children who used the apps and "exploited the data, without disclosure or consent, for profit." *Id.* at 1027. Plaintiffs argued one of the SDK defendants was subject to jurisdiction in California because it had contracted with "California-based Disney" to install the SDK on Disney's app. *Id.* at 1042. The Court disagreed on nexus grounds, explaining that "Plaintiffs here are not parties to the contract between [the SDK developer] and Disney, and are not suing for any breaches of that contract." *Id.*

So too here. The State does not purport to challenge the contracts themselves. And it makes no effort to support its conclusory assertion that the contracts "will form the focus of trial." Br. 42. Read charitably, the FAP at most suggests that Arity 875 did not structure the contracts to account for the TDPSA's disclosure and

49

consent requirements. *See, e.g.*, Am. C.R. 220, ¶ 48 ("Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented to consumers."). But even on that theory, the trial's focus will remain outside of Texas. After all, the State does not allege that Arity 875 negotiated or entered the contracts with GasBuddy or Fuel Rewards in Texas, much less discussed any party's TDPSA obligations in Texas. And the record, which, again, this Court must read favorably towards the trial court's ruling, establishes that the teams responsible for licensing the Arity SDK all sit outside of Texas. *See* Am. C.R. 83, ¶ 13. The allegations and evidence thus fall far short of establishing a "substantial connection" between Arity 875's Texas contacts and the "operative facts" of the TDPSA claim. *Cf. AIKG, LLC v. CSP Consultants Grp., LLC*, 2022 WL 947197, at *5 (Tex. App.-San Antonio Mar. 30, 2022, no pet.) (in breach of contract action, rejecting specific jurisdiction on relatedness grounds when none of the actionable conduct, *i.e.*, "whether the parties entered into an agreement, whether [defendant] breached the agreement, whether [defendant] paid [plaintiff] for its services, and whether [defendant] intended to defraud [plaintiff]" occurred in Texas).

The State suggests in a throwaway sentence that its TDPSA claim relates to Arity 875's purported "targeted advertising." Br. 42. As an initial matter, by failing

to develop that argument, the State has waived it.  *See, e.g.*, *NexPoint*, 674 S.W.3d at 446-47.

But to the extent the State's position is discernible, it is wrong.  As explained above, the FAP does not allege that Arity 875 *itself* advertises within Texas, and the State cannot hale Arity 875 into Texas court based on third parties' advertisements to Texans.  Even setting aside that fatal deficiency, the State's TDPSA claim, to the extent it concerns advertising, challenges Arity 875's alleged *failures to disclose* information about advertising practices or opt-out rights.  *See* Am. C.R. 227-29, ¶¶ 76-79, 82-85 (critiquing Arity 875's privacy disclosures).  The State does not allege that any of those alleged omissions occurred in Texas or that Arity 875 formulated disclosures concerning targeted advertising practices in Texas.  Accordingly, the State has failed to allege that the "operative facts" underlying its advertising-disclosure TDPSA theory are "substantially connected" to Texas.

### B. The Data Broker Claim Challenges Out-of-State Omissions.

The "operative facts" underlying the State's Data Broker claim also concern out-of-state alleged omissions.  The conduct that triggers liability under the data broker statute is not the acquisition of data about Texas residents.  That is, at most, a predicate to liability.  What the statute regulates, and what "give[s] rise" to liability (Br. 43), is a covered entity's failure to register as a data broker.  *See* Tex. Bus. & Com. Code Ann. § 509.005; *see also* Am C.R. 230-31, ¶ 91 (alleging that in

51

"fail[ing] to register with the Texas Secretary of State's Office . . . the Arity Defendants violated Section 509.005 of the Data Broker Law"). After all, the State's claim under the Data Broker statute does not purport to regulate Arity 875's acquisition of data, only whether Arity 875 registered as a data broker in Texas.

Here, if the failure to register as a data broker has a geographic nexus, it is not with Texas. The State does not allege, for example, that the decision about whether to register as a data broker was made within Texas or based on conversations with Texas entities. Moreover, the unrebutted evidence shows that Arity 875 has no employees or offices in Texas. *See* Am. C.R. 83, ¶¶ 14, 17-18.

Even if Arity 875's alleged licensing of data concerning Texas individuals (Br. 43) were relevant to the nexus analysis, the mere receipt of data ***about Texans*** through licensing agreements does not amount to a contact of Arity 875 ***with Texas.*** *See supra* pp. 26-29. That is especially true given that the State fails to allege that the licensing agreements were negotiated or executed in Texas. So, the State has failed to allege that Arity 875 has any Texas contacts that give rise or relate to the "operative facts" of the Data Broker claim.

C. The Insurance Code Claim Challenges Out-of-State Omissions.

The State's Insurance Code claim lacks a substantial connection to Texas for similar reasons. As a threshold matter, the State engages in improper group pleading, asserting the Insurance Code claim against "Defendants" generally, even

52

when, plainly, not all theories of liability apply to all Defendants. The State alleges, for example, that "Defendants" "us[ed] the unlawfully obtained data for Defendants' own car insurance underwriting processes." Am. C.R. 231-32, ¶ 95. But the unrebutted evidence shows that Arity 875 is not an insurance company and does not promote, offer, sell, or administer insurance in Texas. *See* Am. C.R. 81, ¶ 4.

The State's three remaining theories of liability under this claim concern alleged failures to act—none of which relates to any contacts Arity 875 has with Texas.

*First*, the State alleges that "Defendants" failed to verify consumers' consent before purchasing driving-related data from vehicle manufacturers. Am. C.R. 231, ¶ 95. But the State does not allege that *Arity 875* purchased such data from vehicle manufacturers; that, even if it did, that any of those purchases occurred in Texas; or, most importantly, that any alleged "fail[ure] to verify" occurred in Texas.

*Second*, the State alleges that "Defendants" ignored the "strong possibility" that consumers did not consent to the collection and sale of their data to insurers. Am. C.R. 231-32, ¶ 95. But again, the State does not allege that Arity 875 allegedly ignored that possibility in Texas. Regardless, the unrebutted evidence establishes that Arity 875 does not disclose Mobile Data to insurers for pricing or underwriting purposes and that any Mobile Data Insights arguably collected through mobile apps are shared with insurers only with consumers' consent. *See* Am. C.R. 82, ¶ 11.

*Third*, the State complains that Defendants "market[ed] and advertis[ed] the data to Insurers as 'driving behavior' data." Am. C.R. 232, ¶ 95. But the State does not allege that Arity 875 participated in that marketing or advertising or that those activities occurred in, or were specifically directed towards, Texas.

The State also argues its Insurance Code claim relates to Arity 875's alleged "harvesting" of data without consent and alleged "target[ing] insurance advertisements to Texans to support Allstate's unlawful insurance scheme." Br. 42. But the "harvesting" theory fails because, like the TDPSA claim, the Insurance Code claim challenges purported notice-and-consent failures, not data collection. And the "advertising-to-support-Allstate's-insurance-scheme" theory is a nonstarter because it is not alleged in the Insurance Code claim. *See* Am. C.R. 231-32, ¶¶ 92-96; *see also supra* p. 2. Again, much as the State may prefer to, it may not amend the FAP on appeal. *See Kelly*, 301 S.W.3d at 658; *Steward*, 633 S.W.3d at 129.

D. The State's Remaining Contrary Arguments Are Meritless.

As the preceding discussion shows, the operative facts underlying each of the State's claims against Arity 875 concern alleged failures to disclose or other omissions that occurred, if at all, outside of Texas. Accordingly, no claim has the required "substantial connection" with any contacts Arity 875 may have with Texas. By, in substance, attempting to assert jurisdiction over Arity 875 based on the alleged direction of tortious omissions into Texas, the State asserts a theory that the

54

Texas Supreme Court has decisively rejected. *See, e.g.*, *Searcy*, 496 S.W.3d at 69 (expressly rejecting the "'directed-a-tort' theory" of jurisdiction).

The State's remaining contrary arguments are puzzling at best. *First*, the State claims Arity 875 sought to "avoid the 'substantial connection' prong" of the specific jurisdiction analysis in the trial court by claiming the State had alleged, at most, a directed-a-tort theory of jurisdiction. Br. 43. On the contrary, Arity 875 directly acknowledged the "substantial connection" requirement and explained how it militated against specific jurisdiction here. *See* Am. C.R. 66; *id.* at 68 (explaining how "Arity 875 has no contacts with Texas that are 'substantially connected' to the claims here" and citing authority for the proposition that liability based on acts or omissions outside Texas cannot support specific jurisdiction).

*Second*, the State asserts "Arity 875 argued that because it *receives* data outside of Texas, the tort it committed occurred outside of Texas and therefore does not relate to its Texas contacts." Br. 44. The State does not cite the record for that proposition. And for good reason: Arity 875 did not make that argument. The relevant point is simply that none of the State's claims imposes liability for mere data collection. The challenged conduct is the failure to provide adequate disclosures or secure adequate user consents—alleged omissions that, legally and factually, lack a nexus to Texas. To the extent the alleged omissions "occurred" anywhere, it was outside Texas.

55

In that respect, the State accurately contends that alleged torts "committed entirely out of state cannot logically relate to the tortfeasor's contacts within the state." Br. 43-44. That principle resolves Arity 875's jurisdictional challenge here. Just as in *Google*, this Court should reject the State's effort to assert jurisdiction based on contacts unrelated to the State's pleaded theories of liability.

## III. Exercising Personal Jurisdiction Here Would Offend Traditional Notions of Fair Play and Substantial Justice.

Subjecting Arity 875 to jurisdiction in Texas would violate principles of "fair play and substantial justice," yet another reason personal jurisdiction does not lie. *Gulf Coast Int'l, L.L.C. v. The Rsch. Corp. of the Univ. of Haw.*, 490 S.W.3d 577, 584 (Tex. App.-Houston [1st Dist.] 2016, pet. denied). Several factors are relevant to the analysis: "(1) the burden on the nonresident defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering substantive social policies." *Id.*

As the U.S. Supreme Court has explained, "the primary concern is the burden on the defendant." *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 263 (2017) (cleaned up). That burden encompasses not only the "practical problems resulting from litigating in the forum" but also "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in

56

the claims in question." *Id.* After all, "[t]he sovereignty of each State implies a limitation on the sovereignty of all its sister States." *Id.* (cleaned up). Taken together, the fairness factors weigh heavily against jurisdiction.

As to burden, the State claims Arity 875 operates nationally and that its employees work remotely. Br. 46. But neither assertion, even if true, eases Arity 875's burden from litigating in Texas. The undisputed evidence establishes that Arity 875 has no employees or offices in Texas and that decision-making relevant to this litigation occurred outside Texas. *See supra* p. 11. *Dalglish v. Royal Indem. Co.*, 2006 WL 3334543, at *4-5 (Tex. App.-Beaumont Nov. 16, 2006, no pet.) (considering that relevant witnesses and corporate records were located outside Texas in holding that fair play and substantial justice weighed against jurisdiction in Texas). Relying on *Spir Star AG v. Kimich*, 310 S.W.3d 868 (Tex. 2010), the State argues a defendant's distance from the forum cannot "alone" defeat jurisdiction. Br. 46. But Arity 875 does not rely solely on its distance from Texas, and *Spir Star* is distinguishable because, there, Texas was "familiar territory" for the defendant's leadership, including because the defendant's president spent six months of the year there. 310 S.W.3d at 879. The State has not alleged remotely comparable facts here. And to the extent the State is attempting to raise a factual dispute about Arity 875's burden, this Court must resolve that dispute in favor of the trial court's ruling.

The second and third factors also cut against jurisdiction because, although the State brings claims under Texas law, it has failed to sufficiently allege that Arity 875 engaged in *any* relevant conduct within the State. The State concedes as much: despite insisting elsewhere in its brief that this is "not a directed-a-tort case" (Br. 43), the State claims Texas has an interest in this matter because Arity 875 has allegedly "purposefully **directed** [unfair and deceptive conduct] at the Texas marketplace." *Id.* 47 (emphasis added). But when a nonresident has not engaged in any conduct within the forum, jurisdiction cannot lie simply because the State, or any plaintiff, has asserted claims under the forum's law and would prefer to litigate in its home forum. To do so would turn the specific jurisdiction analysis on its head and allow a plaintiff to hale a defendant into court based on the *plaintiff's* unilateral litigation conduct.

The fourth and fifth factors also cut against jurisdiction because federalism interests point to Illinois as a superior forum. "When one state tries a suit, it may prevent sister States from exercising their like authority, even when those states have a greater interest in the dispute." *See Johnson*, 21 F.4th at 323 (cleaned up). The "federalism interest carries enormous weight. It may preclude [the Court's] power even when all other factors—the burden on the defendant, the forum state's interest in applying its own law, and the convenience of the forum—strongly favor . . . jurisdiction." *Id.*

58

Illinois, where Arity 875 is subject to general jurisdiction, has an interest in providing a forum for lawsuits against its corporate citizens. That interest is especially strong here because Arity 875 is already facing a consolidated class action lawsuit in Illinois based on allegations substantially similar to the State's, and Texas residents are *already* included in the putative nationwide class and Texas subclass sought to be certified there. *See In re: Allstate & Arity Consumer Privacy Litigation*, No. 1:25-cv-00407, Corrected Consolidated Class Action Compl., Dkt. No. 46 (N.D. Ill. May 27, 2025). The existence of parallel, substantially overlapping litigation in Illinois means that the judicial system's "interest in the most efficient resolution of controversies" favors Illinois over Texas. *Gulf Coast Int'l*, 490 S.W.3d at 584.

The State argues it would be more efficient to try Arity 875 in Texas because its co-defendants, Arity Services and Arity, LLC, have not challenged jurisdiction. But the State willfully ignores how the Arity Defendants differ from each other and, in turn, how the issues and defenses across them will differ. Arity Services, a federally regulated consumer reporting agency, does not collect driving-related data through mobile apps. *See* Am. C.R. 90-92, ¶¶ 11, 15. And Arity, LLC offers an entirely distinct telematics program that shares a user's driving information with their own insurer only after the user takes several affirmative steps to opt-in to that usage-based insurance program. *See* Am. C.R. 93-94, ¶¶ 18-21. The trial court

recognized these differences when it declined to stay the case as to the remaining Defendants during the pendency of Arity 875's appeal.

## **PRAYER**

Arity 875 respectfully requests that the Court affirm the trial court's order granting Arity 875's Special Appearance and dismissing Arity 875 from the case.[17]

---

[17] The State does not challenge the trial court's denial of the State's request for a continuance to permit the State to take jurisdictional discovery. Accordingly, that challenge is waived. *See, e.g.*, *Gerdes*, 155 S.W.3d at 534; *NexPoint*, 674 S.W.3d at 446-47. Even if it were not, this court reviews "a decision denying a motion for continuance for jurisdictional discovery" for a "clear abuse of discretion." *Rana Shipping Transp., Indus., & Trade, Ltd. v. Davey & Brogan, P.C.*, 2023 WL 2582357, at *5 (Tex. App.-Dallas Mar. 21, 2023, no pet.) (mem. op.). Here, the State has not demonstrated such an abuse of discretion, nor could it. The State "did not present an affidavit showing that [it] could not present facts essential to justify [its] opposition to the special appearance." *Id.* On the contrary, it argued that Arity 875's Special Appearance could be denied based only on the State's jurisdictional allegations. *See* Am. C.R. 380. Moreover, the State's theory of personal jurisdiction fails as a matter of law and cannot be cured with additional jurisdictional discovery. Finally, unlike most civil plaintiffs, the State had ample opportunity to gather jurisdictionally relevant facts through its pre-suit investigation. The State is not entitled to a do-over having conducted a deficient investigation.

Dated: August 4, 2025

Respectfully submitted,

/s/ W. Reid Wittliff
W. Reid Wittliff
State Bar No. 00791951
reid@wittliffcutter.com
**Wittliff | Cutter PLLC**
510 Baylor St.
Austin, Texas 78703
Telephone: (512) 960-4866 Facsimile:
(512) 960-4869

Jake Sommer *(pro hac vice)*
Kelsey Harclerode *(pro hac vice)*
**ZwillGen PLLC**
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 296-3585
jake@zwillgen.com
kelsey@zwillgen.com

Sudhir Rao *(pro hac vice)*
**ZwillGen PLLC**
183 Madison Ave, Suite 1504
New York, NY 10016
Telephone: (646) 362-5590
sudhir.rao@zwillgen.com

**ATTORNEYS FOR ARITY 875, LLC**

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this document contains 14,863 words, excluding exempted text. *See* Tex. R. App. P. 9.4(i).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served on August 4, 2025 with a copy of this document via the Court's CM/ECF system in compliance with Texas Rule of Appellate Procedure 9.5.

*/s/ W. Reid Wittliff*
W. Reid Wittliff

# In the Court of Appeals
# For the Fifteenth Judicial District
# Austin, Texas

————

STATE OF TEXAS

APPELLANT,

V.

ARITY 875, LLC,

APPELLEE.

————

*On Appeal from the 457th Judicial District Court, Montgomery County*
*Trial Court Case No. 25-01-00561*

————

**APPELLEE'S APPENDIX**

————

Tab

1.  Order Granting Arity 875, LLC's Special Appearance (Am. C.R. 415) ........... A

2.  Texas Data Privacy and Security Act ("TDPSA") Tex. Bus. & Com. Code § 541.001 ....................................................................................................... B

3.  TDPSA, Tex. Bus. & Com. Code § 541.051 ............................................... C

4.  TDPSA, Tex. Bus. & Com. Code § 541.101 ............................................... D

5.  TDPSA, Tex. Bus. & Com. Code § 541.102 ............................................... E

6.  TDPSA, Tex. Bus. & Com. Code § 541.103 ............................................... F

7.  Data Broker Law, Tex. Bus. & Com. Code § 509.001 .................................... G

8.  Data Broker Law, Tex. Bus. & Com. Code § 509.005 .................................... H

9.  Tex. Ins. Code § 541.002 ....................................................................... I

10. Tex. Ins. Code § 541.003 ................................................................ J

11. Plaintiff's First Amended Petition (Am. C.R. 205) .............................. K

12. Arity 875, LLC's Original Answer and Special Appearance (Am. C.R. 56) .... L

13. *Google LLC v. State*, 2025 WL 52611 (Tex. App. Corpus Christi-Edinburg Jan. 9, 2025), *petition for review abated* (May 9, 2025) ................................... M

**Tab A: Order Granting Arity 875, LLC's Special Appearance (Am. C.R. 415)**

**CAUSE NO. 25-01-00561**

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **vs.** | § | **MONTGOMERY COUNTY, TEXAS** |
| | § | |
| | § | |
| **THE ALLSTATE CORPORATION;** | § | **457ᵀᴴ JUDICIAL DISTRICT** |
| **ALLSTATE INSURANCE COMPANY;** | | |
| **ALLSTATE VEHICLE AND** | | |
| **PROPERTY INSURANCE COMPANY ;** | | |
| **ARITY, LLC; ARITY 875, LLC; ARITY** | | |
| **SERVICES, LLC** | | |

## ORDER GRANTING SPECIAL APPEARANCES

On this day came for consideration Defendant The Allstate Corporation's Sworn Special Appearance and Defendant Arity 875, LLC's Sworn Special Appearance. The Court, having considered the Motions, any responses thereto, and arguments of the parties, is of the opinion that the Motions should GRANTED. It is therefore:

ORDERED that the Affidavits filed by Plaintiff The State of Texas on April 3, 2024 in response to the Special Appearances were filed untimely pursuant to Rule 120a(3) of the Texas Rules of Civil Procedure and are therefore STRUCK and were not considered by the Court.

ORDERED that Defendant The Allstate Corporation's Sworn Special Appearance is GRANTED. It is hereby ORDERED that Defendant The Allstate Corporation is dismissed for lack of personal jurisdiction.

ORDERED that Defendant Arity 875, LLC's Sworn Special Appearance is GRANTED. It is hereby ORDERED that Defendant Arity 875, LLC is dismissed for lack of personal jurisdiction.

Signed _____ **4/10/2025 3:42:52 PM**

_____
VINCENZO SANTINI, Presiding Judge

**Tab B: Texas Data Privacy and Security Act ("TDPSA")**
**Tex. Bus. & Com. Code § 541.001**


KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
 Business and Commerce Code (Refs & Annos)
  Title 11. Personal Identity Information (Refs & Annos)
   Subtitle C. Consumer Data Protection
    Chapter 541. Consumer Data Protection (Refs & Annos)
     Subchapter A. General Provisions

V.T.C.A., Bus. & C. § 541.001

§ 541.001. Definitions

Currentness

In this chapter, unless a different meaning is required by the context:

(1) "Affiliate" means a legal entity that controls, is controlled by, or is under common control with another legal entity or shares common branding with another legal entity. For purposes of this subdivision, "control" or "controlled" means:

(A) the ownership of, or power to vote, more than 50 percent of the outstanding shares of any class of voting security of a company;

(B) the control in any manner over the election of a majority of the directors or of individuals exercising similar functions; or

(C) the power to exercise controlling influence over the management of a company.

(2) "Authenticate" means to verify through reasonable means that the consumer who is entitled to exercise the consumer's rights under Subchapter B is the same consumer exercising those consumer rights with respect to the personal data at issue.

A-004

(3) "Biometric data" means data generated by automatic measurements of an individual's biological characteristics. The term includes a fingerprint, voiceprint, eye retina or iris, or other unique biological pattern or characteristic that is used to identify a specific individual. The term does not include a physical or digital photograph or data generated from a physical or digital photograph, a video or audio recording or data generated from a video or audio recording, or information collected, used, or stored for health care treatment, payment, or operations under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.).

(4) "Business associate" has the meaning assigned to the term by the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.).

(5) "Child" means an individual younger than 13 years of age.

(6) "Consent," when referring to a consumer, means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer. The term includes a written statement, including a statement written by electronic means, or any other unambiguous affirmative action. The term does not include:

(A) acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information;

(B) hovering over, muting, pausing, or closing a given piece of content; or

(C) agreement obtained through the use of dark patterns.

(7) "Consumer" means an individual who is a resident of this state acting only in an individual or household context. The term does not include an individual acting in a commercial or employment context.

(8) "Controller" means an individual or other person that, alone or jointly with others, determines the purpose and means of processing personal data.

A-005

(9) "Covered entity" has the meaning assigned to the term by the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.).

(10) "Dark pattern" means a user interface designed or manipulated with the effect of substantially subverting or impairing user autonomy, decision-making, or choice, and includes any practice the Federal Trade Commission refers to as a dark pattern.

(11) "Decision that produces a legal or similarly significant effect concerning a consumer" means a decision made by the controller that results in the provision or denial by the controller of:

(A) financial and lending services;

(B) housing, insurance, or health care services;

(C) education enrollment;

(D) employment opportunities;

(E) criminal justice; or

(F) access to basic necessities, such as food and water.

(12) "Deidentified data" means data that cannot reasonably be linked to an identified or identifiable individual, or a device linked to that individual.

(13) "Health care provider" has the meaning assigned to the term by the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.).

A-006

(14) "Health record" means any written, printed, or electronically recorded material maintained by a health care provider in the course of providing health care services to an individual that concerns the individual and the services provided. The term includes:

(A) the substance of any communication made by an individual to a health care provider in confidence during or in connection with the provision of health care services; or

(B) information otherwise acquired by the health care provider about an individual in confidence and in connection with health care services provided to the individual.

(15) "Identified or identifiable individual" means a consumer who can be readily identified, directly or indirectly.

(16) "Institution of higher education" means:

(A) an institution of higher education as defined by Section 61.003, Education Code; or

(B) a private or independent institution of higher education as defined by Section 61.003, Education Code.

(17) "Known child" means a child under circumstances where a controller has actual knowledge of, or wilfully disregards, the child's age.

(18) "Nonprofit organization" means:

(A) a corporation organized under Chapters 20 and 22, Business Organizations Code, and the provisions of Title 1, Business Organizations Code, to the extent applicable to nonprofit corporations;

(B) an organization exempt from federal taxation under Section 501(a), Internal Revenue Code of 1986, by being listed as an exempt organization under Section 501(c)(3), 501(c)(6), 501(c)(12), or 501(c)(19) of that code;

A-007

(C) a political organization; or

(D) an organization that:

(i) is exempt from federal taxation under Section 501(a), Internal Revenue Code of 1986, by being listed as an exempt organization under Section 501(c)(4) of that code; and

(ii) is described by Section 701.052(a), Insurance Code.

(19) "Personal data" means any information, including sensitive data, that is linked or reasonably linkable to an identified or identifiable individual. The term includes pseudonymous data when the data is used by a controller or processor in conjunction with additional information that reasonably links the data to an identified or identifiable individual. The term does not include deidentified data or publicly available information.

(20) "Political organization" means a party, committee, association, fund, or other organization, regardless of whether incorporated, that is organized and operated primarily for the purpose of influencing or attempting to influence:

(A) the selection, nomination, election, or appointment of an individual to a federal, state, or local public office or an office in a political organization, regardless of whether the individual is selected, nominated, elected, or appointed; or

(B) the election of a presidential/vice-presidential elector, regardless of whether the elector is selected, nominated, elected, or appointed.

(21) "Precise geolocation data" means information derived from technology, including global positioning system level latitude and longitude coordinates or other mechanisms, that directly identifies the specific location of an individual with precision and accuracy within a radius of 1,750 feet. The term does not include the content of communications or any data generated by or connected to an advanced utility metering infrastructure system or to equipment for use by a utility.

A-008

(22) "Process" or "processing" means an operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data, such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data.

(23) "Processor" means a person that processes personal data on behalf of a controller.

(24) "Profiling" means any form of solely automated processing performed on personal data to evaluate, analyze, or predict personal aspects related to an identified or identifiable individual's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

(25) "Protected health information" has the meaning assigned to the term by the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.).

(26) "Pseudonymous data" means any information that cannot be attributed to a specific individual without the use of additional information, provided that the additional information is kept separately and is subject to appropriate technical and organizational measures to ensure that the personal data is not attributed to an identified or identifiable individual.

(27) "Publicly available information" means information that is lawfully made available through government records, or information that a business has a reasonable basis to believe is lawfully made available to the general public through widely distributed media, by a consumer, or by a person to whom a consumer has disclosed the information, unless the consumer has restricted the information to a specific audience.

(28) "Sale of personal data" means the sharing, disclosing, or transferring of personal data for monetary or other valuable consideration by the controller to a third party. The term does not include:

(A) the disclosure of personal data to a processor that processes the personal data on the controller's behalf;

A-009

(B) the disclosure of personal data to a third party for purposes of providing a product or service requested by the consumer;

(C) the disclosure or transfer of personal data to an affiliate of the controller;

(D) the disclosure of information that the consumer:

(i) intentionally made available to the general public through a mass media channel; and

(ii) did not restrict to a specific audience; or

(E) the disclosure or transfer of personal data to a third party as an asset that is part of a merger or acquisition.

(29) "Sensitive data" means a category of personal data. The term includes:

(A) personal data revealing racial or ethnic origin, religious beliefs, mental or physical health diagnosis, sexuality, or citizenship or immigration status;

(B) genetic or biometric data that is processed for the purpose of uniquely identifying an individual;

(C) personal data collected from a known child; or

(D) precise geolocation data.

(30) "State agency" means a department, commission, board, office, council, authority, or other agency in any branch of state government that is created by the constitution or a statute of this state, including a university system or institution of higher education as defined by Section 61.003, Education Code.

A-010

(31) "Targeted advertising" means displaying to a consumer an advertisement that is selected based on personal data obtained from that consumer's activities over time and across nonaffiliated websites or online applications to predict the consumer's preferences or interests. The term does not include:

(A) an advertisement that:

(i) is based on activities within a controller's own websites or online applications;

(ii) is based on the context of a consumer's current search query, visit to a website, or online application; or

(iii) is directed to a consumer in response to the consumer's request for information or feedback; or

(B) the processing of personal data solely for measuring or reporting advertising performance, reach, or frequency.

(32) "Third party" means a person, other than the consumer, the controller, the processor, or an affiliate of the controller or processor.

(33) "Trade secret" means all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

A-011

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

**Credits**

Added by Acts 2023, 88th Leg., ch. 995 (H.B. 4), § 2, eff. July 1, 2024.

V. T. C. A., Bus. & C. § 541.001, TX BUS & COM § 541.001

Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-012

**Tab C: TDPSA, Tex. Bus. & Com. Code § 541.051**

 KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated

  Business and Commerce Code (Refs & Annos)

    Title 11. Personal Identity Information (Refs & Annos)

      Subtitle C. Consumer Data Protection

        Chapter 541. Consumer Data Protection (Refs & Annos)

          Subchapter B. Consumer's Rights (Refs & Annos)

V.T.C.A., Bus. & C. § 541.051

§ 541.051. Consumer's Personal Data Rights; Request to Exercise Rights

Currentness

(a) A consumer is entitled to exercise the consumer rights authorized by this section at any time by submitting a request to a controller specifying the consumer rights the consumer wishes to exercise. With respect to the processing of personal data belonging to a known child, a parent or legal guardian of the child may exercise the consumer rights on behalf of the child.

(b) A controller shall comply with an authenticated consumer request to exercise the right to:

(1) confirm whether a controller is processing the consumer's personal data and to access the personal data;

(2) correct inaccuracies in the consumer's personal data, taking into account the nature of the personal data and the purposes of the processing of the consumer's personal data;

(3) delete personal data provided by or obtained about the consumer;

(4) if the data is available in a digital format, obtain a copy of the consumer's personal data that the consumer previously provided to the controller in a portable and, to the extent technically feasible, readily usable format that allows the consumer to transmit the data to another controller without hindrance; or

A-014

(5) opt out of the processing of the personal data for purposes of:

(A) targeted advertising;

(B) the sale of personal data; or

(C) profiling in furtherance of a decision that produces a legal or similarly significant effect concerning the consumer.

**Credits**

Added by Acts 2023, 88th Leg., ch. 995 (H.B. 4), § 2, eff. July 1, 2024.

V. T. C. A., Bus. & C. § 541.051, TX BUS & COM § 541.051

Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-015

**Tab D: TDPSA, Tex. Bus. & Com. Code § 541.101**

 KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
 Business and Commerce Code (Refs & Annos)
  Title 11. Personal Identity Information (Refs & Annos)
   Subtitle C. Consumer Data Protection
    Chapter 541. Consumer Data Protection (Refs & Annos)
     Subchapter C. Controller and Processor Data-Related Duties and Prohibitions

V.T.C.A., Bus. & C. § 541.101

§ 541.101. Controller Duties; Transparency

Currentness

(a) A controller:

(1) shall limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which that personal data is processed, as disclosed to the consumer; and

(2) for purposes of protecting the confidentiality, integrity, and accessibility of personal data, shall establish, implement, and maintain reasonable administrative, technical, and physical data security practices that are appropriate to the volume and nature of the personal data at issue.

(b) A controller may not:

(1) except as otherwise provided by this chapter, process personal data for a purpose that is neither reasonably necessary to nor compatible with the disclosed purpose for which the personal data is processed, as disclosed to the consumer, unless the controller obtains the consumer's consent;

(2) process personal data in violation of state and federal laws that prohibit unlawful discrimination against consumers;

A-017

(3) discriminate against a consumer for exercising any of the consumer rights contained in this chapter, including by denying goods or services, charging different prices or rates for goods or services, or providing a different level of quality of goods or services to the consumer; or

(4) process the sensitive data of a consumer without obtaining the consumer's consent, or, in the case of processing the sensitive data of a known child, without processing that data in accordance with the Children's Online Privacy Protection Act of 1998 (15 U.S.C. Section 6501 et seq.).

(c) Subsection (b)(3) may not be construed to require a controller to provide a product or service that requires the personal data of a consumer that the controller does not collect or maintain or to prohibit a controller from offering a different price, rate, level, quality, or selection of goods or services to a consumer, including offering goods or services for no fee, if the consumer has exercised the consumer's right to opt out under Section 541.051 or the offer is related to a consumer's voluntary participation in a bona fide loyalty, rewards, premium features, discounts, or club card program.

**Credits**

Added by Acts 2023, 88th Leg., ch. 995 (H.B. 4), § 2, eff. July 1, 2024.

V. T. C. A., Bus. & C. § 541.101, TX BUS & COM § 541.101
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-018

**Tab E: TDPSA, Tex. Bus. & Com. Code § 541.102**

 KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle C. Consumer Data Protection
        Chapter 541. Consumer Data Protection (Refs & Annos)
          Subchapter C. Controller and Processor Data-Related Duties and Prohibitions

V.T.C.A., Bus. & C. § 541.102

§ 541.102. Privacy Notice

Currentness

(a) A controller shall provide consumers with a reasonably accessible and clear privacy notice that includes:

(1) the categories of personal data processed by the controller, including, if applicable, any sensitive data processed by the controller;

(2) The purpose for processing personal data;

(3) how consumers may exercise their consumer rights under Subchapter B, including the process by which a consumer may appeal a controller's decision with regard to the consumer's request;

(4) if applicable, the categories of personal data that the controller shares with third parties;

(5) if applicable, the categories of third parties with whom the controller shares personal data; and

A-020

(6) a description of the methods required under Section 541.055 through which consumers can submit requests to exercise their consumer rights under this chapter.

(b) If a controller engages in the sale of personal data that is sensitive data, the controller shall include the following notice:

"NOTICE: We may sell your sensitive personal data." The notice must be posted in the same location and in the same manner as the privacy notice described by Subsection (a).

(c) If a controller engages in the sale of personal data that is biometric data, the controller shall include the following notice:

"NOTICE: We may sell your biometric personal data." The notice must be posted in the same location and in the same manner as the privacy notice described by Subsection (a).

**Credits**
Added by Acts 2023, 88th Leg., ch. 995 (H.B. 4), § 2, eff. July 1, 2024.

V. T. C. A., Bus. & C. § 541.102, TX BUS & COM § 541.102
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-021

**Tab F: TDPSA, Tex. Bus. & Com. Code § 541.103**

 KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle C. Consumer Data Protection
        Chapter 541. Consumer Data Protection (Refs & Annos)
          Subchapter C. Controller and Processor Data-Related Duties and Prohibitions

V.T.C.A., Bus. & C. § 541.103

§ 541.103. Sale of Data to Third Parties and
Processing Data for Targeted Advertising; Disclosure

Currentness

If a controller sells personal data to third parties or processes personal data for targeted advertising, the controller shall clearly and conspicuously disclose that process and the manner in which a consumer may exercise the right to opt out of that process.

**Credits**
Added by Acts 2023, 88th Leg., ch. 995 (H.B. 4), § 2, eff. July 1, 2024.

V. T. C. A., Bus. & C. § 541.103, TX BUS & COM § 541.103
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-023

**Tab G: Data Broker Law, Tex. Bus. & Com. Code § 509.001**

 KeyCite Red Flag

Enacted Legislation  Renumbered by  2025 Tex. Sess. Law Serv. Ch. 204 (H.B. 1620) (VERNON'S),

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 11. Personal Identity Information (Refs & Annos)
      Subtitle A. Identifying Information
        Chapter 509. Data Brokers (Refs & Annos)

V.T.C.A., Bus. & C. § 509.001

§ 509.001. Definitions

Currentness

In this chapter:

(1) "Biometric data" means data generated by automatic measurements of an individual's biological patterns or characteristics, including fingerprint, voiceprint, retina or iris scan, information pertaining to an individual's DNA, or another unique biological pattern or characteristic that is used to identify a specific individual.

(2) "Child" means an individual younger than 13 years of age.

(3) "Collect," in the context of data, means to obtain, receive, access, or otherwise acquire the data by any means, including by purchasing or renting the data.

(4) "Data broker" means a business entity whose principal source of revenue is derived from the collecting, processing, or transferring of personal data that the entity did not collect directly from the individual linked or linkable to the data.

(5) "Deidentified data" means data that cannot reasonably be linked to an identified or identifiable individual or to a device linked to that individual.

A-025

(6) "Employee" includes an individual who is a director, officer, staff member, trainee, volunteer, or intern of an employer or an individual working as an independent contractor for an employer, regardless of whether the individual is paid, unpaid, or employed on a temporary basis. The term does not include an individual contractor who is a service provider.

(7) "Employee data" means information collected, processed, or transferred by an employer if the information:

(A) is related to:

(i) a job applicant and was collected during the course of the hiring and application process;

(ii) an employee who is acting in a professional capacity for the employer, including the employee's business contact information such as the employee's name, position, title, business telephone number, business address, or business e-mail address;

(iii) an employee's emergency contact information; or

(iv) an employee or the employee's spouse, dependent, covered family member, or beneficiary; and

(B) was collected, processed, or transferred solely for:

(i) a purpose relating to the status of a person described by Paragraph (A)(i) as a current or former job applicant of the employer;

(ii) a purpose relating to the professional activities of an employee described by Paragraph (A)(ii) on behalf of the employer;

(iii) the purpose of having an emergency contact on file for an employee described by Paragraph (A)(iii) and for transferring the information in case of an emergency; and

A-026

(iv) the purpose of administering benefits to which an employee described by Paragraph (A)(iv) is entitled or to which another person described by that paragraph is entitled on the basis of the employee's position with the employer.

(8) "Genetic data" means any data, regardless of format, concerning an individual's genetic characteristics. The term includes:

(A) raw sequence data derived from sequencing all or a portion of an individual's extracted DNA; and

(B) genotypic and phenotypic information obtained from analyzing an individual's raw sequence data.

(9) "Individual" means a natural person residing in this state.

(10) "Known child" means a child under circumstances where a data broker has actual knowledge of, or wilfully disregards obtaining actual knowledge of, the child's age.

(11) "Personal data" means any information, including sensitive data, that is linked or reasonably linkable to an identified or identifiable individual. The term includes pseudonymous data when the information is used by a controller or processor in conjunction with additional information that reasonably links the information to an identified or identifiable individual. The term does not include deidentified data, employee data, or publicly available information.

(12) "Precise geolocation data" means information accessed on a device or technology that shows the past or present physical location of an individual or the individual's device with sufficient precision to identify street-level location information of the individual or device in a range of not more than 1,850 feet. The term does not include location information regarding an individual or device identifiable or derived solely from the visual content of a legally obtained image, including the location of a device that captured the image.

A-027

(13) "Process," in the context of data, means an operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data, such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data.

(14) "Publicly available information" means information that:

(A) is lawfully made available through government records;

(B) a business has a reasonable basis to believe is lawfully available to the general public through widely distributed media; or

(C) is lawfully made available by a consumer, or by a person to whom a consumer has disclosed the information, unless the consumer has restricted access to the information to a specific audience.

(15) "Sensitive data" means:

(A) a government-issued identifier not required by law to be available publicly, including:

(i) a social security number;

(ii) a passport number; or

(iii) a driver's license number;

(B) information that describes or reveals an individual's mental or physical health diagnosis, condition, or treatment;

(C) an individual's financial information, except the last four digits of a debit or credit card number, including:

A-028

(i) a financial account number;

(ii) a credit or debit card number; or

(iii) information that describes or reveals the income level or bank account balances of the individual;

(D) biometric data;

(E) genetic data;

(F) precise geolocation data;

(G) an individual's private communication that:

(i) if made using a device, is not made using a device provided by the individual's employer that provides conspicuous notice to the individual that the employer may access communication made using the device; and

(ii) includes, unless the data broker is the sender or an intended recipient of the communication:

(a) the individual's voicemails, e-mails, texts, direct messages, or mail;

(b) information that identifies the parties involved in the communications; and

(c) information that relates to the transmission of the communications, including telephone numbers called, telephone numbers from which calls were placed, the time calls were made, call duration, and location information of the parties to the call;

A-029

(H) a log-in credential, security code, or access code for an account or device;

(I) information identifying the sexual behavior of the individual in a manner inconsistent with the individual's reasonable expectation regarding the collection, processing, or transfer of the information;

(J) calendar information, address book information, phone or text logs, photos, audio recordings, or videos:

(i) maintained for private use by an individual and stored on the individual's device or in another location; and

(ii) not communicated using a device provided by the individual's employer unless the employee was provided conspicuous notice that the employer may access communication made using the device;

(K) a photograph, film, video recording, or other similar medium that shows the individual or a part of the individual nude or wearing undergarments;

(L) information revealing the video content requested or selected by an individual that is not:

(i) collected by a provider of broadcast television service, cable service, satellite service, streaming media service, or other video programming, as that term is defined by 47 U.S.C. Section 613(h)(2); or

(ii) used solely for transfers for independent video measurement;

(M) information regarding a known child;

(N) information revealing an individual's racial or ethnic origin, color, religious beliefs, or union membership;

A-030

(O) information identifying an individual's online activities over time accessing multiple Internet websites or online services; or

(P) information collected, processed, or transferred for the purpose of identifying information described by this subdivision.

(16) "Service provider" means a person that receives, collects, processes, or transfers personal data on behalf of, and at the direction of, a business or governmental entity, including a business or governmental entity that is another service provider, in order for the person to perform a service or function with or on behalf of the business or governmental entity.

(17) "Transfer," in the context of data, means to disclose, release, share, disseminate, make available, sell, or license the data by any means or medium.

**Credits**
Added by Acts 2023, 88th Leg., ch. 963 (S.B. 2105), § 1, eff. Sept. 1, 2023.

V. T. C. A., Bus. & C. § 509.001, TX BUS & COM § 509.001
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-031

**Tab H: Data Broker Law, Tex. Bus. & Com. Code § 509.005**

KeyCite Red Flag
Enacted Legislation  Renumbered by   2025 Tex. Sess. Law Serv. Ch. 204 (H.B. 1620) (VERNON'S),

Vernon's Texas Statutes and Codes Annotated

  Business and Commerce Code (Refs & Annos)

    Title 11. Personal Identity Information (Refs & Annos)

      Subtitle A. Identifying Information

        Chapter 509. Data Brokers (Refs & Annos)

V.T.C.A., Bus. & C. § 509.005

§ 509.005. Registration

Currentness

(a) To conduct business in this state, a data broker to which this chapter applies shall register with the secretary of state by filing a registration statement and paying a registration fee of $300.

(b) The registration statement must include:

(1) the legal name of the data broker;

(2) a contact person and the primary physical address, e-mail address, telephone number, and Internet website address for the data broker;

(3) a description of the categories of data the data broker processes and transfers;

(4) a statement of whether or not the data broker implements a purchaser credentialing process;

(5) if the data broker has actual knowledge that the data broker possesses personal data of a known child:

(A) a statement detailing the data collection practices, databases, sales activities, and opt-out policies that are applicable to the personal data of a known child; and

(B) a statement on how the data broker complies with applicable federal and state law regarding the collection, use, or disclosure of personal data from and about a child on the Internet; and

(6) the number of security breaches the data broker has experienced during the year immediately preceding the year in which the registration is filed, and if known, the total number of consumers affected by each breach.

(c) A registration of a data broker may include any additional information or explanation the data broker chooses to provide to the secretary of state concerning the data broker's data collection practices.

(d) A registration certificate expires on the first anniversary of its date of issuance. A data broker may renew a registration certificate by filing a renewal application, in the form prescribed by the secretary of state, and paying a renewal fee in the amount of $300.

**Credits**
Added by Acts 2023, 88th Leg., ch. 963 (S.B. 2105), § 1, eff. Sept. 1, 2023.

V. T. C. A., Bus. & C. § 509.005, TX BUS & COM § 509.005
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-034

# Tab I: Tex. Ins. Code § 541.002

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 5. Protection of Consumer Interests (Refs & Annos)
      Subtitle C. Deceptive, Unfair, and Prohibited Practices
        Chapter 541. Unfair Methods of Competition and Unfair or Deceptive Acts or
        Practices (Refs & Annos)
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 541.002

§ 541.002. Definitions

Currentness

In this chapter:

(1) "Knowingly" means actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages under Subchapter D [1] is based. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness.

(2) "Person" means an individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyd's plan, fraternal benefit society, or other legal entity engaged in the business of insurance, including an agent, broker, or adjuster.

**Credits**
Added by Acts 2003, 78th Leg., ch. 1274, § 2, eff. April 1, 2005. Amended by Acts 2021, 87th Leg., ch. 355 (H.B. 4030), § 3, eff. Sept. 1, 2021.

Notes of Decisions (19)

**O'CONNOR'S CROSS REFERENCES**
See also *O'Connors Texas COA*, "Deceptive Insurance Practices," ch. 13-C, §1 et seq.

A-036

## Footnotes

1  V.T.C.A., Insurance Code § 541.151 et seq.

V. T. C. A., Insurance Code § 541.002, TX INS § 541.002
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-037

**Tab J: Tex. Ins. Code § 541.003**

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 5. Protection of Consumer Interests (Refs & Annos)
      Subtitle C. Deceptive, Unfair, and Prohibited Practices
        Chapter 541. Unfair Methods of Competition and Unfair or Deceptive Acts or
        Practices (Refs & Annos)
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 541.003

§ 541.003. Unfair Methods of Competition and
Unfair or Deceptive Acts or Practices Prohibited

Currentness

A person may not engage in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

**Credits**
Added by Acts 2003, 78th Leg., ch. 1274, § 2, eff. April 1, 2005.

Notes of Decisions (529)

**O'CONNOR'S CROSS REFERENCES**
See also *O'Connors Texas COA*, "Deceptive Insurance Practices," ch. 13-C, §1 et seq.

V. T. C. A., Insurance Code § 541.003, TX INS § 541.003
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-039

**Tab K: Plaintiff's First Amended Petition (Am. C.R. 205)**

**CAUSE NO. 25-01-00561**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE ALLSTATE CORPORATION, | ) | MONTGOMERY COUNTY, TEXAS |
| ALLSTATE INSURANCE COMPANY, | ) | |
| ALLSTATE VEHICLE AND | ) | |
| PROPERTY INSURANCE COMPANY, | ) | |
| ARITY, LLC, | ) | |
| ARITY 875, LLC, *and* | ) | |
| ARITY SERVICES, LLC, | ) | |
| *Defendants.* | ) | **457th JUDICIAL DISTRICT** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S FIRST AMENDED PETITION

Plaintiff, the State of Texas ("Plaintiff" or the "State"), acting by and through the Attorney General of Texas, Ken Paxton ("Attorney General"), brings this action against Defendant The Allstate Corporation, Defendant Allstate Insurance Company, Defendant Allstate Vehicle and Property Insurance Company (collectively, "Allstate Defendants"), Defendant Arity, LLC, Defendant Arity 875, LLC, and Defendant Arity Services, LLC (collectively, the "Arity Defendants," and collectively with Allstate Defendants, "Defendants"), for violating the Texas Data Privacy and Security Act, Tex. Bus. & Com. Code §§ 541.001 *et seq*. ("TDPSA"); Tex. Bus. & Com. Code §§ 509.001 *et seq*. ("Data Broker Law"); and Tex. Ins. Code §§ 541.001 *et seq*. ("Texas Insurance Code").

**205**

A-041

**INTRODUCTION**

1.      Defendant, The Allstate Corporation ("AllCorp") derives more insurance revenue in the State of Texas than any other state.[1] While AllCorp substantially benefits from its success in Texas, it ran into a problem—Texas is classified as a high-risk car insurance market due to a higher than average number of "risky drivers," which are, purportedly, more likely to make an auto insurance claim and, as a result, cut into AllCorp's profits.

2.      To protect their profits in their largest market, Defendants conspired to secretly collect and sell "trillions of miles" of consumers' "driving behavior" data from mobile devices, in-car devices, and vehicles.[2] Defendants used the illicitly obtained data to build the "world's largest driving behavior database," which, according to Defendants, houses the driving behavior data of over 45 million Americans.[3] Defendants created the database for two main purposes: (1) to support Allstate Defendants' car insurance business and (2) profit from selling the driving behavior data to third parties, including other car insurance carriers ("Insurers").[4] Millions of Americans, including over three million Texans, were never informed of nor consented to, Defendants' continuous collection and sale of their data.

3.      Defendants covertly collected much of their "trillions of miles" of data by maintaining active connections with consumers' mobile devices and harvesting the data directly from their phones. Defendants developed and integrated software into third-party apps so that when a consumer downloaded the third-party app onto their phone, they also unwittingly downloaded Defendants' software. Once Defendants' software was downloaded onto a consumer's device, Defendants could monitor the consumer's location and movement in real-time.

---

[1] https://www.allstateinvestors.com/node/30391/html ("2023 SEC Filing").
[2] https://arity.com/
[3] https://arity.com/solutions/vehicle-miles-traveled/
[4] https://arity.com/

2

4.      Through the software integrated into the third-party apps, Defendants pulled a litany of valuable data directly from consumers' mobile phones. This data included the phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data, which monitors details such as the phone's altitude, longitude, latitude, bearing, GPS time, speed, and accuracy.

5.      To encourage developers to adopt Defendants' software, Defendants paid app developers millions of dollars to integrate Defendants' software into their apps. Defendants further incentivized developer participation by creating generous bonus incentives for increasing the size of their dataset. According to the Arity Defendants, the apps integrated with their software currently allow them to "capture[] [data] every 15 seconds or less" from "40 [million] *active* mobile connections."[5] This data included precise geolocation, trip attribute data, movement data, "dwell time," user metadata, and many other data points of over 40 million mobile phones.

6.      Once collected, Defendants found several ways to monetize the ill-gotten data, including by selling access to Defendants' driving behavior database to other Insurers and using the data for Allstate Defendants' own insurance underwriting. If a consumer requested a car insurance quote or had to renew their coverage, Insurers would access that consumer's driving behavior data in Defendants' database. Insurers then used that consumer's data to justify increasing their car insurance premiums, denying them coverage, or dropping them from coverage.

7.      The Arity Defendants marketed and sold the data obtained through third-party apps as "driving" data reflecting consumers' driving habits, despite the data being collected from and about the location of a person's phone. More recently, however, Defendants began purchasing data about vehicles' operation directly from car manufacturers. Defendants ostensibly did this to better account for their inability to distinguish whether a person was actually driving or a passenger based

---

[5] https://arity.com/solutions/real-time-insights/ (emphasis added).

on the location and movements of their phone. The manufacturers that Defendants purchased data from included Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram. Allstate Defendants have used this data for their own insurance underwriting purposes.

8.     Consumers did not consent to, nor were they aware of Defendants' collection, use, or sale of immeasurable amounts of their sensitive data. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented and obtained from consumers. However, Defendants never informed consumers about their extensive data collection, nor did Defendants obtain consumers' consent to engage in such data collection. Finally, Defendants never informed consumers about the myriad of ways Defendants would analyze, use, and monetize their sensitive data.

9.     Defendants' conduct violates the TDPSA, the Data Broker Law, and the Texas Insurance Code's prohibition on unfair and deceptive acts and practices in the business of insurance.[6] The State of Texas contends that this proceeding is in the public interest and brings this action to end and penalize the privacy and financial harms caused by Defendants' conduct.

## JURISDICTION AND VENUE

10.     This action is brought by the Texas Attorney General's Office through its Consumer Protection Division in the name of the State of Texas and in the public interest, pursuant to the authority granted by Section 541.155 of the TDPSA, Section 509.008 of the Data Broker Law, and Sections 541.201 through 541.207 of the Texas Insurance Code.

---

[6] *See, e.g.*, Concurring and Dissenting Statement of Commissioner Andrew N. Ferguson, *In re Gravy Analytics, Inc. & In re Mobilewalla, Inc.*, Federal Trade Commission, Matter Nos. 2123035 & 2023196 (Dec. 3, 2024), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/gravy_-mobilewalla-ferguson-concurrence.pdf ("Given that the failure to obtain meaningful consent to the collection of precise location data is widespread, data brokers that purchase sensitive information cannot avoid liability by turning a blind eye to the strong possibility that consumers did not consent to its collection and sale. The sale of precise location data collected without the consumer's consent poses a similarly unavoidable and substantial risk of injury to the consumer as does the sale of the non-anonymized data.").

4

11.     In enforcement actions filed pursuant to Section 541.155 of the TDPSA, the Attorney General may seek civil penalties and injunctive relief. In addition, the Attorney General may recover reasonable attorney's fees and other reasonable expenses incurred in investigating and bringing an action.

12.     In enforcement actions filed pursuant to Section 509.008 of the Data Broker Law, the Attorney General may recover civil penalties. In addition, the Attorney General may recover reasonable attorney's fees and court costs incurred in bringing the action.

13.     In enforcement actions filed pursuant to Sections 541.201 through 541.207 of the Texas Insurance Code, the Attorney General may seek civil penalties, redress for consumers, and injunctive relief. In addition, the Attorney General may pursue reasonable attorney's fees and litigation expenses in connection with the prosecution of the instant action, in accordance with Texas Government Code Section 402.006(c).

14.     Jurisdiction is proper for the reasons described throughout this Petition, including because Defendants engaged in unlawful conduct targeting the data of Texans, profited from Texans' data, and harmed millions of Texas consumers through their actions.

15.     Venue of this suit lies in Montgomery County, Texas, pursuant to Section 541.202 of the Texas Insurance Code, because Defendants have done business in Montgomery County and because transactions at issue in this suit have occurred in Montgomery County.

## DISCOVERY

16.     The discovery in this case should be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4. Restrictions concerning expedited discovery under Texas Rule of Civil Procedure 169 do not apply because the State seeks non-monetary injunctive relief as part of its claims.

5

17. In addition to injunctive relief, the State claims entitlement to monetary relief in an amount greater than $1,000,000.00, including civil penalties, reasonable attorney's fees, litigation expenses, restitution, and costs.

## PARTIES

18. The **Office of the Attorney General of Texas by and through its Consumer Protection Division** brings this action pursuant to its authority under Section 541.155 of the TDPSA, Section 509.008 of the Data Broker Law, and Sections 541.201 through 541.207 of the Texas Insurance Code.

19. **Defendant The Allstate Corporation** is a United States public corporation headquartered in Glenview, Illinois, and incorporated under the laws of Delaware. Together with its subsidiaries, Defendant The Allstate Corporation provides insurance products, including car insurance, throughout the United States, including Montgomery County, Texas. Defendant The Allstate Corporation may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. According to Arity's website, Defendant The Allstate Corporation founded Arity in 2016.[7]

20. **Defendant Allstate Insurance Company** is a wholly owned subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Insurance Company provides insurance products, including car insurance, throughout the United States, including Montgomery County, Texas, and maintains at least one office in Montgomery County, Texas. Defendant Allstate Insurance Company may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

---

[7] https://arity.com/about-us/

210

A-046

21. **Defendant Allstate Vehicle and Property Insurance Company** is a subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Vehicle and Property Insurance Company provides insurance products, including car insurance, throughout the United States, including Montgomery County, Texas. Allstate Vehicle and Property Insurance Company may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

22. **Defendant Arity, LLC,** was founded by Defendant The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Arity is a "fully remote company"[8] but lists that its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Delaware. Defendant Arity, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including Montgomery County, Texas, and uses predictive analytics to build solutions to sell to third parties. According to Arity, LLC's privacy policy, regardless of a consumer's state of residence, a consumer can contact Arity, LLC, with questions or concerns about Arity, LLC's privacy practices by mailing Arity, LLC's Data Protection Officer at PO Box 227238, Dallas, TX 75222-7238. Arity, LLC, may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

23. **Defendant Arity 875, LLC,** was founded by Defendant The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Arity is a "fully remote company"[9] but lists that its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Delaware. Defendant Arity 875, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes

---

[8] https://arity.com/about-us/careers/.
[9] https://arity.com/about-us/careers/.

7

data obtained throughout the United States, including Montgomery County, Texas, and uses predictive analytics to build solutions to sell to third parties. According to Arity 875, LLC's privacy policy, regardless of a consumer's state of residence, a consumer can contact Arity, LLC, with questions or concerns about Arity 875, LLC's privacy practices by mailing Arity 875, LLC's Data Protection Officer at PO Box 227238, Dallas, TX 75222-7238. Arity, LLC, may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Arity 875, LLC, may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

24. **Defendant Arity Services, LLC,** was founded by Defendant The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Arity is a "fully remote company"[10] but lists that its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Delaware. Defendant Arity Services, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including Montgomery County, Texas, and uses predictive analytics to build solutions to sell to third parties. Arity Services, LLC, may be served through its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

25. On information and belief, the Arity Defendants share all officers and operations among and between each other, such as their President, Gary Hallgren.

## PUBLIC INTEREST

26. The State has reason to believe that Defendants are engaging in or have engaged in the unlawful acts or practices set forth below. In addition, the State has reason to believe that

---

[10] https://arity.com/about-us/careers/.

8

Defendants have caused injury, loss, and damage to the State, and have caused adverse effects to the lawful conduct of trade and commerce, thereby directly or indirectly affecting the people of this State. Therefore, the Consumer Protection Division of the Office of the Attorney General initiates this proceeding in the public interest. *See* Tex. Ins. Code § 541.201.

## PRE-SUIT NOTICE

27. Section 541.154 of the TDPSA requires the Attorney General to "notify a person in writing, not later than the 30th day before bringing [an] action, identifying the specific provisions of [the TDPSA] the attorney general alleges have been or are being violated." Further, the Attorney General may not bring an action if, within thirty (30) days of receiving notice from the Attorney General, a person "provides the attorney general a written statement that the person: (A) cured the alleged violation; (B) notified the consumer that the consumer's privacy violation was addressed, if the consumer's contact information has been made available to the person; (C) provided supportive documentation to show how the privacy violation was cured; and (D) made changes to internal policies, if necessary, to ensure that no such further violations will occur." Tex. Bus. & Com. Code § 541.154.

28. On November 29, 2024, the Attorney General, by and through the Consumer Protection Division of the Office of the Attorney General, notified the Arity Defendants that their collection and sale of consumers' sensitive data appeared to violate Sections 541.102(a)(1), 541.101(b)(4), 541.102(b), 541.103, 541.051(b)(5), and 541.102(a)(3) of the TDPSA. *See* Nov. 29, 2024 Notice of Violation ("Attachment 1").

29. As of December 29, 2024—thirty (30) days after receiving the Notice of Violation—the Arity Defendants did not cure the alleged violation(s) in accordance with Section 541.154 of the TDPSA because the Arity Defendants did not provide the Attorney General a

9

written statement and supportive documentation showing that the Arity Defendants: (1) cured the alleged violation(s); (2) notified affected consumers of the privacy violations; and (3) made changes to internal policies, if necessary.

30. The Consumer Protection Division also provided the Arity Defendants notice on April 2, 2024, that the Arity Defendants had apparently failed to register with the Texas Secretary of State as required by the Data Broker Law. On information and belief, the Arity Defendants have not registered with the Texas Secretary of State as of the filing of the State's Original Petition.

## FACTS

31. Defendants have amassed the data of millions of Americans, including—on information and belief—at least three million Texans.[11] Defendants obtained this data in at least two ways: (1) by installing software designed and patented by Allstate Defendants into various mobile apps that allowed Defendants to collect and use data directly from consumers' phones; and (2) by contracting to obtain data directly from vehicle manufacturers.

32. Defendants have monetized and financially benefited from this data in a variety of ways, including by building and selling Insurers access to the "world's largest driving behavior database," consisting of the "driving behavior" data of over 45 million Americans,[12] and by using the data for the Allstate Defendants' own insurance underwriting purposes.

33. Defendants never notified consumers nor obtained their consent to collect or sell their data.

### I. The Allstate Defendants Developed Software to Covertly Collect Consumers' Location Data

---

[11] https://arity.com/solutions/vehicle-miles-traveled/
[12] https://arity.com/

10

34.     On information and belief, in 2015 the Allstate Defendants designed and patented a software development kit ("SDK") that could be integrated into mobile phone applications to collect data about the location and movements of a person's phone. In general, SDKs can provide app developers a helpful tool to build and develop their apps. SDKs usually consist of a set of tools (APIs, software, etc.) with preprogrammed functions that are integrated into an app and operate in the background.

35.     But the SDK Defendants developed was little more than a way for Defendants to scrape user data from several third-party apps under the pretext of providing a necessary function. Specifically, Defendants designed the Arity Driving Engine SDK ("Arity SDK") to collect an immense amount of granular data points from or about the location of a person's mobile phone ("Arity SDK Data").

36.     Once installed in a mobile app, the Arity SDK harvested several types of data, including but not limited to:

(a) a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

(b) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

(c) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

(d) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

11

**215**

A-051

(e) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

37. Because the Arity SDK operated and collected data in the background, absent being notified by Defendants or the app, users would be kept in the dark about the Arity SDK's existence. Apps users would likewise be unaware that Defendants were directly collecting Arity SDK Data from their phones. Defendants never notified nor otherwise informed consumers that they were collecting their data via the Arity SDK and the apps.

## II. Defendants Paid to Integrate the Arity SDK into Mobile Apps

38. Since at least 2017, Defendants have been "licensing" the Arity SDK by paying app developers millions of dollars to integrate the Arity SDK into their respective mobile apps. On information and belief, to avoid alerting consumers of their data collection, Defendants only sought to partner with apps that, prior to contracting with Defendants, already contained features that relied on location information to function properly. The apps that integrated the Arity SDK included Routely,[13] Life360, GasBuddy, and Fuel Rewards. GasBuddy and Fuel Rewards are headquartered in Dallas, Texas.

39. Each of these apps routinely requested and received permission from users to use their location information to enable certain in-app features prior to integrating the Arity SDK. But after an app integrated the Arity SDK, if an app user allowed the app to access their location information for those same in-app features, the user was also unwittingly enabling Defendants to collect the Arity SDK Data via the Arity SDK.

40. Defendants' agreements with app developers generally had similar key provisions. Pursuant to these agreements, Defendants granted an app developer a limited license to integrate

---

[13] On information and belief, Defendants now own the Routely app.

12

the Arity SDK into the developer's mobile app. Once integrated into an app, Defendants were permitted to use the Arity SDK to collect and use the Arity SDK Data from app users' mobile phones.

41.     Pursuant to their agreements with the app developers, Defendants owned any Arity SDK Data they collected from an app user and were permitted to use the Arity SDK Data for their own independent purposes. Defendants further agreed to license or transfer subsets of the Arity SDK Data to the app developers to use to support specific features in their apps, such as displaying a summary of a user's trip and fuel efficiency.

42.     On information and belief, the Arity SDK Data in isolation could not (or at least could not reliably) be linked to a specific individual. To allow Defendants to match specific individuals to the Arity SDK Data, the app publishers licensed the personal data that they collected from their users to Defendants. The personal data that mobile apps licensed to Defendants generally included first and last name, phone number, address, zip code, mobile ad-ID ("MAID"), device ID, and ad-ID (collectively "Personal Data"). Upon combining the Personal Data with the Arity SDK Data, Defendants could more reliably identify the specific person being monitored by the Arity SDK.

### III.     Defendants' Products and Services Monetized Consumers' Data

43.     Defendants used the Arity SDK Data and Personal Data, alone and in conjunction with one another, to develop, advertise, and sell several different products and services to third parties, including Insurers, and used the Arity SDK Data and Personal Data for the Allstate Defendants' own underwriting purposes. Defendants' products and services included:

(a) Drivesight. In 2015, Allstate Defendants developed Drivesight to generate a driving score based on Defendants' own scoring model by analyzing data and generating driving scores that assign a particular value to an individual's driving risk.

13

**217**

(b) ArityIQ. The Arity Defendants let companies, including Insurers, "[a]ccess actual driving behavior collected from mobile phones and connected vehicles to use at time of quote to more precisely price nearly any driver."[14]

(c) Arity Audiences. The Arity Defendants let companies, including Insurers, "[t]arget drivers based on risk, mileage, commuting habits" and "[m]ore effectively reach [their] ideal audiences with the best offers to eliminate wasted spend, increase retention, and achieve optimal customer LTV."[15] The Arity Defendants or their customers could reach "millions of validated drivers, segmented by driving behavior" to display ads and promotions.[16] On information and belief, as part of this product, the Arity Defendants could and did display ads to the Texas users of apps that agreed to integrate the Arity SDK.

(d) Real Time Insights. The Arity Defendants advertised that their business customers could "[r]eceive granular driver probe and event data for real-time applications."[17]

(e) Routely. The Arity Defendants offer consumers Routely, a "free" application which purports to provide "helpful insights" into the consumers' driver data. By contrast, when marketing to Insurers, Defendants describe Routely as "telematics in a box" that Insurers can use to "more accurately identify drivers with riskier driving profiles based on actual driving data, provide personalized discounts or surcharges at renewal, promote safer driving habits, and improve retention of [their] safer drivers."[18]

---

[14] https://arity.com/solutions/arity-iq/
[15] https://arity.com/solutions/arity-audiences/
[16] https://arity.com/solutions/arity-marketing-platform/
[17] https://arity.com/solutions/real-time-insights/
[18] https://arity.com/solutions/routely/

14

44.     The Arity Defendants also marketed and advertised the data they collected and analyzed from Texans to business customers.[19]

**Rural areas in west Texas saw an upswing in distracted driving**

Phone distraction while driving, 2019-2023

Phone distraction

45.     The Arity Defendants also notably primarily marketed the Arity SDK Data to third parties as "driving behavior" data as opposed to what the Arity SDK Data really was: data about the movements of a person's *mobile phone*. On information and belief, Defendants had no way to reliably determine whether a person was driving at the time Defendants collected the Arity SDK Data.

46.     For example, if a person was a passenger in a bus, a taxi, or in a friend's car, and that vehicle's driver sped, hard braked, or made a sharp turn, Defendants would conclude that the passenger, not the actual driver, engaged in "bad" driving behavior based on the Arity SDK Data.[20] Defendants would then subsequently sell and share the data so it could be used to inform decisions

---

[19] https://arity.com/wp-content/uploads/2024/06/arity_GenPop-report_2024.pdf

[20] As a further example, it was publicly reported that a person's driving score was lowered because the "driving" behavior data collected from his phone claimed he was driving when he was actually riding a roller coaster. https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cuts-driving-score-man-riding-the-beast-kings-island/75554987007/.

15

about that passenger's insurability based on their "bad" driving behavior. The Arity Defendants' public advertising for their products and services do not disclose the limitations of the Arity SDK Data.

47. To potentially account for the Arity SDK Data's limitations, Defendants sought to combine the SDK Data with data collected directly from vehicles. As a result, Defendants began purchasing consumers' driving-related data from car manufacturers such as Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram. On information and belief, consumers did not consent, nor were otherwise aware that, Defendants purchased their driving-related data from these car manufacturers.

## IV. Defendants' Lack of Privacy Disclosures

48. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented to consumers. However, neither Defendants, nor the apps on Defendants' behalf, informed consumers that Defendants were collecting Arity SDK Data. Nor did Defendants, nor the apps on Defendants' behalf, inform consumers of the various ways that Defendants would collect, use, and ultimately monetize the Arity SDK Data.

49. For example, Life360 merely told app users that it needed location sharing turned on "to enable data use for the in-app map, Place Alerts, and location sharing with [a user's] Circle." Nowhere did Life360 even mention Defendants' existence, let alone any of Defendants' data collection or sales.

Figure 1

**Life360 requires these permissions to work properly**

**Location**
Location set to "Always" is used to enable data use for the in-app map, Place Alerts, and location sharing with your Circle.

**Push Notifications**
Stay up-to-date with check-ins, alerts, and messages from your Circle.

**Motion Sensors**
Motion activity data provides more reliable location, enables Driving Safety features, analytics, and Crash Detection.

**Bluetooth**
Connect to nearby devices and improve location updates for the Life360 community.

220

50.    Because Defendants did not disclose their conduct, consumers were wholly unaware that Defendants were collecting the Arity SDK Data from their phone. Consumers were likewise wholly unaware that Defendants would use the Arity SDK Data to create and sell several different products and services to third parties, including Insurers.

51.    Defendants did not provide consumers with any sort of notice of their data and privacy practices, nor did the mobile apps notify consumers about Defendants' practices on Defendants' behalf. *See* Figure 1. Similarly, neither Defendants nor the mobile apps notified consumers of the ways in which their SDK Data would be used, nor did consumers agree to have their data used for Defendants' own products or services. *See id*.

52.    Even if a consumer took the extra step to investigate Defendants outside of their app, navigated to Defendants' website, and located their privacy disclosures, they would still not understand what Defendants did with their data. Consumers reading Defendants' privacy disclosures are met with a series of untrue and contradictory statements that do not reflect Defendants' practices.

53.    For example, Defendants state that they "do not sell personal information for monetary value," which is untrue. Defendants sold a number of data-based products and services

17

**221**

for monetary value that linked a specific app user to their alleged driving behavior. Further, Defendants do not provide consumers with the ability to request that Defendants stop selling their data. *See* Attach. 1, Ex. A.

54. Defendants likewise obscured how they used consumers' data. In the Arity Defendants' privacy disclosures, the Arity Defendants state that they "[u]se [consumers'] personal data for analytics and profiling." But in describing how the Arity Defendants "profile" consumers, the description does not reflect their actual "profiling" conduct—which consisted of Defendants combining the Arity SDK Data and Personal Data to create a database of driving profiles for more than 45 million Americans and selling access to said database. Rather, the Arity Defendants describe their profiling activities as follows:

> "We use your personal data to assist in our development of predictive driving models. We may profile [consumers'] personal data only for the purposes of creating a driving score ('Driving Score'), which is used for our analytics purposes to develop and validate our predictive driving models." *See* Attach. 1, Ex. A.

55. In the event a consumer took the extraordinary steps of tracking down the Arity Defendants' privacy statements, finding the subparagraph describing profiling, parsing through the Arity Defendants' convoluted description of their profiling activities, and concluding that they did not want the Arity Defendants to use their data to create a "Driving Score" about them, consumers still could do nothing to stop Defendants from collecting their data and creating a Driving Score. The Arity Defendants did not describe, nor provide, a method for a consumer to request that their data not be used to profile them.

56. Similarly, if a consumer concluded they did not want the Arity Defendants to use their data for targeted advertising, the Arity Defendants instructed them that they could "[l]earn how to opt out of targeted advertising" by visiting another link. But if a consumer followed that link, they would be taken to a page that—instead of offering them a way to submit a request to opt

18

out of targeted advertising—only provided them with links to several third-party websites, such as the Apple Support Center. These third-party websites merely contained explanations regarding how a consumer could turn off certain types of targeted advertising and did not contain a way for a consumer to submit a request to the Arity Defendants specifically.

## CAUSES OF ACTION

### COUNT I (*Arity Defendants*)

### Violations of the Texas Data Privacy and Security Act, Tex. Bus. & Com. Code §§ 541.001 *et seq*. ("TDPSA")

57. The State incorporates and adopts by reference each and every factual allegation contained in all preceding paragraphs of this Petition as if fully set forth herein.

58. The TDPSA "regulates the collection, use, processing, and treatment of consumers' personal data by certain business entities."[21] The TDPSA defines "personal data" as "any information, including sensitive data, that is linked or reasonably linkable to an identified or identifiable individual," including "pseudonymous data when the data is used by a controller or processor in conjunction with additional information that reasonably links the data to an identified or identifiable individual." Tex. Bus. & Com. Code § 541.001(19).

59. In addition to protecting consumers' personal data, the TDPSA provides heightened protections for the "processing" or sale of "sensitive data." The TDPSA defines "processing" as an "operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data." *Id*. at 541.001(22).

60. The TDPSA defines "sensitive data" by providing several examples of sensitive "categor[ies] of personal data," such as "precise geolocation data." *Id*. at 541.001(29). The TDPSA

---

[21] Tex. House Committee Report (https://capitol.texas.gov/tlodocs/88R/analysis/pdf/HB00004H.pdf).

19

defines as "information derived from technology, including global positioning system level latitude and longitude coordinates or other mechanisms, that directly identifies the specific location of an individual with precision and accuracy within a radius of 1,750 feet." *Id*. at 541.001(21).

61. The Arity Defendants obtained a consumer's sensitive precise geolocation data by using the Arity SDK integrated into mobile apps to collect the data directly from a consumer's mobile phone, including their phone's latitude, longitude, speed, GPS time, bearing, and altitude. The Arity Defendants would take the precise geolocation to analyze and sell the data for their own purposes.

62. Based on the Arity Defendants' collection, processing, and sale of consumers' sensitive precise geolocation data, the Attorney General notified the Arity Defendants that their conduct violated the following sections of the TDPSA:

**Violation 1: Section 541.102(a)(1)**

63. Section 541.102(a)(1) of the TDPSA requires a "controller [to] provide consumers with a reasonably accessible and clear privacy notice that includes . . . any sensitive data processed by the controller." The TDPSA defines a "controller" as an "individual or other person that, alone or jointly with others, determines the purpose and means of processing personal data." Tex. Bus. & Com. Code § 541.001(8).

64. The Arity Defendants acted as a controller in several respects, including by exercising ownership over the data, integrating the Arity SDK into several mobile apps to collect consumers' sensitive data, analyzing the data for certain driving behaviors, combining the data with other data sets, and repurposing the data to sell as part of various products and services.

65. Despite being the controller of the data, consumers were wholly unaware of the Arity Defendants' processing of their sensitive data, and the Arity Defendants never provided

20

consumers with a privacy notice. By extension, the Arity Defendants did not provide consumers with notice about the Arity Defendants' processing of consumers' sensitive data. Additionally, the mobile apps did not provide consumers with notice of the Arity Defendants' processing of their sensitive data on behalf of the Arity Defendants or in a reasonably accessible or clear manner.

66.     The Arity Defendants did not provide a reasonably clear and accessible privacy notice indicating the sensitive data processed by the controller. As a result, the Arity Defendants violated TDPSA Section 541.102(a)(1).

**Violation 2: Section 541.101(b)(4)**

67.     Section 541.101(b)(4) of the TDPSA prohibits a controller from "process[ing] the sensitive data of a consumer without obtaining the consumer's consent." The TDPSA defines "consent" as a "clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer." Tex. Bus. & Com. Code § 541.001(6).

68.     The TDPSA also explicitly excludes the following practices from its definition of consent: "(A) acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; (B) hovering over, muting, pausing, or closing a given piece of content; or (C) agreement obtained through the use of dark patterns." *Id*.

69.     Consumers were wholly unaware of any of the Arity Defendants' conduct, including that by downloading and using a mobile app with the Arity SDK integrated, the Arity Defendants would own, collect, analyze, and sell their sensitive data. Further, neither the Arity Defendants, nor the mobile apps on the Arity Defendants' behalf, informed consumers that the Arity Defendants were collecting their sensitive data, nor did the Arity Defendants or the mobile

21

apps obtain consumers' consent to do so. Rather, consumers were entirely unaware that by allowing one of the mobile apps to access their "location," they were also permitting the Arity Defendants to own, collect, analyze, and sell their sensitive data in a variety of ways, including by selling it to Insurers to adjust their car insurance premiums.

70. The Arity Defendants processed consumers' sensitive data without obtaining their consent through a clear affirmative act signifying their freely given and informed agreement to permit the Arity Defendants to process their sensitive data. In doing so, the Arity Defendants violated Section 541.102(b).

**Violation 3: Section 541.102(b)**

71. Section 541.102(b) of the TDPSA requires a "controller engag[ing] in the sale of personal data that is sensitive data, [to] include the following notice: 'NOTICE: We may sell your sensitive personal data.'" The TDPSA further requires that this notice "be posted in the same location and in the same manner as the privacy notice." *Id*. The TDPSA defines the "sale of personal data" as the "sharing, disclosing, or transferring of personal data for monetary or other valuable consideration by the controller to a third party." *Id*. at 541.001(28).

72. Pursuant to the agreements with app developers, Defendants owned the sensitive data collected by the Arity SDK and/or were permitted to use Arity SDK Data for their own purposes. After collecting and analyzing consumers' sensitive data, the Arity Defendants then sold the sensitive data to several third parties, including app developers and Insurers.

73. The sensitive data the Arity Defendants sold to third parties included but was not limited to GPS points, such as the accuracy, position, speed, GPS time, bearing and altitude of a consumer's phone, start and end location of a trip, start and end time of a trip, distance traveled,

22

duration of travel, hard braking events, and whether a consumer picked up or opened their phone while traveling at certain speeds.

74.     The Arity Defendants licensed app developers the sensitive data and permitted them to use it for specific purposes, such as displaying trip and fuel efficiency summaries to their respective users. With respect to Insurers, the Arity Defendants packaged the sensitive data in various ways to sell Insurers several products, such as ArityIQ, which lets Insurers "[a]ccess actual driving behavior collected from mobile phones and connected vehicles to use at time of quote to more precisely price nearly any driver."[22]

75.     The Arity Defendants did not provide the required notice as required under the TDPSA. As a result, the Arity Defendants violated Section 541.102(b) of the TDPSA.

### Violation 4: Section 541.103

76.     Section 541.103 of the TDPSA requires a "controller sell[ing] personal data to third parties or process[ing] personal data for targeted advertising, [to] clearly and conspicuously disclose that process and the manner in which a consumer may exercise the right to opt out of that process." Tex. Bus. & Com. Code § 541.103. "Targeted advertising" is defined as "displaying to a consumer an advertisement that is selected based on personal data obtained from that consumer's activities over time and across nonaffiliated websites or online applications to predict the consumer's preferences or interests. *Id*. at 541.001(19).

77.     The Arity Defendants sold personal data as part of several products and services that let businesses target consumers based on the personal data the Arity Defendants collected about them. The Arity Defendants, however, did not provide consumers any notice of their activities whatsoever, let alone a clear and conspicuous disclosure about their sales of personal

---

[22] https://arity.com/solutions/arity-iq/

23

data to third parties, their processing of personal data for targeted advertising, or a mechanism to opt out of either.

78.     Because the Arity Defendants did not provide any disclosure regarding their sales of personal data, targeted advertising practices, or a method to opt-out of either, the Arity Defendants violated Section 541.103 of the TDPSA.

**Violation 5: Sections 541.102(a)(3) and 541.051(b)(5)**

79.     Section 541.102(a)(3) of the TDPSA requires a "controller [to] provide consumers with a reasonably accessible and clear privacy notice that includes . . . how consumers may exercise their consumer rights." The consumer rights contained in Section 541.051(b)(5) of the TDPSA include the right to "opt out of the processing of [their] personal data for the purposes of: (A) targeted advertising; (B) the sale of personal data; or (C) profiling in furtherance of a decision that produces a legal or similarly significant effect concerning the consumer." The TDPSA defines "profiling" as "any form of solely automated processing performed on personal data to evaluate, analyze, or predict personal aspects related to an identified or identifiable individual's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements." *Id.* at 541.001(21).

80.     The Arity Defendants acted as a controller by collecting consumers' personal data using the Arity SDK and using that data in a variety of ways, including by selling it to third parties.

81.     Consumers were wholly unaware that the Arity Defendants were collecting their personal data, and the Arity Defendants never provided consumers with any privacy notice whatsoever. By extension, the Arity Defendants did not provide consumers with notice of their right to opt out of processing for the purposes specified in Section 541.051(b)(5) of the TDPSA.

Further, the mobile apps did not provide consumers with the Arity Defendants' privacy notice in a reasonably accessible or clear manner on behalf of the Arity Defendants.

82.     In addition, even if a consumer navigated to the Arity Defendants' website and located the Arity Defendants' privacy disclosures, the Arity Defendants did not provide consumers with a method for consumers to exercise their rights. The Arity Defendants had no method for consumers to request that the Arity Defendants stop selling their data, nor did the Arity Defendants provide consumers a method to request that the Arity Defendants stop using their data to create "driving behavior" profiles about them.

83.     Similarly, the Arity Defendants did not describe or provide consumers with a method to submit either a request to opt out of the sale of their personal data or a request to opt out of targeted advertising. Rather, the Arity Defendants merely told consumers that they do not sell personal information but that consumers could "[l]earn how to opt out of targeted advertising" by visiting another link.

84.     But if a consumer followed that link, they would be taken to a page that, instead of offering them a way to submit a request, only provided them with links to several third-party websites, such as the Apple Support Center. These websites contained explanations regarding how a consumer could turn off certain types of targeted advertising and did not contain a way for a consumer to submit a request to the Arity Defendants specifically. The Arity Defendants did not provide any method to actually submit a request to them.

85.     The Arity Defendants failed to supply a reasonably accessible privacy notice that included how consumers may exercise their rights under the TDPSA. In doing so, the Arity Defendants violated Sections 541.102(a)(3) and 541.051(b)(5) of the TDPSA.

**The Data Broker Law, Tex. Bus. & Com. Code §§ 509.001 *et seq.***

86.     The State incorporates and adopts by reference each and every factual allegation contained in all preceding paragraphs of this Petition as if fully set forth herein.

87.     Any company that "derives revenue from processing or transferring the personal data of more than 50,000 individuals that the data broker did not collect directly from the individuals to whom the data pertains" was required to register with the Texas Secretary of State by March 1, 2024. Tex. Bus. & Com. Code §§ 509.003(a)(2), 509.005; Tex. Admin. Code § 106.3(c).

88.     As of March 1, 2024, the Arity Defendants were conducting business in the State of Texas and deriving revenue by processing and transferring the personal data of more than 50,000 individuals that the Arity Defendants did not collect directly from the individuals to whom the data pertains. Specifically, several app developers licensed over 45 million individuals' personal data, which was collected by the app developers, to the Arity Defendants. The Personal Data included an app user's first and last name, phone number, zip code, number of vehicles associated with their account, device ID, and mobile ad-ID.

89.     The Arity Defendants subsequently used the Personal Data in a number of ways, including by combining it with the Arity SDK Data and selling it to third parties, including Insurers.

90.     In addition, the Arity Defendants entered into agreements with multiple vehicle manufacturers to receive and access Texans' driving data.

91.     The Arity Defendants failed to register with the Texas Secretary of State's Office by March 1, 2024, and as of the date of the State's Original Petition, and still have not registered

26

**230**

A-066

with the Texas Secretary of State's Office. In doing so, the Arity Defendants violated Section 509.005 of the Data Broker Law.

**COUNT III (*All Defendants*)**

**Unfair Methods of Competition and Unfair or Deceptive Acts or Practices in the Business of Insurance, Tex. Ins. Code §§ 541.001 *et seq*.**

92. The State incorporates and adopts by reference each and every factual allegation contained in all preceding paragraphs of this Petition as if fully set forth herein.

93. The Texas Insurance Code "regulate[s] trade practices in the business of insurance" by broadly prohibiting businesses from engaging in "unfair or deceptive acts or practices" related to insurance. Tex. Ins. Code § 541.001. The Texas Insurance Code is to be "liberally construed" to prohibit a "person [from] engag[ing] in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." *Id*. at 541.003; 541.008. The Texas Department of Insurance has promulgated rules determining that "no person may engage in this state in any trade practice which is determined pursuant by law to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." 28 Tex. Admin. Code § 21.3(a)–(b).

94. Pursuant to the Texas Insurance Code, the Texas Attorney General may request a civil penalty of not more than $10,000 per violation when a person has engaged in an act or practice determined to be unlawful under any chapter or rule under the Texas Insurance Code. Tex. Ins. Code § 541.204.

95. Defendants engaged in several acts and practices in the business of insurance that, alone and in conjunction with each other, constitute unfair and deceptive acts and practices, including by "failing to verify" consumers' consent before purchasing driving-related data from vehicle manufacturers, "turning a blind eye to the strong possibility that consumers did not consent

27

to [their] collection and sale" of their sensitive and/or non-anonymized data to Insurers,[23] using the unlawfully obtained data for Defendants' own car insurance underwriting processes, and marketing and advertising the data to Insurers as "driving behavior" data.

96. By engaging in these practices, Defendants violated Section 541.003 of the Texas Insurance Code.

## PRAYER FOR RELIEF

97. Pursuant to Section 541.155 of the TDPSA, the State of Texas respectfully requests that this Honorable Court impose a civil penalty in an amount of not more than $7,500 per violation.

98. Pursuant to Section 509.008 of the Data Broker Law, the State of Texas respectfully requests that this Honorable Court impose a civil penalty of up to $10,000 and in an amount of: (1) not less than the total of $100 for each day Defendants were in violation of Section 509.004 or 509.005; and (2) the amount of unpaid registration fees for each year the entity failed to register in violation of Section 509.005. Tex. Bus. & Com. Code § 509.008(b)(1).

99. Pursuant to Section 541.204 of the Texas Insurance Code, the State of Texas respectfully requests that this Honorable Court impose a civil penalty in an amount of not more than $10,000 per violation.

100. The State of Texas further respectfully requests that this Honorable Court issue an order:

(a) Declaring Defendants' conduct as described herein to be in violation of the TDPSA;

---

[23] Concurring and Dissenting Statement of Commissioner Andrew N. Ferguson, *In re Gravy Analytics, Inc. & In re Mobilewalla, Inc.*, Federal Trade Commission, Matter Nos. 2123035 & 2023196 (Dec. 3, 2024), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/gravy_-mobilewalla-ferguson-concurrence.pdf (explaining that it is an unfair practice to sell precise location data without verifying that a consumer consented to such a sale because such a practice poses an "unavoidable and substantial risk of injury to the consumer").

28

**232**

A-068

(b) Declaring Defendants' conduct as described herein to be in violation of the Data Broker Law;

(c) Declaring Defendants' conduct as described herein to be an unfair or deceptive act or practice in the business of insurance in violation of the Texas Insurance Code;

(d) Directing Defendants to delete or otherwise destroy all data obtained prior to the entry of any judgment by this Court, including any data in the possession of any third party;

(e) Directing Defendants to make full restitution or restoration to all consumers who suffered a loss as a result of the acts and practices alleged in this Petition and any other acts and practices proved by the State, pursuant to Section 541.205 of the Texas Insurance Code; and

(f) Permanently enjoining Defendants, their agents, employees, and all other persons acting on their behalf, directly or indirectly, from violating the TDPSA, the Data Broker Law, and the Texas Insurance Code.

95. The State of Texas further respectfully requests that this Honorable Court award the Office of the Texas Attorney General attorney's fees and costs of court pursuant to the TDPSA, the Data Broker Law, and the Texas Insurance Code, under which attorney's fees and costs of court are recoverable by the Office of the Texas Attorney General.

96. Lastly, the State of Texas respectfully requests that this Honorable Court grant any other general, equitable, or further relief this Court deems just and proper.

29

Dated:  April 2, 2025

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

*/s/ Tyler Bridegan*
TYLER BRIDEGAN (TX Bar No. 24105530)
RICHARD R. MCCUTCHEON (TX Bar No. 24139547)
MADELINE FOGEL (TX Bar No. 24141985)
Assistant Attorneys General
Office of the Attorney General of Texas
Consumer Protection Division
808 Travis Street, Suite 1520
Houston, Texas 77002
Telephone: (713) 225-8922
Fax: (713) 223-5821
Tyler.Bridegan@oag.texas.gov
Richard.McCutcheon@oag.texas.gov
Madeline.Fogel@oag.texas.gov

GABRIELLA GONZALEZ (TX Bar No. 24080184)
JOHN C. HERNANDEZ (TX Bar No. 24095819)
Assistant Attorneys General
Office of the Attorney General of Texas
Consumer Protection Division
112 E. Pecan Street, Suite 735
San Antonio, Texas 78205
Phone: (210) 225-4191
Fax: (210) 225-1075
Gabriella.Gonzalez@oag.texas.gov
JC.Hernandez@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**


**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2025, a true and correct copy of the foregoing document

was served via electronic mail to counsel of record.

W. Reid Wittliff
State Bar No. 00791951
WITTLIFF CUTTER PLLC
510 Baylor St.
Austin, Texas 78703
Telephone: (512) 960-4866

30

Facsimile: (512) 960-4869
Email: reid@wittliffcutter.com

Jake Sommer *(pro hac vice pending)*
Kelsey Harclerode *(pro hac vice pending)*
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, D.C. 20036
Telephone: (202) 296-3585
Email: jake@zwillgen.com
      kelsey@zwillgen.com

Sudhir V. Rao *(pro hac vice pending)*
ZWILLGEN PLLC
183 Madison Ave., Suite 1504
New York, NY 10016
Telephone: (646) 362-5590
Email: sudhir.rao@zwillgen.com

**ATTORNEYS FOR DEFENDANTS**

*/s/  Tyler Bridegan*
Tyler Bridegan,
Assistant Attorney General

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

Glenn Gallegos on behalf of Tyler Bridegan
Bar No. 24105530
glenn.gallegos@oag.texas.gov
Envelope ID: 99198917
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Petition
Status as of 4/2/2025 3:08 PM CST

Associated Case Party: The Allstate Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |

Associated Case Party: Allstate Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |

Associated Case Party: Allstate Vehicle and Property Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

Glenn Gallegos on behalf of Tyler Bridegan
Bar No. 24105530
glenn.gallegos@oag.texas.gov
Envelope ID: 99198917
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Petition
Status as of 4/2/2025 3:08 PM CST

Associated Case Party: Allstate Vehicle and Property Insurance Company

| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
|---|---|---|---|---|
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |

Associated Case Party: Arity, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |

Associated Case Party: Arity 875, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

Glenn Gallegos on behalf of Tyler Bridegan
Bar No. 24105530
glenn.gallegos@oag.texas.gov
Envelope ID: 99198917
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Petition
Status as of 4/2/2025 3:08 PM CST

Associated Case Party: Arity Services, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Saba | | john@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 4/2/2025 3:03:35 PM | SENT |
| Sudhir Rao | | sudhir.rao@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 4/2/2025 3:03:35 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Esther Chavez | | esther.chavez@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Monica Wadleigh | | monica.wadleigh@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Brad Schuelke | | Brad.Schuelke@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Gabriella M. Gonzalez | | gabriella.gonzalez@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| JC Hernandez | | jc.hernandez@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Summer Lee | | summer.lee@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Hannah Campus | | hannah.campus@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Richard RMcCutcheon | | richard.mccutcheon@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Mary Clarkson | | mary.clarkson@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Glenn Gallegos | | glenn.gallegos@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Tyler Bridegan | | tyler.bridegan@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |

**Automated Certificate of eService**

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

Glenn Gallegos on behalf of Tyler Bridegan
Bar No. 24105530
glenn.gallegos@oag.texas.gov
Envelope ID: 99198917
Filing Code Description: Amended Petition
Filing Description: Plaintiff's First Amended Petition
Status as of 4/2/2025 3:08 PM CST

Associated Case Party: State of Texas

| Tyler Bridegan | | tyler.bridegan@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
|---|---|---|---|---|
| Adam Holtz | | Adam.Holtz@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |
| Roberta HNordstrom | | roberta.nordstrom@oag.texas.gov | 4/2/2025 3:03:35 PM | SENT |

**Tab L: Arity 875, LLC's Original Answer and Special Appearance (Am. C.R. 56)**

**CAUSE NO. 25-01-00561**

| | | |
|---|---|---|
| THE STATE OF TEXAS,<br>*Plaintiff*, | §<br>§<br>§ | |
| | § | IN THE DISTRICT COURT OF |
| v. | §<br>§ | MONTGOMERY COUNTY, TEXAS |
| THE ALLSTATE CORPORATION,<br>ALLSTATE INSURANCE COMPANY, | §<br>§ | 457TH JUDICIAL DISTRICT |
| ALLSTATE VEHICLE AND PROPERTY<br>INSURANCE COMPANY, ARITY, LLC,<br>ARITY 875, LLC, and ARITY SERVICES,<br>LLC,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§ | JURY TRIAL DEMANDED |
| | § | |

**ARITY 875, LLC'S SWORN SPECIAL APPEARANCE, ORIGINAL ANSWER, AND
AFFIRMATIVE DEFENSES
<u>TO THE STATE OF TEXAS'S ORIGINAL PETITION</u>**

### I.     <u>DEFENDANT'S SPECIAL APPEARANCE</u>

Defendant Arity 875, LLC ("Arity 875"), reserving all rights and defenses, specially appears pursuant to Texas Rule of Civil Procedure 120a prior to its Original Answer or any other pleading and respectfully requests that the Court sustain its Special Appearance and dismiss the State of Texas's claims in its Original Petition (the "Petition") against Arity 875 for lack of personal jurisdiction. Arity 875 requests a hearing on this Special Appearance and reserves the right to supplement this pleading with additional evidence and briefing as necessary. In support of its sworn motion, Arity 875 attaches as **Exhibit A** the Declaration of Joy A. Thomas (the "Thomas Decl.") and respectfully shows the Court as follows:

### <u>INTRODUCTION</u>

Personal jurisdiction, like standing, is not dispensed in gross. Due Process requires that a Texas court have personal jurisdiction over *each* defendant in a multiparty lawsuit before that defendant is forced to defend itself in Texas. The State's Petition ignores that foundational

1

**56**
A-077

principle and attempts to conjure jurisdiction over six distinct defendants through rampant and undisciplined group pleading. That effort fails.

Arity 875 is not subject to personal jurisdiction, whether general or specific, in Texas. General jurisdiction is absent because Arity 875 is neither organized nor headquartered in Texas and lacks any meaningful presence in the State—much less a presence so substantial that would render Arity 875 "at home" in Texas. Meanwhile, specific jurisdiction is absent because Arity 875 lacks contacts with Texas that give rise or relate to the privacy-related claims against Arity 875. Arity 875's sole alleged Texas contact is that it has a registered agent in Texas. The State's claims against Arity 875 plainly have nothing to do with that agent. Rather, the State challenges data collection practices that occurred nationally or outside Texas. Well-settled law forecloses personal jurisdiction based on those allegations.

Fair play and substantial justice-factors also cut sharply against jurisdiction, though the Court need not even address those factors because Arity 875 lacks minimum contacts with Texas. Arity 875, a nonresident limited liability corporation with no employees within Texas, would be unnecessarily burdened by being forced to defend itself in Texas. On the flip side, in Illinois, where Arity 875 is subject to general jurisdiction, Arity 875 is already facing numerous lawsuits based on allegations substantially similar to those the State asserts here. The nationwide putative classes in those lawsuits also include the Texas consumers on whose behalf the State seeks relief here. As a matter of interstate federalism, efficiency, and administrability, then, Illinois is a superior forum to Texas, rendering the exercise of jurisdiction here unreasonable.

For all these reasons, the Court should sustain Arity 875's Special Appearance and dismiss Arity 875 from this lawsuit for lack of personal jurisdiction.

2

**57**

A-078

## BACKGROUND

**I.**     **Arity 875 Is Not an Insurance Company and Lacks Any Meaningful Presence in Texas.**

Arity 875 is not an insurance company and does not promote, offer, sell, or administer insurance in Texas. *See* Thomas Decl. ¶ 4. Arity 875 also does not hold any certificate of authority to issue, write, or sell insurance policies in Texas (or any other state). *Id.* ¶ 5. Nor does Arity 875 sell or issue any type of insurance policy that would be subject to the requirements of the Texas Department of Insurance. *Id.* ¶ 6. Arity 875 has no dealings with insurance ratemaking in Texas and does not collect any premiums in connection with any insurance provided to citizens of any state, including Texas. *Id.* ¶¶ 6-7.

Arity 875 is a mobility data and analytics company that, as relevant here, develops and licenses a software development kit ("SDK") to certain mobile application ("app") operators. *See* Thomas Decl. ¶ 8. The SDK collects data through the apps about the user's phone handling, driving, speeding, and braking (the "Mobile Data"). *Id.* ¶ 9. Before receiving any Mobile Data, Arity 875 requires its mobile app partners to warrant that the Mobile Data is being lawfully disclosed to Arity 875. *Id.* ¶ 10. Arity 875 does not disclose the Mobile Data to insurers for pricing or underwriting. *Id.* ¶ 11. Rather, the insights generated from the Mobile Data ("Mobile Data Insights") are only ever disclosed to insurers for pricing or underwriting (i) by a <u>separate</u> entity, Arity Services, LLC (which receives Mobile Data Insights from Arity 875 for limited purposes) and (ii) if a consumer directs the insurer to use the Mobile Data Insights. *Id.*

Arity 875 is a limited liability corporation organized under the laws of Delaware and has its principal place of business in Illinois. Thomas Decl. ¶ 3. Arity 875 does not have a telephone listing in Texas or maintain or possess any bank accounts in the state. *Id.* ¶¶ 15-16. It also has no

3

employees in Texas and does not own, lease, or in any other way maintain or possess any real property in Texas, including office space, a warehouse, or manufacturing facilities. *Id.* ¶¶ 17-18. Arity 875 does not target its services specifically to Texas; rather, its services are equally available in Texas as they are in all other States. *Id.* ¶ 12. Arity 875's development and licensing of the SDK is also not specifically directed towards Texas, and none of the Arity 875 teams involved in developing or licensing the SDK is based in Texas. *Id.* ¶ 13. Decision-making concerning Arity 875's policies with respect to Mobile Data and Mobile Data Insights occurs outside of Texas. *Id.* ¶ 14.

## II.     The Petition's Allegations Against Arity 875 Are Sparse and Nonspecific.

The State's Petition is long on inuendo and short on facts. The 96-paragraph Petition barely references Arity 875 and consistently engages in improper group pleading, lodging almost all allegations against "Defendants" generally, the "Arity Defendants," or the "Allstate Defendants."[1]

In substance, the State alleges that unspecified defendants collected location and driving-related data through software installed in mobile apps—apps that individuals voluntarily installed

---

[1] The State's cavalier approach to its pleading burden results in demonstrably false allegations. The Petition, for example, purports to describe "**Defendants'** privacy disclosures" (Pet. ¶ 49 (emphasis added)) but cites to a Privacy Statement instead offered by Arity, LLC and Arity 875, LLC. *See* Pet., Ex. A at internal p. 1 ("This Privacy Statement describes the privacy practices of Arity, LLC and Arity 875, LLC ('Arity,' 'we' or 'us')."). Plainly, Exhibit A does not reflect all "Defendants'" privacy disclosures, as the State pleads. To take another example, the State alleges that "**Defendants** covertly collected much of their 'trillions of miles' of data by maintaining active connections with consumers' mobile devices and harvesting the data directly from their phone." Pet. ¶ 2 (emphasis added). But as explained above, it is Arity 875 that engages in any alleged data collection; The Allstate Corporation, as it explains in its concurrently filed Special Appearance, is a nonoperating holding company, so necessarily does not engage in any data collection.

These examples are merely illustrative. And they likely reflect the State's desire to rush to the courthouse, press release in tow. Had the State bothered to undertake an appropriate investigation—it did not engage with the three Allstate Defendants *at all* before filing suit—its Petition perhaps would have been less riddled with errors.

4

on their mobile phones. *See, e.g.*, Pet. ¶¶ 28, 32. The State alleges the collection occurred without sufficient consent and disclosure. *See, e.g., id.* ¶ 43. But the State concedes that the collection was *national* in scope, not targeted to Texas in any specific way. *See id.* ¶ 21 (alleging that Arity 875 and other subsidiaries of The Allstate Corporation "collect[] and analyze[] data ***obtained throughout the United States***") (emphasis added); *id.* ¶ 28 (alleging that "[d]efendants have amassed the data of ***at least 45 million Americans*** . . . by integrating a piece of software into various mobile apps") (emphasis added). Nor does the State allege that Arity 875's decision-making related to data-consent or disclosure policies occurred in Texas. The State also alleges that the data collected through the mobile apps was sold to unspecified "third parties" and "Insurers" and was used in the "Allstate Defendants'" insurance underwriting business. *See, e.g., id.* ¶¶ 1, 39-40. But the State does not allege that Arity 875 participated in those sales.

The Petition's lone paragraph on jurisdiction seeks to hand-wave it into existence, alleging that "[j]urisdiction is proper for the reasons described throughout this Petition." Pet. ¶ 13. But the State concedes that Arity 875 is neither incorporated nor headquartered in Texas. *Id.* ¶ 21. And none of the purportedly illustrative examples of jurisdiction-granting conduct, including allegedly "targeting the data of Texans" and "profit[ting] from Texans' data," moves the needle because none is alleged against Arity 875 specifically. *Id.* ¶ 13. In any event, the State itself alleges that the challenged data collection was national in scope and did not specifically target Texas.

The State also misleadingly alleges that "[t]ogether with its subsidiaries, Defendant The Allstate Corporation provides insurance products, including car insurance, throughout the United States, including Montgomery County, Texas." Pet. ¶ 17. But Arity 875 does not provide any insurance services, including in Texas. *See supra*. For the same reason, the State's conclusory

5

allegation that "Defendants" (which presumably includes Arity 875) "have done business in Montgomery County" rings hollow. *Id.* ¶ 13.

Finally, the State alleges that Arity 875 may be served through a registered agent with an address in Dallas, Texas. Pet. ¶ 21. Even if true, that is not remotely enough to confer jurisdiction. *See infra.*

## LEGAL STANDARD

Whether a court has personal jurisdiction over a defendant is a question of law. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The court shall determine a special appearance based on "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3).

Texas courts may assert personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Google LLC v. State*, No. 13-23-00114-CV, 2025 WL 52611, at *1 (Tex. App.-Corpus Christi-Edinburg Jan. 9, 2025) (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). Because the Texas long-arm statute "extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit," the statute's requirements "are satisfied if the exercise of personal jurisdiction comports with federal due process limitations." *Id.*; Tex. Civ. Prac. & Rem. Code Ann. § 17.042.

Under the federal Due Process Clause, personal jurisdiction is proper when a "nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Moki Mac*, 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); U.S. Const. amend. XIV,

6

§ 1.  Minimum contacts can give rise to either general or specific jurisdiction.  *See Google*, 2025 WL 52611, at *2.  General jurisdiction exists when a defendant is "at home" in the forum state, in which case the defendant may be sued on any and all claims, no matter if they relate to the defendant's forum contacts.  *See id.*  By contrast, specific (or case-linked) jurisdiction exists only when the defendant has purposely availed itself of the forum and the claims arise from or relate to the defendant's forum contacts.  *See id.*

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction.  The plaintiff "bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute."  *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).  If the plaintiff fails to do so, "the defendant need only prove that it does not live in Texas to negate jurisdiction."  *Id.* at 659.  If the plaintiff carries its initial burden, the defendant "bears the burden to negate all bases of personal jurisdiction *alleged by the plaintiff.*"  *Id.* at 658 (emphasis added).  That is, the defendant's burden to negate jurisdiction "is tied to the allegations in the plaintiff's pleading."  *Id.*  A defendant may negate jurisdiction either factually or legally.  To do the former, the defendant can present evidence that the defendant lacks the alleged contacts with Texas.  *See id.* at 659.  To do the latter, the defendant can show that jurisdiction cannot be established even if the plaintiff's allegations are accepted as true.  *See id.*

## **ARGUMENT**

### **I.        General Jurisdiction Is Lacking:  Arity 875 Is Not "At Home" in Texas.**

The State has failed to plead (and cannot plead) that Arity 875 is subject to general jurisdiction in Texas.  A defendant is subject to general jurisdiction only where it is "essentially at home."  *Grupo Mex. S.A.B. DE C.V. v. Mt. McKinley Ins. Co.*, No. 13-17-00134-CV, 2020 WL 486501, at *4 (Tex. App.-Corpus Christi-Edinburg Jan. 30, 2020).  The "paradigm" forums in

7

which a corporate defendant is "at home" are its "place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). Although the United States Supreme Court has declined to "foreclose the possibility" that general jurisdiction might exist in a forum other than the two paradigm forums, such a case would be "exceptional." *Daimler*, 571 U.S. at 139 & n.19. *See also Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 336 (5th Cir. 2020) (explaining that it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business").

Here, the State concedes that Arity 875 is neither incorporated in, nor has its principal place of business in, Texas. *See* Pet. ¶ 21. And the State has not even attempted to allege that this is an "exceptional" case in which Arity 875's "affiliations with [Texas] are so continuous and systematic as to render it essentially at home" in Texas. *Daimler*, 571 U.S. at 139 (cleaned up). The State does not allege, for example, that Arity 875 "maintains an office in Texas, let alone a de facto corporate office where it manages all of its business affairs." *Grupo Mex.*, 2020 WL 486501, at *6. Nor does the State allege any facts about Arity 875's presence *outside* Texas to support an inference that, of all the locations where Arity 875 does business, Texas is where Arity 875 is "at home." *See Daimler*, 571 U.S. at 139 n.20 (explaining that general jurisdiction "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide" because a "corporation that operates in many places can scarcely be deemed at home in all of them"). In fact, the State's allegation that Arity 875, together with other unidentified subsidiaries of The Allstate Corporation, "collects and analyzes data obtained throughout the United States, including Montgomery County, Texas," (Pet. ¶ 21) "effectively negate[s]" general jurisdiction because Arity

8

875 "cannot be 'essentially at home' in every foreign jurisdiction where it operates." *Google*, 2025 WL 52611, at \*4.

The lone Texas contact the State alleges is that Arity 875 maintains an agent for service of process within the state. *See* Pet. ¶ 21. That is insufficient, given that a far more substantial presence within a forum does not establish general jurisdiction. *See, e.g.*, *BNSF Ry. Co.*, 581 U.S. at 414 (holding that defendant was not subject to general jurisdiction in Montana even though it had "over 2,000 miles of railroad track and more than 2,000 employees in Montana" because defendant was not "so heavily engaged in activity in Montana as to render it essentially at home" (cleaned up)). The State well knows this. Just weeks ago, the Texas Court of Appeals rejected the State's attempt to establish general jurisdiction over a large corporation merely because it does substantial business in Texas. *See Google*, 2025 WL 52611, at \*3 (concluding that defendant was not at home in Texas even when it had approximately 5,500 employees in the state, maintained one of four data centers in Texas, and derived 8.9% of its domestic revenue from Texas).[2]

Because the State has failed to plead that Arity 875 is "at home" in Texas, it has failed to plead general jurisdiction. That ends the general jurisdiction analysis. *See, e.g.*, *id.*, at \*4 (plaintiff's "allegations are insufficient to meet its initial burden").

But even if the Petition somehow could be construed as alleging an exceptional case, Arity 875's evidence conclusively refutes any such suggestion. Arity 875 has no employees in Texas

---

[2] The State alleges that Arity 875 has a registered agent within Texas (Pet. ¶ 21) possibly to suggest that Arity 875 has consented to general jurisdiction in Texas. But no such consent theory has been pleaded, and jurisdictional allegations must be alleged in the petition. *See Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 129 (Tex. App.-Dallas 2021). Regardless, Arity 875 has not consented to jurisdiction by allegedly maintaining a registered agent within Texas. *See Repairify, Inc. v. Opus IVS, Inc.*, No. 05-23-00921-CV, 2024 WL 2205663, at \*1 (Tex. App.-Dallas May 16, 2024).

and does not own, lease, or in any other way maintain or possess any real property in Texas, including office space, a warehouse, or manufacturing facilities. *See* Thomas Decl. ¶¶ 17-18. It also does not have a telephone listing in Texas or maintain or possess any bank accounts in the state. *See id.* ¶¶ 15-16. Both the United States Supreme Court and the Texas Court of Appeals have rejected general jurisdiction when defendants had a substantially greater presence in the state. *See, e.g.*, *BNSF Ry. Co.*, 581 U.S. at 414; *Google*, 2025 WL 52611, at \*3; *FedEx Corp. v. Contreras*, No. 04-19-00757-CV, 2020 WL 4808721, at \*8-9 (Tex. App.-San Antonio Aug. 19, 2020). This Court should do the same.

## II. Specific Jurisdiction Is Lacking: Arity 875 Has Not Purposefully Availed Itself of The Privilege of Doing Business in Texas in Any Way that is Substantially Connected to this Case.

Specific jurisdiction, unlike general jurisdiction, focuses on the defendant's contacts with the forum state and the relationship between those contacts and the plaintiff's claims. The specific-jurisdiction analysis, in other words, "has two co-equal components": purposeful availment and relatedness. *Moki Mac*, 221 S.W.3d at 579.

The first considers if a defendant has purposely availed itself of the privilege of doing business in the forum state. Three principles guide the purposeful availment analysis: (i) the *defendant*'s forum contacts matter—not the plaintiff's or any other party's; (ii) the defendant's contacts must be "purposeful," not "random, isolated or fortuitous"; and (iii) the defendant must seek some "benefit, advantage, or profit" by "availing itself of the jurisdiction." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). In *Michiana*, the Texas Supreme Court also "expressly rejected the 'directed-a-tort' theory from the jurisprudence surrounding specific jurisdiction." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 69 (Tex. 2016). As a result, "[e]ven if a nonresident defendant *knows* that the effects of its actions will be felt by a resident

10

plaintiff, that knowledge alone is insufficient to confer personal jurisdiction over the nonresident." *Id.* (emphasis in original).

Meanwhile, the relatedness inquiry asks if a "substantial connection" exists between the defendant's forum contacts and the operative facts in the litigation. *Moki Mac*, 221 S.W.3d at 577. After all, "purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contact." *Id.* at 579.

Here, the State has identified no contacts Arity 875 has with Texas that would establish specific jurisdiction. The only Texas contact alleged is that Arity 875 maintains an agent for service of process within the state. *See* Pet. ¶ 21. Even if that contact constituted purposeful availment, it has no nexus whatsoever to the State's claims against Arity 875. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) ("[S]pecific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis."). Those claims, under the Texas Data Privacy and Security Act, the Data Broker Law, and for unfair and deceptive trade practices in the business of insurance, concern the alleged collection and sale of location and driving-related data and Arity 875's alleged failure to register as a data broker within Texas. But those claims have nothing to do with Arity 875's alleged registered agent within the state. The State has thus failed to plead that its claims against Arity 875 arise out of or relate to Arity 875's one alleged Texas contact. Because Arity 875 has demonstrated that it does not reside within Texas, this Court need not proceed further and can grant Arity 875's Special Appearance. *See Kelly*, 301 S.W.3d at 658.

In any event, the State's allegations, combined with Arity 875's evidence, foreclose any assertion of specific jurisdiction here, whether for lack of purposeful availment or relatedness. The State apparently attempts to rest jurisdiction on the fact that Texans—along with users in several other states—downloaded the mobile apps offered to them by non-parties with which Arity 875

11

partners and that Texans' data was collected by those apps. *See* Pet. ¶ 13 (alleging that "[d]efendants engaged in unlawful conduct targeting the data of Texans, profited from Texans' data, and harmed millions of Texas consumers through their actions"); *see also id.* ¶ 28. But it is axiomatic that only the *defendant's* forum contacts—not the plaintiff's or any other party's—can establish purposeful availment. *See Michiana*, 168 S.W.3d at 785. The "mere fact that [a defendant's alleged] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 285, 291 (2014). Here, the challenged data collection affected Texans in the same way it did residents of all other States; nothing about that collection evinces the kind of targeting or purposeful availment that could support jurisdiction. *See also, e.g., id.* at 290 (no jurisdiction over Georgia defendant when plaintiffs would have experienced the same injury "wherever . . . they might have traveled and found themselves"); *cf. Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021) ("Making a website that's visible in Texas, of course, does not suffice" to establish specific jurisdiction because, "[i]f it could, our jurisdiction would have no limit; a plaintiff could sue everywhere.") (cleaned up).

Moreover, even if Arity 875 knew that its mobile app partners had users in Texas, "[m]ere knowledge that the 'brunt' of the alleged harm would be felt—or have effects—in the forum state is insufficient to confer specific jurisdiction." *Searcy*, 496 S.W.3d at 68-69. Texas has rejected the "directed-a-tort" theory. *Id.*; *see also Moncrief Oil*, 414 S.W.3d at 157 (alleged "tortious conduct in California against a Texas resident [was] insufficient to confer specific jurisdiction"); *Google*, 2025 WL 52611, at *7 ("A nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction.").

Not least, to the extent the State attempts to base jurisdiction on Arity 875's purported failure to secure adequate consent from the mobile app users, a failure to act cannot establish purposeful availment; an affirmative act is required. *See Hinduja Glob. Sol., Inc. v. Ganjaei*, No. 05-22-00052-CV, 2023 WL 179808, at \*6 (Tex. App.-Dallas Jan. 13, 2023), *review denied* (Sept. 29, 2023) ("[A]n alleged failure to disclose cannot be purposeful availment of a Texas forum. By its very nature, [a] failure to disclose demonstrates that a party did not have contacts with the forum state." (collecting cases)). And in any event, Arity 875 has no contacts with Texas that are "substantially connected" to the claims here: Arity 875's development and licensing of the SDK is not specifically directed towards Texas; none of the Arity 875 teams involved in developing or licensing the SDK is based in Texas; Arity 875's decision-making with respect to Mobile Data and Mobile Data Insights occurs outside Texas; and again, per the State's own allegations, the challenged data collection occurred nationally. *See* Thomas Decl. ¶¶ 13-14; Pet. ¶ 28. Jurisdiction is lacking under these circumstances. *See, e.g.*, *Google*, 2025 WL 52611, at \*7 (rejecting specific jurisdiction on relatedness grounds because allegations that Google misled users, including those in Texas, about location tracking settings were based on statements made *outside* Texas).

### III. The State Cannot Impute Other Defendants' Purported Texas Contacts to Arity 875.

If the reader stretches the Petition's allegations to their absolute limit, the group pleading suggests the State may believe Arity 875 is subject to personal jurisdiction based on *other defendants'* purported Texas contacts. *See* Pet. ¶ 1 (alleging that The Allstate Corporation "own[s]" the other defendants); *id.* ¶ 21 (alleging that Arity 875, "*together with the other subsidiaries of Defendant The Allstate Corporation*, collects and analyzes data obtained

13

throughout the United States, including Montgomery County, Texas, and uses predictive analytics to build solutions to sell to third parties") (emphasis added).

But courts "must . . . assess each defendant's contacts with Texas individually." *FedEx Corp.*, 2020 WL 4808721, at *4. *See also Calder v. Jones*, 465 U.S. 783, 790 (1984) (same). As a result, any purported Texas contacts that have been pleaded on a group basis must be disregarded. *See Head v. Las Vegas Sands, LLC*, 760 F. App'x 281, 284 (5th Cir. 2019) (per curiam) ("Head's vague and generalized assertion that the Casino Defendants sent jets to Texas an undetermined number of times to transport her husband to Las Vegas does not comport with applicable caselaw that requires plaintiffs to submit evidence supporting personal jurisdiction over each defendant ***without grouping them together***.") (emphasis added).

To the extent the State seeks to advance an agency or alter ego-based theory of personal jurisdiction, neither theory is pleaded facially, much less adequately.[3] That omission is fatal because a party "seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities" bears the burden to "prove this allegation." *Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 730 (Tex. App.-Hous. 2008).

A plaintiff, moreover, must clear a high bar to attribute one company's contacts to another. That is because Texas law "presumes that two separate corporations are distinct entities." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). *See also Dickson Marine*

---

[3] Although the State includes a single, throwaway allegation that defendants "conspired" with each other (Pet. ¶ 1), the Texas Supreme Court rejected a conspiracy theory of personal jurisdiction nearly 30 years ago. *See Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) ("declin[ing] to recognize the assertion of personal jurisdiction over a nonresident defendant based solely upon the effects or consequences of an alleged conspiracy with a resident in the forum state" and "restrict[ing] our inquiry to whether [the defendant] itself purposefully established minimum contacts such as would satisfy due process").

14

*Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) ("Courts have long presumed the institutional independence of related corporations, such as parent and subsidiary, when determining if one corporation's contacts with a forum can be the basis of a related corporation's contacts."). "To fuse a parent company and its subsidiary for jurisdictional purposes, a plaintiff must prove the parent controls the internal business operations and affairs of the subsidiary to the extent that the two entities effectively cease to be separate." *FedEx Corp.*, 2020 WL 4808721, at *5 (cleaned up). No ordinary control will suffice. Rather, "the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities ***cease to be separate*** so that the corporate fiction should be disregarded to prevent fraud or injustice." *BMC Software*, 83 S.W.3d at 799 (emphasis added). To be sure, "[a]ppropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." *PHC-Minden, L.P.*, 235 S.W.3d at 176. So, to pierce the veil for jurisdictional purposes, a "plus factor" is required, namely, "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* (cleaned up).

Here, the Petition lacks a *single* allegation that any defendant is an alter ego of another or that any defendant exercises the requisite control over Arity 875 to attribute that defendant's purported Texas contacts to Arity 875. The Court can and should reject any imputation-based theory of personal jurisdiction on that basis alone.

### IV. Exercising Jurisdiction Over Arity 875 Would Offend Traditional Notions of Fair Play and Substantial Justice.

Even if the State could establish that Arity 875 has the requisite minimum contacts with Texas (it cannot), it would also need to show that the exercise of jurisdiction "comport[s] with

15

traditional notions of fair play and substantial justice." *Gulf Coast Int'l, L.L.C. v. The Rsch. Corp. of the Univ. of Haw.*, 490 S.W.3d 577, 584 (Tex. App.-Hous. 2016) (cleaned up). Several factors are relevant to that analysis: "(1) the burden on the nonresident defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering substantive social policies." *Id.*

As the U.S. Supreme Court has explained, among the "variety of interests" relevant to the personal jurisdiction analysis, "the primary concern is the burden on the defendant." *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 263 (2017) (cleaned up). That burden encompasses not only the "practical problems resulting from litigating in the forum" but also "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.* After all, "[t]he sovereignty of each State implies a limitation on the sovereignty of all its sister States." *Id.* (cleaned up).

Exercising jurisdiction over Arity 875 would violate traditional notions of fair play and substantial justice. As a Delaware and Illinois limited liability corporation, Arity 875 would be substantially burdened by litigating this case in Texas, particularly because Arity 875 has no employees in Texas. *See* Thomas Decl. ¶¶ 3, 17; *Dalglish v. Royal Indem. Co.*, No. 09-06-069 CV, 2006 WL 3334543, at *4–5 (Tex. App.-Beaumont Nov. 16, 2006) (considering that relevant witnesses and corporate records were located outside Texas in holding that fair play and substantial justice weighed against jurisdiction in Texas).

Although the State has asserted claims under Texas law against Arity 875, Texas's interest in adjudicating its dispute against Arity 875 is marginal, at best, given that Arity 875 has no meaningful Texas presence and that the core challenged conduct against Arity 875 (and all other

16

defendants) is allegedly national in scope. *See, e.g.*, Pet. ¶ 1 (alleging that "Defendants" built a "'driving behavior database,' housing the driving behavior of over 45 million ***Americans***") (emphasis added). Meanwhile, Illinois, where Arity 875 is subject to general jurisdiction, has a countervailing interest in providing a forum for lawsuits against its corporate citizens—particularly given that Arity 875 is already facing multiple lawsuits in Illinois based on allegations substantially similar to those at issue here. *See Azar v. Allstate Corp.*, No. 1:25-cv-00866, Compl. Dkt. No. 1 (N.D. Ill. Jan. 24, 2025); *Eppley v. Allstate Corp.*, No. 1:25-cv-00815, Compl. Dkt. No. 1 (N.D. Ill. Jan. 23, 2025); *Roque v. Allstate Corp.*, No. 1:25-cv-00709, Compl. Dkt. No. 1 (N.D. Ill. Jan. 21, 2025); *Duffield v. Allstate Corp.*, No. 1:25-cv-00609, Compl. Dkt. No. 1 (N.D. Ill. Jan. 17, 2025); *Bare v. Allstate Corp.*, No. 1:25-cv-00621, Compl. Dkt. No. 1 (N.D. Ill. Jan. 17, 2025); *Sims v. Allstate Corp.*, No. 1:25-cv-00407, Compl. Dkt. No. 1 (N.D. Ill. Jan. 14, 2025).

Relatedly, and further undermining Texas's interest in the litigation, is the significant "practical problem" that would arise from Arity 875 having to defend Texas's claims on behalf of consumers who are *already included* in the putative nationwide classes sought to be certified in the pending actions in Illinois federal court. *See Azar*, Compl., Dkt. No. 1 at ¶ 67 (seeking certification of class comprising "[a]ll persons in the United States whose mobile phone data, including but not limited to their geolocation data, was collected, distributed, stored, used, and/or sold by Defendants"); *Eppley*, Compl., Dkt. No. 1 at ¶ 62 (similar); *Roque*, Compl., Dkt. No. 1 at ¶ 67 (similar); *Duffield*, Compl., Dkt. No. 1 at ¶ 68 (similar); *Bare*, Compl., Dkt. No. 1 at ¶ 81 (similar); *Sims*, Compl., Dkt. No. 1 at ¶ 43 (similar). The existence of parallel, substantially overlapping litigation in Illinois also means both that Texas consumers' interests are already being amply represented and that the judicial system's "interest in the most efficient resolution of controversies" favors Illinois over Texas. *Gulf Coast Int'l*, 490 S.W.3d at 584. For all these

17

reasons, exercising jurisdiction over Arity 875 in Texas would offend fair play and substantial justice.

**REQUEST FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Arity 875 respectfully requests that the Court grant this Special Appearance, dismiss all claims against Arity 875 for lack of personal jurisdiction, and, subject to this Special Appearance, grant such other and further relief to which Arity 875 may be justly entitled.

**II.     DEFENDANT'S ORIGINAL ANSWER**

**GENERAL DENIAL**

1.      Subject to and without waiving the foregoing Special Appearance and any other defenses, Arity 875 generally denies each and every allegation in the Petition pursuant to Texas Rule of Civil Procedure 92 and demands strict proof thereof.

2.      Arity 875 reserves the right to amend this pleading as authorized by the Texas Rules of Civil Procedure.

**III.     AFFIRMATIVE DEFENSES**

3.      Subject to and without waiving the foregoing Special Appearance and any other defenses, pursuant to Rule 94 of the Texas Rule of Civil Procedure, Arity 875 asserts the following affirmative defenses, without conceding that it bears the burden of proof as to any of these issues.

4.      Plaintiff's claims are barred, in whole or in part, because consumers were provided all necessary information for consumers to assess the products and services at issue in the Petition.

5.      Plaintiff's claims are barred, in whole or in part, because the privacy statements maintained by Defendants and their third-party partners disclosed to consumers the collection, use, and sharing of consumers' information at issue in the Petition.

18

6. Plaintiff's claims are barred, in whole or in part, by consumers' consent to the alleged collection, use, and sharing of consumers' information.

7. Plaintiff's claims are barred because they have no basis in law or fact.

8. Plaintiff's claims are barred, in whole or in part, under the void-for-vagueness doctrine.

9. Plaintiff's claim under the Texas Data Privacy and Security Act, Tex. Bus. & Com. Code §§ 541.001 *et seq.* (the "TDPSA claim") is barred, in whole or part, to the extent it is based on data to which the TDPSA is not applicable.

10. Plaintiff's TDPSA claim is barred, in whole or part, to the extent Arity 875 is not among the entities to which the TDPSA applies.

11. Plaintiff's TDPSA claim is barred, in whole or part, to the extent it is based on data processing activities to which the TDPSA is not applicable.

12. Plaintiff's claim under the Data Broker Law, Tex. Bus. & Com. Code §§ 509.001 *et seq.* is barred in whole or part to the extent Arity 875 is not a "data broker" under the Data Broker Law.

13. Plaintiff's claim for Unfair Methods of Competition and Unfair or Deceptive Acts or Practices in the Business of Insurance, Tex. Ins. Code §§ 541.001 *et seq.* (the "Deceptive Acts claim") is barred, in whole or in part, because Plaintiff has not established and cannot establish an unfair or deceptive act or practice.

14. Plaintiff's Deceptive Acts claim is barred, in whole or in part, to the extent the purported unfair or deceptive acts or practices are not acts or practices in the "business of insurance."

19

**74**

15. Plaintiff's Deceptive Acts claim is barred, in whole or in part, to the extent it is based on alleged representations or misrepresentations that do not rise above the level of puffery or opinion, which are not actionable.

16. Plaintiff's claims are barred, in whole or in part, by applicable limitations of liability in terms agreed to by consumers.

17. Plaintiff's claims are barred, in whole or in part, because consumers suffered no injuries or damages.

18. Plaintiff's claim for restitution must be offset and reduced by the value consumers received from Defendants' services.

19. Plaintiff's claims are barred, in whole or in part, because consumers have enjoyed the full benefit of the use of relevant mobile applications and related services.

20. Plaintiff's claims are barred, in whole or in part, by accord and satisfaction.

21. Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, ratification, consent, and/or estoppel.

22. Plaintiff's claims are barred, in whole or in part, as moot.

23. Plaintiff's claims are barred, in whole or in part, to the extent they are preempted by federal law, including but not limited to the Fair Credit Reporting Act, 15 U.S.C. § 1681t(b)(1)(F) and the Graham Leach Bliley Act ("GLBA"), 15 U.S.C. § 6821 *et seq.*

24. Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff has failed to join all parties necessary and indispensable to this action.

25. Plaintiff's claims are barred, in whole or in part, to the extent that this Court is an improper venue to adjudicate Plaintiff's claims.

**75**

A-096

26.     Plaintiff's claims may be barred, in whole or in part, by applicable statutes of limitations or repose.

27.     Plaintiff's claims for civil penalties and injunctive relief are barred or limited by the prohibition against excessive fines in Article I, Section 10 of the U.S. Constitution and Article 1, Section 13 of the Texas Constitution.

28.     Defendant Arity 875 reserves the right to amend or supplement these affirmative defenses or assert additional affirmative defenses after it has a more complete understanding of Plaintiff's claims, or as discovery indicates is proper.

21

## IV.    REQUEST FOR RELIEF

FOR THESE REASONS, Defendant Arity 875 respectfully requests that the Court:

1.      Grant Arity 875's Special Appearance and dismiss all claims against Arity 875 for lack of personal jurisdiction.

2.      Subject to Arity 875's Special Appearance, find for Arity 875 on its affirmative defenses.

3.      Subject to Arity 875's Special Appearance, order that Plaintiff take nothing against Arity 875 in this suit.

4.      Subject to Arity 875's Special Appearance, grant such other and further relief to which Arity 875 may be justly entitled.

Dated:  February 19, 2025

Respectfully submitted,

*/s/ W. Reid Wittliff*
W. Reid Wittliff
State Bar No. 00791951
reid@wittliffcutter.com
**Wittliff | Cutter PLLC**
510 Baylor St.
Austin, Texas 78703
Telephone:  (512) 960-4866
Facsimile:  (512) 960-4869

Jake Sommer *(pro hac vice forthcoming)*
Kelsey Harclerode *(pro hac vice forthcoming)*
**ZwillGen PLLC**
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone:  (202) 296-3585
jake@zwillgen.com
kelsey@zwillgen.com

Sudhir V. Rao *(pro hac vice forthcoming)*
**ZwillGen PLLC**
183 Madison Ave., Suite 1504
New York, NY 10016
Telephone:  (646) 362-5590
sudhir.rao@zwillgen.com

**ATTORNEYS FOR DEFENDANTS**

23

**CERTIFICATE OF SERVICE**

This is to certify that on this, the 19th day of February 2025, a true and correct copy of the foregoing, Arity 875, LLC's Sworn Special Appearance, Original Answer, and Affirmative Defenses to the State of Texas's Original Petition, has been served upon counsel of record, listed below, via authorized electronic service in accordance with the Texas Rules of Civil Procedure.

| Name | Email |
|---|---|
| Esther Chavez | esther.chavez@oag.texas.gov |
| Monica Wadleigh | monica.wadleigh@oag.texas.gov |
| Brad Schuelke | brad.schuelke@oag.texas.gov |
| Mary Clarkson | mary.clarkson@oag.texas.gov |
| Zoann Willis | zoann.willis@oag.texas.gov |
| Summer Lee | summer.lee@oag.texas.gov |
| Madeline Fogel | madeline.fogel@oag.texas.gov |
| Richard R. McCutcheon | richard.mccutcheon@oag.texas.gov |
| Adam Holtz | adam.holtz@oag.texas.gov |
| Roberta H. Nordstrom | roberta.nordstrom@oag.texas.gov |
| Gabriella M. Gonzalez | gabriella.gonzalez@oag.texas.gov |
| JC Hernandez | jc.hernandez@oag.texas.gov |
| Tyler Bridegan | tyler.bridegan@oag.texas.gov |

*/s/ W. Reid Wittliff*
W. Reid Wittliff


**CERTIFICATE OF CONFERENCE**

This is to certify that on the 13th day of February 2025, counsel for Defendant Arity 875, LLC conferred with counsel for Plaintiff via email regarding Arity 875, LLC's Special Appearance. Despite a good-faith effort to resolve the dispute, the parties were unable to reach an agreement, and this matter remains opposed.

*/s/ W. Reid Wittliff*
W. Reid Wittliff

# Exhibit A

**80**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | MONTGOMERY COUNTY, TEXAS |
| | § | |
| THE ALLSTATE CORPORATION, | § | 457TH JUDICIAL DISTRICT |
| ALLSTATE INSURANCE COMPANY, | § | |
| ALLSTATE VEHICLE AND PROPERTY | § | |
| INSURANCE COMPANY, ARITY, LLC, | § | |
| ARITY 875, LLC, and ARITY SERVICES, | § | JURY TRIAL DEMANDED |
| LLC, | § | |
| *Defendants.* | § | |

## DECLARATION OF JOY A. THOMAS

1. My name is Joy A. Thomas. My date of birth is ▮▮▮▮▮▮▮▮, and my business address is 222 West Merchandise Mart Plaza, Suite 875, Chicago, Illinois 60654. I am of sound mind, 18 years or older, and competent to make this Declaration. I submit this Declaration in support of Arity 875, LLC's ("Arity 875") Special Appearance.

2. I am an Officer of Arity 875 and serve in the role of Vice President. My responsibilities include operations. I submit this Declaration based on my personal knowledge of the matters stated herein, learned in my capacity as an Officer of Arity 875 and review of records and information maintained in the normal course of business by Arity 875.

3. Arity 875 is a limited liability corporation organized under the laws of Delaware with its principal place of business in Illinois.

4. Arity 875 is not an insurance company and does not promote, offer, sell, or administer insurance in Texas.

1

**81**

A-102

5. Arity 875 does not hold any certificate of authority issued by a commissioner of insurance in Texas, or any other State, to issue, write, or sell insurance policies in Texas or any other State.

6. Arity 875 does not sell or issue any type of insurance policy that would be subject to the requirements of the Texas Department of Insurance. Arity 875 has no dealings with insurance ratemaking in Texas.

7. Arity 875 does not collect any premiums in connection with any insurance provided to citizens of any State, including Texas.

8. Arity 875 is a mobility data and analytics company that develops and licenses a software development kit ("SDK") to certain mobile application ("app") operators.

9. The SDK collects data through the apps about the user's phone handling, driving, speeding, and braking (the "Mobile Data").

10. Before receiving any Mobile Data, Arity 875 requires its mobile app partners to warrant that the Mobile Data is being lawfully disclosed to Arity 875.

11. Arity 875 does not disclose the Mobile Data to insurers for pricing or underwriting. Rather, the insights generated from the Mobile Data ("Mobile Data Insights") are only ever disclosed to insurers for pricing or underwriting (i) by a separate entity, Arity Services, LLC (which receives Mobile Data Insights from Arity 875 for limited purposes) and (ii) if a consumer directs the insurer to use the Mobile Data Insights.

12. Arity 875 does not target its services specifically to Texas; rather, its services are equally available in Texas as they are in all other States.

2

13. Arity 875's development and licensing of the SDK is not specifically directed towards Texas, and none of the Arity 875 teams involved in developing or licensing the SDK is based in Texas.

14. Decision-making concerning Arity 875's policies with respect to the Mobile Data and Mobile Data Insights occurs outside of Texas.

15. Arity 875 does not have a telephone listing in Texas.

16. Arity 875 does not maintain or possess any bank account in Texas.

17. Arity 875 has no employees in Texas.

18. Arity 875 does not own, lease, or in any other way maintain or possess any real property in Texas, including, but not limited to, office space, a warehouse, or manufacturing facilities.

My name is Joy A. Thomas, my date of birth is ███████████, and my address is 222 West Merchandise Mart Plaza, Suite 875, Chicago, Illinois 60654. I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Cook County, Illinois, on this 13th day of February, 2025.

*Joy A Thomas*

_____
Joy A. Thomas

3

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

William Wittliff on behalf of William Wittliff
Bar No. 00791951
reid@wittliffcutter.com
Envelope ID: 97537560
Filing Code Description: Original Answer
Filing Description: Arity 875, LLC's Sworn Special Appearance, Original Answer, and Affirmative Defenses
Status as of 2/19/2025 11:21 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Esther Chavez | | esther.chavez@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Monica Wadleigh | | monica.wadleigh@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Brad Schuelke | | Brad.Schuelke@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Mary Clarkson | | mary.clarkson@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Gabriella M. Gonzalez | | gabriella.gonzalez@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| JC Hernandez | | jc.hernandez@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Tyler Bridegan | | tyler.bridegan@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Summer Lee | | summer.lee@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Richard RMcCutcheon | | richard.mccutcheon@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Adam Holtz | | Adam.Holtz@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |
| Roberta HNordstrom | | roberta.nordstrom@oag.texas.gov | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: The Allstate Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: Allstate Insurance Company

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

William Wittliff on behalf of William Wittliff
Bar No. 00791951
reid@wittliffcutter.com
Envelope ID: 97537560
Filing Code Description: Original Answer
Filing Description: Arity 875, LLC's Sworn Special Appearance, Original Answer, and Affirmative Defenses
Status as of 2/19/2025 11:21 AM CST

Associated Case Party: Allstate Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: Allstate Vehicle and Property Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: Arity, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: Arity 875, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

# Automated Certificate of eService

The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing

William Wittliff on behalf of William Wittliff
Bar No. 00791951
reid@wittliffcutter.com
Envelope ID: 97537560
Filing Code Description: Original Answer
Filing Description: Arity 875, LLC's Sworn Special Appearance, Original Answer, and Affirmative Defenses
Status as of 2/19/2025 11:21 AM CST

Associated Case Party: Arity 875, LLC

| | | | | |
|---|---|---|---|---|
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

Associated Case Party: Arity Services, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Taylor Board | | taylor@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| John Saba | | john@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 2/19/2025 10:54:40 AM | SENT |

**Tab M:** *Google LLC v. State*, 2025 WL 52611 (Tex. App. Corpus Christi-Edinburg Jan. 9, 2025), *petition for review abated* (May 9, 2025)

KeyCite Yellow Flag
Declined to Extend by   Texas v. Google LLC,   E.D.Tex.,   January 28, 2025

2025 WL 52611

Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Corpus Christi-Edinburg.

GOOGLE LLC, Appellant,

v.

The STATE of Texas, Appellee.

NUMBER 13-23-00114-CV

|

Delivered and filed January 9, 2025.

**ON APPEAL FROM THE 377TH DISTRICT COURT OF VICTORIA COUNTY, TEXAS**,
Hon. Eli E. Garza, District Judge

**Attorneys and Law Firms**

Jonathan Patchen, Willkie Farr & Gallagher LLP, San Francisco, R. Paul Yetter, Yetter Coleman LLP, Houston, Robyn Bigelow Hargrove, Simona Agnolucci, Benedict Y. Hur, Steven James Wingard, Steve McConnico, Harris Mateen, Eduardo E. Santacana, James "Jim" Cole, Shelby Hart-Armstrong, Joshua Anderson, Bryan Lauer, for Appellant.

Warren Kenneth Paxton Jr., Judd Stone II, Lanora Pettit, Law Enforcement Defense Division, Austin, Julie Ann Nayar Searle, Joseph Mazzara, Marc Brian Collier, Joseph Graham Jr., for Appellee.

Before Chief Justice Tijerina and Justices Silva and Peña

**MEMORANDUM OPINION**

Memorandum Opinion by Chief Justice Tijerina

**\*1** This appeal is from the denial of a special appearance filed by appellant Google LLC. Appellee the State of Texas filed suit against appellant under the Texas Deceptive Trade Practices Act (DTPA) on its own behalf seeking civil penalties for alleged representations and omissions on

appellant's website and software that are accessible nationwide. *See* TEX. BUS. & COM. CODE ANN. § 17.41 et seq. By three issues, Google contends that the trial court erred in denying its special appearance because there is neither general nor specific jurisdiction in Texas, and traditional notions of fair play and substantial justice do not support the exercise of personal jurisdiction in Texas. We reverse and render.

## I. STANDARD OF REVIEW AND APPLICABLE LAW

Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000). A special appearance is a dilatory plea that challenges the trial court's subject-matter jurisdiction without regard to whether the asserted claims have merit. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Whether the trial court has personal jurisdiction over a defendant is a question of law. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Thus, we review the trial court's ruling on a special appearance *de novo*. *Id*. The trial court determines the special appearance by referring to the pleadings, any stipulations made by and between the parties, any affidavits and attachments filed by the parties, discovery, and any oral testimony. TEX. R. CIV. P. 120a(3). Because the question of a court's exercise of personal jurisdiction over a nonresident defendant is one of law, we review a trial court's determination of a special appearance *de novo*. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software Belg.,* 83 S.W.3d at 793.

Where, as here, the trial court does not issue findings of fact and conclusions of law, all facts necessary to support the judgment and supported by the evidence are implied, and we presume that the trial court resolved all factual disputes in favor of its ruling. *BMC Software Belg.,* 83 S.W.3d at 795; *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). These implied findings are not conclusive and may be challenged for legal and factual sufficiency if the appellate record includes the reporter's and clerk's records. *BMC Software Belg.,* 83 S.W.3d at 795.

Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moki Mac,* 221 S.W.3d at 574; *Gray, Ritter & Graham, PC v. Goldman Phipps PLLC,* 511 S.W.3d 639, 654 (Tex. App.—Corpus Christi–Edinburg 2015, pet. denied). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *BMC Software Belg.,* 83 S.W.3d at 795. The Texas long-arm statute sets out several activities that constitute "doing business" in Texas; however, the list

A-110

is not exclusive, and Texas's long-arm statute's "broad language extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.' " *Id.* (quoting ⚑*U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Therefore, "the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations." ⚑*CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996).

**\*2** Under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, a Texas court has personal jurisdiction over a nonresident defendant when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." ⚑*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); ⚑*BMC Software Belg.*, 83 S.W.3d at 795; *see* U.S. CONST. amend. XIV, § 1. "The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state." ⚑*Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

The plaintiff bears the initial burden of pleading "sufficient allegations to bring a nonresident defendant within the provisions of the [Texas] long-arm statute." ⚑*BMC Software Belg.*, 83 S.W.3d at 793. The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant doing business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045. Texas's long-arm statute provides:

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
>
> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

*Id.* § 17.042.

Once the plaintiff pleads sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute, the burden is on the defendant to challenge personal jurisdiction by filing a special appearance negating all bases of personal jurisdiction asserted by the plaintiff in its pleading. ⚑*Moki Mac*, 221 S.W.3d at 574; ⚑*BMC Software Belg.*, 83 S.W.3d

at 793; *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 628 (Tex. App.—Corpus Christi–Edinburg 2002, pet. dism'd w.o.j.).

The defendant's contacts with the forum state may establish either specific or general jurisdiction over the nonresident defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). General jurisdiction allows for the nonresident defendant to be sued in the forum state for all claims even if the claims are not related to the nonresident defendant's activities in that state. *BMC Software Belg.*, 83 S.W.3d at 796. In other words, the defendant is treated as if the defendant's contacts with the forum state have been so constant, the defendant has been essentially rendered "at home" in the forum state, which is the equivalent to the defendant either having a principal place of business in the forum state or being incorporated there. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 406 (2017); *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

Specific jurisdiction over the nonresident defendant is present if the defendant purposefully directed his activities at residents of Texas and the litigation arose from or related to those contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414; *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 227.

Even if the nonresident defendant has purposefully availed himself of personal jurisdiction in Texas, we must also conclude that the defendant's liability arises from or is substantially connected to those contacts. *See Burger King*, 471 U.S. at 472; *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414; *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 226. Thus, we review the substantial connection between the operative facts of the litigation based on the claims involved in the litigation and the defendant's contacts with Texas. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex. 2009).

## II. GENERAL JURISDICTION

**\*3** By its first issue, appellant contends that appellee failed to establish that it is "at home" in Texas; therefore, there is no evidence of general jurisdiction.

### A. Applicable Law

General or all-purpose personal jurisdiction requires that a defendant be "essentially at home" in the forum state. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (quotation marks omitted). "This kind of personal jurisdiction allows courts to render a binding judgment against a defendant even if the plaintiff's claims neither arise from activities conducted

A-112

in the forum state nor relate to the forum state or the defendant's activity there." *Id.* (cleaned up). Under general jurisdiction, the cause of action "may concern events and conduct anywhere in the world." *Id.* (quotation marks omitted).

Specific jurisdiction requires that the operative facts of the defendant's acts relate to the plaintiff's claims; general jurisdiction allows a defendant to be sued "on any and all claims against it, wherever in the world the claims may arise." *Daimler AG, 571 U.S. at 121*. In other words, under general jurisdiction, there is no need to tie the defendant's acts with the plaintiff's claims. *Id.* at 132 ("[A] corporation's 'continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.' "); *see also Grupo Mex. S.A.B. de C.V. v. Mt. McKinley Ins. Co. and Everest Reinsurance Co.*, No. 13-17-00134-CV, 2020 WL 486501, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 30, 2020, pet. denied) (mem. op.) ("General jurisdiction, on the other hand, does not require a nexus between the defendant's in-state contacts and the plaintiff's claim; instead, the focus is solely on the defendant's contacts with the forum."). We must only focus on the defendant's contacts with the forum state. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414; *see also Grupo Mex.*, 2020 WL 486501, at *4.

## B. Discussion

Appellant contends that it met its burden to negate general jurisdiction because "the undisputed facts confirm that this is not an exceptional case for general jurisdiction." Specifically, appellant argues that its "operations in Texas represent a small fraction of its operations across the country and across the world" because it employs 58,500 people in California and 169,000 people worldwide, while in contrast it has a total of 2,400 permanent employees in Texas. Appellant states that even considering its temporary employees, interns, advisers, vendors, and other miscellaneous employees which total approximately 5,500 employees in Texas, its number of employees in Texas is not enough to support a conclusion that appellant is "essentially at home" in Texas. In addition to tying appellant to Texas based on appellant's 5,500 Texas employees, appellee claims that general jurisdiction applies because appellant has one of its four data centers in Texas. [1] According to appellee, "Texas accounts for approximately 8.9%" of appellant's U.S. revenue and 4% of its worldwide revenue. Thus, appellee argues that general jurisdiction over appellant exists due the number of employees appellant has in Texas, the fact that appellant has one of four data centers in Texas, and 8.9% of appellant's revenue in the United States and 4% of its worldwide revenue is made in Texas.

**\*4** In *BNSF Ry.*, the United States Supreme Court stated that under general jurisdiction principles, its due process precedent under the Fourteenth Amendment does not support for "a State to hale an out-of-State corporation before its court when the corporation is not 'at home' in the State ...." 581 U.S. at 405–06. The Court explained that "[t]he 'paradigm' forums in which a corporate

A-113

defendant is 'at home' ... are the corporation's place of incorporation and its principal place of business." *Id.* at 413. However, only in an "exceptional case," the Court explained could "a corporate defendant's operations in another forum" be "so substantial and of such a nature as to render the corporation at home in that State." *Id.* The Court cited *Perkins v. Benguet Consol. Mining Co.*, as being one such exceptional case. 342 U.S. 437, 447–48 (1952). In that case, the corporation was forced by war "to temporarily relocate the enterprise from the Philippines to Ohio." *BNSF Ry.*, 581 U.S. at 413. Therefore, according to the United States Supreme Court, Ohio had general jurisdiction over the defendant corporation "[b]ecause Ohio then became 'the center of the corporation's wartime activities.' " *Id.* In *Daimler AG*, the United States Supreme Court clarified that it has "declined to stretch general jurisdiction beyond limits traditionally recognized" in *Perkins.* 571 U.S. at 132.

The *BNSF Ry.* Court emphasized that the defendant was not amenable to general jurisdiction because it had not been incorporated in the forum State and did not maintain a principal place of business there. *BNSF Ry.*, 581 U.S. at 414. The Court noted that the defendant corporation, BNSF, had over 2,000 miles of railroad track and more than 2,000 employees in the forum state; however, general jurisdiction analysis "does not focus solely on the magnitude of the defendant's in-state contacts." *Id.* The activities of the defendant must amount to having its principal place of business in the forum state. *See id.*

Here, it is undisputed that appellant is not incorporated in Texas and does not maintain a principal place of business there. *See id.* at 413. "Those affiliations have the virtue of being unique— that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG,* 571 U.S. at 137. Additionally, allegations that the defendant maintains in-state business alone does not suffice to subject a corporation to general jurisdiction. *See id.* at 137–38. The United States Supreme Court rejected the argument that a State has general jurisdiction over that defendant because the defendant conducts some business in that state. *See id.* The Court stated, "Plaintiffs would have us look beyond the exemplar bases [such as having a principal place of business in the state or being incorporated in the states as] *Goodyear* identified, and [instead] approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business' "; however, "[t]hat formulation ... is unacceptably grasping." *Id.* (discussing *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919, 924 (2011)).

The United States Supreme Court explained that "the words 'continuous and systematic' were used in *International Shoe* to describe situations in which the exercise of specific jurisdiction would be appropriate." *Id.* at 138. Instead, the proper question in a general jurisdiction analysis is: "whether [a foreign] corporation's 'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.' " *Id.* at 138–39 (internal quotations omitted).

In *Perkins*, the defendant admittedly and indisputably moved its principal place of business to Ohio; that is not the case here. *See id.*; *see also* *BNSF Ry.*, 581 U.S. at 413; *Daimler AG*, 571 U.S. at 132 (setting out that "the placement of a product into the stream of commerce 'may bolster an affiliation germane to *specific* jurisdiction,' " but "such contacts 'do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant' "). Appellant has not temporarily relocated its business to Texas, and we find no authority supporting a conclusion that it is sufficient to find general jurisdiction based merely on appellant conducting the amount of business it performs in Texas or employing its number of employees in Texas. Thus, we are not persuaded that appellant's contacts with Texas are sufficient to find under guiding precedent that appellant is "essentially at home" in Texas. *See* *BNSF Ry.*, 581 U.S. at 413; *see also* *Daimler AG*, 571 U.S. at 129 (explaining that *Perkins* "remains the textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum") (internal quotations omitted). To subject appellant to general jurisdiction in Texas, would allow that appellant "be sued on any and all claims against it [in Texas], wherever in the world the claims may [have] arise[n]" because its business in Texas equates with it having its principal place of business in Texas. *See* *Daimler AG*, 571 U.S. at 121. The crux of *Perkins*, according to the United States Supreme Court, is that Ohio, the forum state, had become "the corporation's principal, if temporary, place of business.' " *Daimler AG*, 571 U.S. at 130 (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780, n.11 (1984)). Here, that is not the case; it is undisputed that appellant has not made Texas its temporary principal place of business and appellee has not made such a claim. Furthermore, we are without authority to support a conclusion that appellant's business dealings as previously set out above in Texas have in essence made Texas its principal place of business. *See id.* We agree with appellant that general jurisdiction requires that the out-of-state corporate defendant's in-state activities be equivalent to the defendant incorporating or establishing a principal place of business in the forum that is rendering them "essentially home in the forum state." *See* *Goodyear*, 564 U.S. at 919, 924; *Volkswagen*, 669 S.W.3d at 412; *see also* *Grupo Mex.*, 2020 WL 486501, at *4. The small percentage of business that appellant performs in Texas as alleged by appellee does not even amount to substantial, continuous, and systematic contacts, but even if it does, the United States Supreme Court has disavowed that rubric as the proper measure of analyzing general jurisdiction. *See* *Goodyear*, 564 U.S. at 919, 924; *Volkswagen*, 669 S.W.3d at 412; *see also* *Grupo Mex.*, 2020 WL 486501, at *4. Instead, general jurisdiction analysis "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *See* *Daimler AG*, 571 U.S. at 139 n.20. From our appraisal of the record before us, appellant's activity in Texas compared with its nationwide and worldwide activity does not support a conclusion that appellant has made Texas its home. *See id.* Appellee's allegations are insufficient to meet its initial burden. Moreover, without more, these allegations effectively negate the trial court's general jurisdiction. Appellant cannot be "essentially at home" in every foreign

jurisdiction where it operates. *See* *BNSF Rye.*, 581 U.S. at 413; *Daimler AG*, 571 U.S. at 139 & n.20; *Goodyear*, 564 U.S. at 919; *Perkins*, 342 U.S. at 447–48; *see also* *Grupo Mex.*, 2020 WL 486501, at *6.

**\*5** Therefore, we conclude that appellant negated general jurisdiction in Texas under these facts and that the trial court should have granted its special appearance on general jurisdiction grounds. *See* *Daimler AG*, 571 U.S. at 132 ("[A] corporation's 'continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.' "). We sustain appellant's first issue. [2]

## III. SPECIFIC JURISDICTION

By its second issue, appellant contends that in its petition, appellee did not allege facts supporting a conclusion that Texas has specific jurisdiction over appellant and that it negated specific jurisdiction. Specifically, appellant argues that its contacts do not amount to purposeful availment and no substantial connection exists between its contacts with Texas and the operative facts of the litigation.

### A. Applicable Law

Specific personal jurisdiction focuses on the defendant's connections with the state and its relationship to the plaintiff's claims. *See* *Volkswagen*, 669 S.W.3d at 412. In our specific-jurisdiction analysis we measure the two co-equal components of relatedness and purposeful availment. *Moki Mac*, 221 S.W.3d at 579. The relatedness inquiry defines "the appropriate 'nexus between the nonresident defendant, the litigation, and the forum.' " *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 14 (Tex. 2021) (quoting *Moki Mac*, 221 S.W.3d at 579). "[T]he exercise of specific jurisdiction is prohibited if 'the suit' does not 'arise out of or relate to the defendant's contacts with the forum.' " *Id.* (alterations omitted). Thus, the lawsuit must arise from or relate to " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 9 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

"The 'touchstone of jurisdictional due process [is] 'purposeful availment.' " *Id.* The defendant's act in the forum state must amount to it purposefully availing " 'itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). A defendant that has " 'deliberately' engaged in significant activities within a state," has "manifestly ... availed himself of the privilege

of conducting business there." *Id.* (quoting ⚑*Burger King*, 471 U.S. at 475–76 (cleaned up)). Therefore, because the defendant has availed itself of the " 'benefits and protections' of the forum's laws, it is 'presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.' " *Id.*

**\*6** Whether the defendant has had minimum contacts with the forum state depends solely on the defendant's acts within that state. *Id.* Additionally, "fortuitous" or "attenuated" contacts cannot "be relied upon to satisfy the requirements of due process." *Id.* "Rather, whether due process is satisfied depends upon 'the quality and nature of the activity in relation to the fair and orderly administration of the laws.' " *Id.* (quoting ⚑*Int'l Shoe*, 326 U.S. at 319).

Even when a defendant has had purposeful contacts with the forum states, "the exercise of specific jurisdiction is prohibited if 'the *suit*' does not aris[e] out of or relat[e] to the defendant's contacts with the forum." *Id.* at 14. This relatedness doctrine requires a nexus between the defendant's contacts and the litigation and the forum. *Id.* There must be a "substantial connection" between the operative facts of the litigation and the defendant's contacts with the state. *Id.* In other words, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.' " *Id.*

## B. Relatedness
Appellant argues that we should begin our analysis of specific jurisdiction by examining the relatedness doctrine first. Appellant states, that appellee's "live petition identifies various general business contacts that Google has with Texas, which are insufficient to be 'at home' in the state and also wholly unrelated to this case." Appellant claims that "[e]ven a 'flood' of purposeful contacts with a forum state is irrelevant if 'the *suit*' does not 'arise out of or relate to the defendant's contacts with the *forum*.' " Because we agree with appellant, we will first analyze whether the contacts as alleged by appellee are related to the operative facts and the State of Texas. *See id.*

### 1. The Allegations
Appellee sued appellant pursuant to the DTPA. Appellee alleged that appellant

> has become one of the richest companies in the world, in part, by deceiving Texans and profiting off their confusion. Specifically, [appellant] has systematically misled, deceived, and withheld material facts from users in Texas about how and why their behavior is tracked and how to stop [appellant] from monetizing their personal data. As relevant to this Petition, [appellant]'s

A-117

deceptive practices fall into two closely related buckets: tracking location history and tracking private-browsing activity.

Appellee accused appellant of deceiving Texas residents into believing that users can disable location tracking. In addition, appellee accused appellant of collecting Texas users browsing history, even when the users believe that they are not being tracked by appellant because appellant claims that its users can go incognito, which appellee claims is a sham. According to appellee, appellant lies about how it tracks and collects data about its Texas users, and Texas residents are unaware of this deception. Appellee avers that appellant's deception to Texas users is motivated by appellant's desire for more profits from the information it gathers unbeknownst to its users. Appellee alleged that appellant misleads Texas users through both misrepresentations and omissions.

Appellee stated that appellant does the following:

[(1)] uses its window into millions of Texans' personal lives to sell "targeted" advertising designed to exert the maximum influence over those users. In so doing, the Company has reaped spectacular gains at the expense of Texans' privacy. Indeed, [appellant] has generated hundreds of millions—if not billions—of dollars of advertising revenues from ads presented to users in Texas alone.

**\*7** ....

[(2)] has caused and will cause adverse effects to consumers in Texas, to legitimate business enterprises which lawfully conduct trade and commerce in this state, and to the State of Texas. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas is of the opinion that these proceedings are in the public interest.

### 2. Discussion

To prevail, appellee must show that there is a "substantial connection" between appellant's contacts and the operative facts of the litigation." *Id*. If the focus of the trial involves facts that occur outside of the forum state, then the operative facts are not sufficiently related. *Moki Mac*, 221 S.W.3d at 585. Thus, if the events that took place outside of Texas would "consume most if not all of the litigation's attention" and "the overwhelming majority of the evidence [would] be directed" at events outside of Texas, then the contacts are not sufficiently related to the litigation's operative facts. *Id*. "[A] nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157 (Tex. 2013). In

A-118

our analysis of the relatedness doctrine, we consider what the principal complaint involves. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 53 (Tex. 2016).

Appellees do not specifically plead allegations that the operative facts of the litigation are related to appellant's contacts with Texas. *See Luciano*, 625 S.W.3d at 8 (the plaintiff bears the initial burden to plead allegations sufficient to confer jurisdiction). Nonetheless, the evidence shows that appellant's alleged contacts with Texas were made by appellant's employees who were not in Texas. Appellee has not alleged that any of appellant's Texas employees made the misleading statements. Thus, the evidence shows that appellant's employees directed the alleged misleading statements from afar, which is insufficient to confer specific jurisdiction. *See Moncrief Oil Int'l Inc.*, 414 S.W.3d at 157. The principal complaint that the terms of service and disclosures made by appellant were misleading requires that the overwhelming evidence be directed at events outside of Texas. [3] *Id.* Stated differently, appellee has not identified an "activity or occurrence ... that takes place in" Texas. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (cleaned up). Accordingly, we cannot conclude that appellee met its initial burden to show that appellant's allegedly tortious conduct occurring outside of Texas is sufficient to confer specific jurisdiction over appellant. *See Moncrief Oil Int'l Inc.*, 414 S.W.3d at 157; *see also Ford Motor Co.*, 592 U.S. at 362 n.3 (rejecting the "view that a state court should have jurisdiction over a nationwide corporation ... on *any* claim, no matter how unrelated to the State or [the corporation's] activities there" and explaining that "[r]emoving the need for any connection between the case and forum State would transfigure our specific jurisdiction standard as applied to corporations"). We sustain appellant's second issue.

## IV. CONCLUSION

**\*8** The trial court's order denying the special appearance is reversed and judgment is rendered dismissing all of appellee's claims against appellant for want of personal jurisdiction.

**All Citations**

Not Reported in S.W. Rptr., 2025 WL 52611

## Footnotes

1   According to appellee, appellant has 250 employees at the Texas data center.

In its response to appellant's special appearance, appellee lists all properties owned by appellant as evidence that general jurisdiction applies. Specifically, appellee lists the following:

- 800,000 square feet in the 35-floor Google Tower (Austin)

- The top 10 floors of the 500 West 2nd building (Austin)

- 150,000 square feet across all seven floors of a Saltillo building (Austin)

- 11,000 square feet in the One Buffalo Heights building (Houston)

- At least one office in Dallas, Texas (Dallas)

- A $600 million data center (Midlothian)

- A planned $600 million data center (Red Oak)

- A Google Fiber Kiosk (San Antonio)

- Additional Google offices (Addison)

However, as set out by the United States Supreme Court, we must appraise appellant's contacts in Texas by comparing them with appellant's nationwide and worldwide business. *See* *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014). And here there is no evidence that appellant's contacts in Texas are the same, equal to, or greater than its worldwide and nationwide contacts as to render Texas its principal place of business.

In *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021), the product that the defendant marketed in the forum state caused injury in that state. *See id.* The *Ford* court explained that the allegations that the products caused the plaintiffs' injuries in the forum state was related to Ford's activities of selling its products in the forum states and emphasized that the ads in the local media and instate activities possibly caused the plaintiffs to purchase the vehicles. *Id.* at 367. Thus, the operative facts of the litigation regarding the plaintiff's injuries occurring in the forum states were related to Ford's activities in the forum states. *See id.* Here, appellee has not alleged that the product itself caused the injury. Instead, appellee asserts that appellant's employees who were not in Texas caused the complained-of injuries while not in Texas. Thus, the operative facts all occurred outside of Texas, and we cannot conclude that under these facts, *Ford* applies. *See* *id.* at 366 ("That is why this Court has used this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, *for an in-state accident*) as an illustration —even a paradigm example—of how specific jurisdiction works." (emphasis added)).

A-120

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A-121

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

William Wittliff on behalf of William Wittliff
Bar No. 00791951
reid@wittliffcutter.com
Envelope ID: 103952501
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellee Arity 875, LLC and Appendix
Status as of 8/4/2025 4:35 PM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Rick Berlin | | Rick.Berlin@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Daniel Zwart | | Daniel.Zwart@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Kaylie Buettner | | Kaylie.Buettner@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Meredith Spillane | | Meredith.Spillane@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Zeilic Contreras | | Zeilic.Contreras@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Carlos Fernandez | | Carlos.Fernandez@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |
| Richard RMcCutcheon | | richard.mccutcheon@oag.texas.gov | 8/4/2025 4:15:52 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jonathan Hung | | johung@winston.com | 8/4/2025 4:15:52 PM | SENT |
| Eric Shinabarger | | EShinabarger@winston.com | 8/4/2025 4:15:52 PM | SENT |
| W. Reid Wittliff | | reid@wittliffcutter.com | 8/4/2025 4:15:52 PM | SENT |
| Jake Sommer | | jake@zwillgen.com | 8/4/2025 4:15:52 PM | SENT |
| Kelsey Harclerode | | kelsey@zwillgen.com | 8/4/2025 4:15:52 PM | SENT |
| Sudhir V. Rao | | sudhir.rao@zwillgen.com | 8/4/2025 4:15:52 PM | SENT |
| Sean Wieber | | swieber@winston.com | 8/4/2025 4:15:52 PM | SENT |
| Kevin Simpson | | kpsimpson@winston.com | 8/4/2025 4:15:52 PM | SENT |